## NO. 24-1761

# United States Court of Appeals
### *for the*
# Fourth Circuit

In re: ROCK SPRINGS DRIVE, LLC

*Petitioner*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## RESPONDENT'S APPENDIX

## VOLUME ONE (Pages 1-233)

WILLIAM M. BOSCH
DEBORAH B. BAUM
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW Washington
DC 20036
(202) 663-8000
william.bosch@pillsburylaw.com
deborah.baum@pillsburylaw.com

JEFFREY P. METZLER
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
(212) 858-1000
jeffrey.metzler@pillsburylaw.com

*Attorneys for Respondent*

# TABLE OF CONTENTS

**Volume One**

Memorandum Order (ECF No. 386) Filed Feb. 21, 2024 ...................................... R.A.002

Letter from Rock Springs Drive, LLC to Rock Spring Plaza II, LLC
(ECF No. 435.34) Filed June 13, 2019 ......................................................... R.A.002

Rock Spring Plaza II, LLC's Motion in Limine (ECF No. 474)
Filed July 22, 2024 ....................................................................................... R.A.005

    Exhibit 9: D. Feltman Deposition Transcript Excerpts .................................. R.A.037

    Exhibit 10: R. Barron Depostion Transcript Excerpts ................................... R.A.058

    Exhibit 11: RSD Operating Agreement .......................................................... R.A.067

    Exhibit 12: 6560 Term Sheet .......................................................................... R.A.121

    Exhibit 13: T. Taylor Deposition Transcript Excerpts ................................... R.A.128

    Exhibit 14: Letter from AURA to W. Bosch Aug. 31, 2017 ........................... R.A.147

    Exhibit 15: Email Rubin to Van Gorp July 17, 2019 ..................................... R.A.150

    Exhibit 16: P. Rubin Deposition Trancript Excerpts ...................................... R.A.152

    Exhibit 18: Letter Plaza to Barron Sept. 29, 2017 ......................................... R.A.157

    Exhibit 19: Letter Plaza to Barron Feb. 22, 2018 .......................................... R.A.159

    Exhibit 20: Letter Barron to Plaza March 30, 2018 ....................................... R.A.162

    Exhibit 21: RSD Registration Information ..................................................... R.A.167

Order Vacating ECF No. 405 (ECF No. 487) Filed July 23, 2024 ......................... R.A.169

Rock Spring Plaza II, LLC's Response to Defendant's Motion in Limine to Exclude
Information Protected by the Attorney-Client Privilege and Work Product
Doctrine (ECF No. 497) Filed July 29, 2024 ............................................... R.A.170

    Exhibit A: R. Barron Deposition Transcript Excerpts ................................... R.A.182

Pretrial Conference Transcript Excerpts, Aug. 8, 2024 ........................................... R.A.195

T. Taylor Deposition Transcript Excerpt .................................................................. R.A.230

**Volume Two (Sealed)**

Rock Spring Plaza II, LLC's Motion in Limine (ECF No. 474)
Filed July 22, 2024 ...........................................................................R.A.234

Sealed Exhibit 7: Email N. Hutchinson to D. Wirtjes, J. Gilmore, and M. Pithan
July 7, 2016..........................................................................R.A.266

Sealed Exhibit 17: IWA Balance Sheet....................................................R.A.270

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

PETER J. MESSITTE                                               6500 CHERRYWOOD LANE
UNITED STATES DISTRICT JUDGE                              GREENBELT, MARYLAND 20770
                                                                          301-344-0632

**MEMORANDUM**

TO:        Counsel of Record

FROM:      Judge Peter J. Messitte

RE:        Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC, et al.
           No. 20-cv-1502

DATE:      February 21, 2024

                            * * *

The Court has learned that the U.S. Court of Appeals for the Fourth Circuit recently granted in part and denied in part Investors Warranty of America, LLC ("IWA")'s petition for mandamus. The Fourth Circuit order grants the petition insofar as this Court is directed to "vacate its Production Order" but denies IWA's "request for an order directing the district court to maintain certain information under seal and to reassign the case upon remand." Doc. No. 34, *In re: Investors Warranty of America, LLC*, No. 23-1928 (4th Cir. Feb. 21, 2024).

Aside from vacating the Production Order, the Fourth Circuit's order is ambiguous as to precisely what next steps this Court should take.

Accordingly, the Court **SCHEDULES** a telephone conference with counsel for the parties to discuss the Fourth Circuit's decision tomorrow, February 22, 2024, at 2:30 p.m.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

                                         Peter J. Messitte
                                    United States District Judge

CC:        Court file
           Counsel of Record

**R.A.001**

Exhibit 32

# BERGER SINGERMAN

Robert W. Barron
(954) 712-5145
RBarron@bergersingerman.com

June 13, 2019

**VIA FEDERAL EXPRESS**

William M. Bosch, Esq.
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

> Re:  Amended and Restated Ground Lease Indenture dated November 14, 1990 (the
> "Ground Lease") between Anne D. Camalier ("Landlord") and Rock Springs
> Drive, LLC, a Maryland limited liability company, assignee of Investors Warranty
> of America, LLC ("Tenant")

Dear Mr. Bosch:

I received your letter dated June 6, 2019 (the "Letter") with respect to the Ground Lease and the building constructed on the Premises (as defined in the Ground Lease) (the "Property").

Tenant disagrees with your suggestion that no commercial activity is occurring with respect to the Property.  The manager of the Managing Member of Tenant is a nationally recognized restructuring professional in the commercial real estate industry.  Tenant has worked with CBRE, Inc. and other brokers to seek prospective subtenants for the Property.

Tenant is very familiar with GSA Request for Lease Proposals No. 5MD0220 (the "GSA RLP").  In connection with such GSA RLP, Tenant engaged CBRE, Inc. and Interplan Architects and expended significant funds to prepare and submit to the GSA a request for lease proposal with the necessary architectural plans prepared by Interplan Architects in order to file a written response to the GSA RLP.   In connection with the preparation of such proposal, Tenant estimated that the necessary tenant improvement allowance and related lease costs (including brokerage commissions) which would be payable by Tenant if the GSA selected the Property for a sublease transaction would be approximately $17 million.

The GSA received Tenant's request for lease proposal and responded with a customary "deficiency letter" seeking additional information from Tenant with respect to such lease proposal.  However, based upon (i) the proposed rental rates for the GSA space which were suggested to Tenant by outside advisors, (ii) the $17 million capital requirement for the GSA RLP transaction, (iii) the difficulty of financing such amount under the current Ground Lease economic structure

**R.A.003**

Camalier0004025

William M. Bosch, Esq.
June 13, 2019
Page 2

and (iv) the existing rental obligations under the Ground Lease, Tenant determined that the GSA RLP opportunity was not a financially viable option for the Tenant.

Accordingly, Tenant continues to seek one or more subtenants to sublease the Property upon financially viable terms.

If your Letter is suggesting that Landlord is willing to restructure the entire rental obligations under the Ground Lease and/or provide financing upon acceptable terms for the tenant improvement capital requirements required for prospective subleases of the Property, then, Tenant would be interested in pursuing discussions with Landlord with respect to the possible terms of such restructuring and financing.

With respect to various comments in your letter, Tenant has not abandoned the Property, Tenant retains and deploys maintenance personnel Monday through Friday (and on call during other time periods) with respect to the Property and Tenant believes the Property is being properly maintained.

We note that your letter did not allege the occurrence of any default under the Ground Lease and we respectfully dispute your vague suggestion that a default somehow may exist under the Ground Lease. Tenant reserves all of its rights and remedies under the Ground Lease, at law, in equity and by statute.

Sincerely,

Berger Singerman LLP

Robert W. Barron

9157515-2

BERGER SINGERMAN

Camalier0004026

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROCK SPRING PLAZA II, LLC

              Plaintiff,

     v.                               Civil Action No. 8:20-cv-01502-PJM

INVESTORS WARRANTY OF AMERICA,
LLC, et al.,

              Defendants.

**PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTIONS *IN LIMINE***

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................. 3

     A.  Factual Background ................................................................................. 3

     B.  Plaza's Claims ........................................................................................ 6

     C.  Procedural History .................................................................................. 7

III. LEGAL STANDARDS ................................................................................... 9

     A.  Motions *in Limine* .................................................................................. 9

     B.  Admissibility: Relevance, Prejudice, and Confusion ........................... 10

IV.  PLAZA'S MOTIONS *IN LIMINE* ................................................................. 11

     A.  The Court Should Exclude All Evidence or Argument Concerning the Original Tenant, the Loan, and the Original Tenant's Default. ................................................. 11

     B.  The Court Should Exclude Any Argument Concerning the Negotiation or the Intent of the Estoppel Agreement. ............................................................................ 16

     C.  Defendants Should be Precluded from Making Blanket References to the Entire "Camalier Family" or Referring to Plaza or the Original Tenant as a "Camalier Family Company." ............................................................................................. 19

     D.  The Court Should Exclude Any Evidence or Argument that Members of the Camalier Family or Entities In Which the Camaliers Have an Interest Were "On Both Sides" of the Ground Lease, or that the Terms of the Ground Lease are Favorable to Tenants as a Result. ................................................................................................... 20

     E.  The Court Should Exclude Any Reference to the Wealth or Other Business Activities of the Camalier Family, Including Other Properties in Which the Camalier Family Has an Interest. ................................................................................................... 21

     F.  The Court Should Exclude Reference to Previous Disputes Between Related Parties and their Counsel. ...................................................................................... 22

     G.  The Court Should Exclude Any Evidence or Argument Describing Plaza or its Counsel as "Litigious" or "Aggressive." ..................................................................... 23

V.   CONCLUSION ............................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Adams v. NVR Homes, Inc.*,
141 F. Supp. 2d 554 (D. Md. 2001) ........................................................... 10

*Al-Sabah v. Agbodjogbe*,
2019 WL 6498049 (D. Md. Dec. 3, 2019) ................................................... 9

*Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*,
99 F. Supp. 2d 665 (D. Md. 2000) ...................................................... 11, 15

*Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*,
652 F. Supp. 1400 (D. Md. 1987) .............................................................. 10

*Daskarolis v. Firestone Tire & Rubber Co.*,
651 F.2d 937 (4th Cir. 1981) .................................................................... 11

*Dorman v. Annapolis OB-GYN Assocs., P.A.*,
781 F. App'x 136 (4th Cir. 2019) .............................................................. 23

*EEOC v. Proctor Fin., Inc.*,
644 F. Supp. 3d 400 (E.D. Mich. 2022) ..................................................... 24

*Fulton v. Nisbet*,
2018 WL 565265 (D.S.C. Jan. 25, 2018) .............................................. 14, 18

*Gaiser v. Am.'s Floor Source*,
2021 WL 5354702 (S.D. Ohio Nov. 17, 2021) ........................................... 22

*In re C.R. Bard, Inc., MDL, Pelvic Repair Sys. Prod. Liab. Litig.*,
810 F.3d 913 (4th Cir. 2016) .................................................................... 18

*In re Smith & Nephew Birmingham HIP Resurfacing HIP Implant Prod. Liab. Litig.*,
2021 WL 2685642 (D. Md. June 29, 2021) ................................................ 23

*Innovation Ventures, LLC v. N2G Distrib. Inc.*,
763 F.3d 524 (6th Cir. 2014) .................................................................... 24

*Kauffman v. Park Place Hospitality Grp.*,
468 F. App'x 220 (4th Cir. 2012) .............................................................. 10

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013) ................................................................ 9, 10

ii

**R.A.007**

*Luce v. United States*,
    469 U.S. 38 (1984) ........................................................................................ 9

*McEwen v. City of Norman, Okl.*,
    926 F.2d 1539 (10th Cir. 1991) ................................................................. 10

*Mullen v. Princess Anne Volunteer Fire Co., Inc.*,
    853 F.2d 1130 (4th Cir.1988) ..................................................................... 15

*Muse v. Supervalu Inc.*,
    2011 WL 1980607 (D. Md. May 20, 2011) ................................................ 14

*Nelson v. City of Chicago*,
    810 F.3d 1061 (7th Cir. 2016) .................................................................... 24

*Old Chief v. United States*,
    519 U.S. 172 (1997) .................................................................................... 11

*Prassas Cap., LLC v. Blue Sphere Corp.*,
    2019 WL 2881560 (W.D.N.C. July 3, 2019) ........................................ 21, 22

*Stalnaker v. City of Charleston, W.Va.*,
    934 F.2d 320 (4th Cir. 1991) ...................................................................... 14

*United States v. Bailey*,
    840 F.3d 99 (3d Cir. 2016) .......................................................................... 11

*United States v. Boros*,
    668 F.3d 901 (7th Cir. 2012) ...................................................................... 11

*United States v. Forrest*,
    429 F.3d 73 (4th Cir. 2005) ........................................................................ 11

*United States v. Gondres-Medrano*,
    3 F.4th 708 (4th Cir. 2021) ......................................................................... 10

*United States v. Mosby*,
    2024 WL 96349 (D. Md. Jan. 9, 2024) ...................................................... 22

*United States v. Vargas*,
    552 F.3d 550 (7th Cir. 2008) ...................................................................... 11

*Westmoreland v. Prince George's Cnty.*,
    2013 WL 12246630 (D. Md. Apr. 5, 2013) ............................................... 13

<u>Statutes</u>

Md. Code Ann., Com. Law § 15-207 ................................................................... 6

iii

**R.A.008**

Md. Code Ann., Cts. & Jud. Proc. § 3-406 ................................................................ 7

<u>Rules</u>

Fed. R. Evid. 401 ......................................................................... 10, 14, 21,,22

Fed. R. Evid. 402 ............................................................................... 10, 14

Fed. R. Evid. 403 ...................................................................... 10, 11, 14, 15, 18

## INDEX OF EXHIBITS

| Exhibit Number | Exhibit Name |
|---|---|
| Exhibit 1 | Hearing Transcript, Feb. 16, 2023 |
| Exhibit 2 | Ground Lease |
| Exhibit 3 | Assignment of Amended and Restated Leasehold Deed of Trust |
| Exhibit 4 | Stamped and Recorded Estoppel Agreement |
| Exhibit 5 | Trustee's Deed of Assignment |
| Exhibit 6 | IWA Value Consultation, Dec. 19, 2011 |
| Exhibit 7 | Email from Neal Hutchinson to Dale Wirtjes, Jul. 7-8, 2016 |
| Exhibit 8 | Email from Nick Koluch to David Feltman, Jan.3-4, 2017 |
| Exhibit 9 | David Feltman Deposition Transcripts, March 16-17, 2023 |
| Exhibit 10 | Robert Barron Deposition Transcript, Apr. 14, 2023 |
| Exhibit 11 | RSD Operating Agreement |
| Exhibit 12 | 6560 Rock Springs Drive Term Sheet |
| Exhibit 13 | Troy Taylor Deposition Transcript, Apr. 6, 2023 |
| Exhibit 14 | Letter from IWA to Plaza, Aug. 31, 2017 |
| Exhibit 15 | Email from Paul Rubin to Greg Van Gorp and Troy Taylor, July 17, 2019 |
| Exhibit 16 | Paul Rubin Deposition Transcript, Apr. 7, 2023 |
| Exhibit 17 | IWA Balance Sheet, Sept. 30, 2012 |
| Exhibit 18 | Letter from Plaza to RSD, Sept. 29, 2017 |
| Exhibit 19 | Letter from Plaza to RSD, Feb. 22, 2018 |
| Exhibit 20 | Letter from RSD to Plaza, Mar. 30, 2018 |
| Exhibit 21 | RSD Registration Information |
| Exhibit 22 | Hearing Transcript, Dec. 1, 2020 |

Exhibit 23            30(b)(6) Deposition of Rock Springs Plaza II, LLC (C. Camalier)
                     Transcript, Mar. 21, 2023

Exhibit 24            Hearing Transcript, Jul. 18, 2024

Exhibit 25            Notification of Loan Status Change

vi

**R.A.011**

## <u>PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTIONS *IN LIMINE*</u>

Plaintiff Rock Spring Plaza II, LLC ("Plaza") submits these motions *in limine* to preclude Defendants Investors Warranty of America, LLC ("IWA") and Rock Spring Drive, LLC ("RSD") from referencing certain matters before the jury and to exclude certain categories of evidence at trial.

## I.   INTRODUCTION

This case concerns a ground lease (the "Ground Lease") for the property located at 6560 Rock Springs Drive, Bethesda, Maryland (the "Property"). IWA acquired the tenant's interest in the Ground Lease (the "Leasehold Estate") in 2012. Five years later, IWA determined that its investment in the Leasehold Estate had become "worthless" and that it needed an "exit strategy" to escape its long-term financial liabilities to the landlord. After trying but quickly failing to sell the Leasehold Estate to a bona fide third-party purchaser, IWA decided instead to create a sham entity (RSD) that IWA would own and control and assigned the Leasehold Estate to that new sham entity (the "Assignment"). IWA planned for RSD to wait until after the three-year statute of limitations for fraudulent conveyance claims had run and then strategically default on the Ground Lease so that IWA could walk away from its obligations under the Ground Lease scot-free.

Before the statute of limitations ran, however, Plaza sued to invalidate the sham assignment, alleging that it was a fraudulent conveyance and, in the alternative, that it should be voided under contract theories (including breach of the implied duties of good faith and fair dealing). Plaza also alleged claims for corporate veil-piercing and alter-ego.

The resulting litigation has lasted more than four years and has been hotly contested at every turn. Along the way, the Court determined that several ancillary topics about which Defendants sought discovery were irrelevant and therefore could not be the subject of discovery – including a previous tenant's loan arrangements and default on that loan that occurred several years

1

**R.A.012**

before the Assignment and the business activities of the family that owns the Property (the Camalier family). Despite the Court's determination that these issues are irrelevant, Defendants have continued to place them at the center of their case, including on summary judgment, advancing a narrative that looks back in time nearly a decade before the Assignment and focuses on irrelevant collateral issues such as the circumstances surrounding the creation of the Ground Lease and the default of an entity that is not a party to this case.

Allowing Defendants to go into these irrelevant topics would unfairly prejudice Plaza and confuse the jury by suggesting that allowing a foreclosure and creating a structure to avoid liability are similar. It would also distract the jury from the relevant issues and potentially bias the jury against Plaza. Finally, it would waste time and resources on evidence and argument that have no bearing on Plaza's claims or Defendants' remaining defenses.

Motions *in limine* are designed to help focus trial on the relevant issues. Given Defendants' continual reference to irrelevant issues designed to muddy the issues and make Plaza appear culpable, narrowing the topics that can be discussed at trial is especially warranted in this case. Ultimately, this case, in the words of the Court, concerns "whether the assignment was appropriate or not." Ex. 1, Feb. 16, 2023, Hr'g Tr. 160:1-2. The Court should grant Plaza's motions *in limine* to ensure that the trial remains focused on what is relevant to this central question.[1]

---

[1] Plaza files these motions *in limine*, in accordance with the Court's schedule for the parties to file pretrial motions (*See* ECF No. 461, Jul. 9, 2024, Order at 1), before receiving Defendants' proposed statement of facts for the pretrial order, witness list, exhibit list, or deposition designations. Plaza therefore reserves the right to modify these motions *in limine* or file additional motions *in limine* after reviewing Defendants' disclosures related to the pretrial order.

## II.    BACKGROUND

### A.    Factual Background

On November 14, 1990, Plaza's predecessor-in-interest entered into a 99-year ground lease with Rock Spring II LP ("Original Tenant"). Ex. 2, Ground Lease. A few years later, the Original Tenant borrowed $30 million (the "Loan") using the Leasehold Estate as collateral. After the Original Tenant defaulted on the Loan, IWA acquired the lender's position under the loan documents by assignment. Ex. 3, Assignment of Amended and Restated Leasehold Deed of Trust.

At that point, IWA had a decision to make. It had the right to walk away from the matter entirely, in which case it would have no rights and no obligations under the Ground Lease. Or IWA could acquire the tenant's rights and obligations under the Ground Lease. IWA, after conducting extensive due diligence, choose the latter course and made a considered investment decision to take title to the Leasehold Estate in a foreclosure sale in 2012. Ex. 4, Stamped and Recorded Estoppel Agreement; Ex. 5, Trustee's Deed of Assignment. IWA was aware that the office building on the Property was not generating income and that, as tenant, in exchange for the right to lease the Property to new tenants, it would be responsible for the financial obligations (in particular, ground rent payments) for the remaining 67 years on the Ground Lease. Ex. 6, IWA Value Consultation.

However, by July 2016, years after IWA made its decision to take title to the Leasehold Estate, IWA's parent company, Transamerica, determined that the Property was "worthless" and asked IWA "is there any exit strategy on this to get it off the books[?] Is it even possible to just walk away from the agreement?" Ex. 7, Email from Neal Hutchinson to Dale Wirtjes, Jill Gilmore, and Matt Pithan, Jul. 7, 2016. IWA's asset management team, led by IWA's corporate representative, David Feltman, "engaged outside counsel to explore an exit which would stop the

monthly losses and any future liability." Ex. 8, Email from Neal Hutchinson to Dale Wirtjes, Jill Gilmore, and Matt Pithan, July 7, 2016.

IWA initially tried to sell the Ground Lease to a bona fide third party. Ex. 8, Email N. Koluch to D. Feltman, Jan. 3-4, 2017; Ex. 9, Feltman Dep. Tr., 307:18-308:4. After one attempt failed, the "exit strategy" IWA devised "to stop future liability under the ground lease" (Ex. 9, Feltman Dep. Tr. 247:9-10) was to assign the Ground Lease to a sham entity that IWA would create and control and that would strategically default on the Ground Lease in three years, just after the statute of limitations for fraudulent conveyance claims would have expired. Ex. 9, Feltman Dep. Tr. 185:3-186:15; 247:9-10; 360:16-363:15; Ex. 10, Barron Dep. 64:2-66:12. That sham entity is RSD.

IWA retained a 98% interest in RSD and recruited restructuring experts, Troy Taylor and Paul Rubin of Algon Group, acting through a special purpose entity (SPE), Longshore Ventures LLC ("Longshore" or the "Algon Member"), to hold the remaining 2% interest. Ex. 11, RSD Operating Agreement; Ex. 12, Term Sheet. Longshore paid nothing for its interest. Ex. 11, RSD Operating Agreement, Ex. A; Ex. 13, Taylor Dep. Tr. 146:1-17. IWA reserved the option to reacquire the Algon Member's 2% interest for $1,000 at any time. Ex. 11, RSD Operating Agreement; Ex. 12, Term Sheet. RSD had no independent source of revenue; it was funded exclusively by voluntary contributions from IWA, which committed only $3.9 million, barely enough to cover rent and operating expenses for three years. Ex. 11, RSD Operating Agreement; Ex. 12, Term Sheet.

During the three-year statute of limitations period, IWA hid both RSD's design and the fact that IWA remained the real interested party. IWA appointed Algon's outside counsel, Robert Barron, to serve as the mouthpiece for RSD (Ex. 14, Letter from IWA to Plaza, Aug. 31, 2017)

and decided not to record the assignment or pay recordation taxes. Ex. 15, Email P. Rubin to G. Van Gorp and T. Taylor, Jul. 17, 2019; Ex. 16, Rubin Dep. Tr. 265:4-16. Feltman directed Longshore to make no attempt to sell the Property for three years (Ex. 9, Feltman Dep. Tr. 406:7-22; Ex. 13, Taylor Dep. Tr. 281:14-284:16) and directed RSD not to communicate with Plaza for the same three years. Ex. 9, Feltman Dep. Tr. 384:15-387:20.

Once the statute of limitations had run, IWA and RSD (the assignee it created and controlled) "would be turning the keys over to the landlord," leaving Plaza to chase an empty shell. Ex. 10, Barron Dep. Tr. 219:14-20; *see also* Ex. 9, Feltman Dep. Tr. 373:21-374:6. At the time of RSD's formation, Defendants not only planned to leave Plaza high and dry after the statute of limitations ran but also agreed to dissolve RSD by no later than August 1, 2026, with more than 60 years left on the Ground Lease. Ex. 11, RSD Operating Agreement at Sec. 10.1.1.

IWA, a well-capitalized company with over $650 million in assets and no debt, indisputably had the ability to fulfill its obligations under the Ground Lease, including its obligations to pay Ground Rent and to maintain the Property. Ex. 17, IWA Balance Sheet, Sept. 30, 2012. Before the Assignment, Plaza had no reason to believe IWA would be unable to perform its obligations under the Ground Lease or otherwise would impair the value of the Ground Lease.

IWA notified Plaza that it had assigned the Ground Lease to RSD on August 31, 2017 – but said nothing more about RSD. Ex. 14, Letter from IWA to Plaza, Aug. 31, 2017. Plaza (through counsel) immediately pressed for information regarding RSD, to determine whether RSD had the ability to fulfill tenant's obligations under the Ground Lease. Ex. 18, Letter from Plaza to RSD, Sept. 29, 2017. Despite numerous follow-up requests (*see, e.g.*, Ex. 19, Letter from Plaza to RSD, Feb. 22, 2018), IWA and RSD refused to provide any information concerning RSD's members or

its capacity to fulfill tenant's obligations under the Ground Lease. Ex. 20 Letter from RSD to Plaza, Mar. 30, 2018.

Only through its own investigation was Plaza able to determine that RSD was not in fact a bona fide third-party assignee but rather was a new affiliate of IWA. Ex. 21, RSD Registration Information. RSD's status as a sham entity owned and controlled by IWA was confirmed in discovery, including in documents containing "basic information" about RSD that the Court ordered Defendants to provide to Plaza. *See* ECF No. 151, Aug. 3, 2022, Mem. Op. at 16.

### B.     Plaza's Claims

Plaza filed suit to invalidate the Assignment and to ensure that IWA could not escape its obligations under the Ground Lease by assigning it to a related entity that would "walk away" after the statute of limitations had run. In the Second Amended Complaint, Plaza asserts five counts, including for declaratory judgment that the Assignment was made with the intent to hinder, delay, or defraud Plaza and was a fraudulent conveyance (Count II) and to set aside the Assignment under Section 15-207 of the Maryland Uniform Fraudulent Conveyance Act ("MUFCA") (Count III), as well as a claim for "Wrongful, Invalid Assignment" (Count I). *See* ECF No. 196, 2nd Am. Compl., at 10-11. Plaza also seeks to pierce the corporate veil to allow Plaza to collect ground rent from IWA for the remainder of the Ground Lease (Count IV) and a judgment that RSD is the alter ego of IWA (Count V). *Id.* at 12.

Plaza's claims focus on the Assignment and the relationship between IWA and RSD. Plaza's fraudulent conveyance claim is based on common law fraud theories and MUFCA Section 15-207 and turns on IWA's intent in making the Assignment. *See, e.g.*, Md. Code Ann., Com. Law § 15-207 ("Every conveyance made . . . with actual intent . . . to hinder, delay, or defraud present or future creditors is fraudulent as to both present and future creditors."). And in its contract-based claim, Plaza seeks a determination of the Assignment's "validity arising under the…contract" at

issue here, when read with the Restatement (Second) of Contracts (the "Restatement") and the covenant of good faith and fair dealing, which is implicit in every contract under Maryland law. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-406.[2] Plaza's veil-piercing and alter-ego claims turn on the relationship between IWA and RSD and the purpose for which IWA formed RSD.

Plaza does not maintain that the underlying agreements prohibit assignment to bona fide third parties. Rather, the central issue is whether Maryland law permits IWA to assign its interest in the Ground Lease to a sham entity that IWA created and that has no independent ability to perform the tenant's obligations under the Ground Lease, with the intention of having that entity default once the statute of limitations for a fraudulent conveyance claim expired, leaving Plaza with no recourse.

### C.    Procedural History

Here Plaza sets forth only the key procedural developments that bear directly on these Motions *in Limine*. In August 2022, the Court granted in part Plaza's Motion for Partial Summary Judgment and ruled that, as a matter of law, an obligor under a contract is "entitled to at least some basic information regarding a proposed assignee by the proposed assignor and proposed assignee – such as the identity of the assignee; if an entity, who the owners and principals of the assignee are; when the assignee, if an entity, was formed and for what purpose, and cursory information about an assignee entity's organization and structure." ECF No. 151, Aug. 3, 2022, Mem. Op. at 16. The Court ordered Defendants to "provide information sufficient to give Plaintiff adequate

---

[2]  The Court has already determined that: (1) the Restatement and implied covenant of good faith and fair dealing restrict IWA's right to assign the Ground Lease despite provisions in the documents that permit assignment; (2) Plaza is entitled to adequate assurance under the Restatement that RSD is able to perform the tenant's obligations under the Ground Lease; and (3) Restatement § 323 does not apply because Plaza did not assent to an assignment in violation of Restatement § 317 or to the materially adverse impacts such an assignment would have on Plaza. ECF No. 151, Aug. 3, 2022, Mem. Op. at 17-20.

assurance that RSD can fulfill IWA's obligations under the Ground Lease" because of the duties of "good faith and fair dealing that Maryland courts have held inherent in all contracts, which . . . cannot simply be renounced at the whim of the parties to a contract." *Id.* at 16, 19.

In so ruling, the Court rejected Defendants' contention that IWA had an unfettered right to assign the Ground Lease to any person or entity and be released forever from all future Ground Lease obligations – regardless of the assignee's ability to assume and perform such obligations. *Id.*; *see also* Ex. 22, Dec. 1, 2020, Hr'g Tr. 7:11-13 (holding that the Ground Lease contains restrictions on assignment). As such, this case turns on how the assignment right in the Ground Lease is objectively interpreted in light of, *inter alia,* the Restatement and the common law duty of good faith and fair dealing and IWA's obligations under Maryland law to refrain from making a fraudulent conveyance.

On February 16, 2023, the Court ruled that certain topics about which Defendants sought discovery were irrelevant: (1) information about both Plaza's and the Original Tenant's capitalization and finances, (2) the Original Tenant's default on the Loan and the Ground Lease, (3) the business activities and other properties of the Camalier family and related entities, and (4) other disputes between related entities not parties to this case. Ex. 1, Feb. 16, 2023, Hr'g Tr. 124:5-9; 162:12-14; 167:11-168:23; 182:17-20; 184:8-9; 185:25. Indeed, the Court determined that *anything* that happened before August 31, 2015 – two years before the date of the Assignment – was irrelevant. *Id.* at 150:19-23. Plaza therefore moves *in limine* to preclude Defendants from referencing or introducing evidence related to several of the topics that the Court has already determined are irrelevant.

In a ruling just before the close of discovery, the Court observed that "the parties filed a flurry of motions related to discovery shortly before (and some after) the deadline for the close of

discovery" and that "some of the motions [sought] information that, frankly . . . concerns events that (for purposes of this litigation) occurred at the dawn of time." ECF No. 380, Nov. 2, 2023, Mem. Op. at 2. The Court granted Plaza's motions to quash the depositions of both William Bosch (trial counsel for Plaza) and Anne Camalier. In particular, the Court questioned the relevance of the "negotiation process of either the Ground Lease (which was executed in 1990, over thirty years ago) or the Estoppel Agreement (executed in 2006)." *Id.* at 7. Neither IWA nor RSD was involved in those negotiations, but Plaza's corporate representative, Chris Camalier, testified to the best of his recollection that Plaza executed the Estoppel Agreement in 2006 because it was required to do so under the terms of the Ground Lease. Ex. 23, 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr., 38:1-13. He did not recall there being any negotiation about Section 12 of the Estoppel Agreement. *Id.* at 49:19-22.

Finally, on July 18, 2024, the Court granted Plaza's motion for summary judgment on Defendants' affirmative defenses of adequate remedy at law, subject matter jurisdiction, improper advisory opinion, unconscionability, fraud, unclean hands, statute of limitations, and laches. *See* Ex. 24, Jul. 18, 2024, Hr'g Tr. 136:22-140:23.[3]

## III.    LEGAL STANDARDS

### A.    Motions *in Limine*

Pretrial motions *in limine* seek to exclude inadmissible and prejudicial evidence before it is offered at trial. *Al-Sabah v. Agbodjogbe*, 2019 WL 6498049, at *2 (D. Md. Dec. 3, 2019) (citing *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). They are "'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions,'" including by avoiding "'lengthy

---

[3] Defendants earlier withdrew their affirmative defenses of acquiescence, accord and satisfaction, payment, and failure to mitigate damages. ECF No. 430, Defs.' Joint Resp. in Opp. to Pl.'s Mot. for Summ. J. as to Certain of Defs.' Affirmative Defenses at 7 n.4; *see also* Ex. 24, Jul. 18, 2024, Hr'g Tr. 6:3-4.

argument'" about evidentiary issues during the trial. *Id.* (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) and *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987)).

Motions *in limine* can help to avoid prejudice that could not be adequately remedied even when an objection is sustained, a remark is stricken, or a suggestion is entirely disproved. *See, e.g.*, *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1548 (10th Cir. 1991) (One purpose of a motion *in limine* is to avoid the obviously futile attempt to "unring the bell" when highly prejudicial evidence is offered and then stricken at trial.). The decision to grant motions *in limine* falls within the Court's "broad discretion." *Kauffman v. Park Place Hospitality Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012).

### B.    Admissibility: Relevance, Prejudice, and Confusion

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Even where evidence is relevant, however, it may be excluded "if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also United States v. Gondres-Medrano*, 3 F.4th 708, 719 (4th Cir. 2021) (noting that district courts have wide discretion to exclude relevant evidence when its probative value is "'substantially outweighed' by one or more of the listed dangers" in Rule 403).

"The decision to exclude relevant evidence pursuant to Rule 403 is committed to the sound discretion of the trial court." *Adams v. NVR Homes, Inc.*, 141 F. Supp. 2d 554, 558 (D. Md. 2001). A court "abuse[s] its discretion by refusing to exclude such evidence [if] there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is

10

disproportionate to the probative value of the offered evidence." *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005) (internal quotation marks omitted).

To determine whether the prejudicial effect of evidence substantially outweighs its probative value, courts conduct a balancing test, weighing the probative value of the evidence against the dangers listed in Rule 403. *See Old Chief v. United States*, 519 U.S. 172, 182 (1997). "'[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.'" *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (quoting *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008)). Thus, "[w]hen the probative value of evidence is tenuous, a relatively minor risk of substantial undue prejudice should counsel against admitting it." *United States v. Bailey*, 840 F.3d 99, 119 (3d Cir. 2016).

"As the Fourth Circuit has in particular noted, considerations of potential confusion of the jury through the introduction of evidence not directly related to the controversy before it adequately justifies an exercise of a trial judge's discretion in favor of exclusion." *Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 666 (D. Md. 2000) (citing *Daskarolis v. Firestone Tire & Rubber Co.*, 651 F.2d 937, 940 (4th Cir. 1981)).

## IV.    PLAZA'S MOTIONS *IN LIMINE*

### A.    The Court Should Exclude All Evidence or Argument Concerning the Original Tenant, the Loan, and the Original Tenant's Default.

The Court should exclude all evidence or argument concerning the Original Tenant, the Loan it obtained related to the Property, and the Original Tenant's eventual default. In a case about IWA's assignment of its interest under the Ground Lease to RSD, events that occurred before IWA acquired the Leasehold Estate are irrelevant, and there is significant danger of unfair prejudice to Plaza should evidence and argument about these issues be introduced at trial.

11

In 2006, the Original Tenant (not a party to this case) took out a $30 million loan from Monumental Life Insurance Company ("Monumental Life") (also not a party to this case) using the Leasehold Estate as collateral. In September 2011, after the Property had been vacant for three years, the Original Tenant informed the Lender[4] that it did not intend to continue to make payments on the Loan.[5] After the Loan went into default, IWA acquired the Loan by assignment. Thereafter, IWA acquired the Leasehold Estate in foreclosure on February 28, 2012. Ex. 25, Notification of Loan Status Change; Ex. 5, Trustee's Deed of Assignment.

The Original Tenant is not a party to this lawsuit, which involves IWA, RSD, and Plaza. And the facts and circumstances of the Original Tenant's financing and default are of no consequence to this litigation, which concerns only the Assignment. The Loan and the Original Tenant's default both occurred more than five years before IWA assigned its interest in the Ground Lease to RSD on August 31, 2017, and in the intervening years, IWA acquired the Ground Lease with eyes-wide-open about its rights and obligations under the Ground Lease (including the obligation to pay Ground Rent). The Loan and the Original Tenant's default have absolutely no bearing on the question whether Defendants made the Assignment with an intent "to hinder, delay, or defraud" IWA's "present or future creditors," Md. Comm. L. Code, § 15-207, or whether IWA violated its duties of good faith and fair dealing in making the Assignment.

It is also immaterial how IWA came to hold a loan issued by Monumental Life to the Original Tenant that already was in default. What matters now is that, as between Plaza and IWA,

---

[4] To avoid confusion, Plaza simply refers to "the Lender," even though the Loan changed hands a number of times before IWA acquired it.

[5] Contrary to Defendants' assertions on summary judgment, the Original Tenant never defaulted on the Ground Lease. *See* ECF No. 431-1 ¶ 21. Defendants' misrepresentation of the facts is another reason to preclude Defendants from offering evidence and argument on the Original Tenant's default.

IWA *was the tenant* under the Ground Lease and assigned the Leasehold Estate to a sham entity that would strategically default once the statute of limitations for a fraudulent conveyance claim expired. The rest is, in the words of the Court, "ancient history." Ex. 1, Feb. 16, 2023, Hr'g Tr. 150:19-23; *see also Westmoreland v. Prince George's Cnty.*, 2013 WL 12246630, at *1 (D. Md. Apr. 5, 2013) (excluding evidence on events that took place "nearly a decade before the relevant actions" because it was "not a necessary background fact").

The Court has already determined that both the Loan and the Original Tenant's default are irrelevant. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. 162:12-14 (discussing Defendant's requested discovery about loans related to the Property, THE COURT: "I don't think it's frankly relevant and I don't think anything – I don't think you need to respond. It's irrelevant and we're not going to permit it."); *see also id*. at 167:23-168:1 (THE COURT: "All these other things about default and so on, it's all past history."). The Court also determined that the Original Tenant's capitalization and finances more broadly (as well as those of Plaza itself) are likewise irrelevant. *Id.* at 124:5-9 (THE COURT: "This is the kind of thing I think that really is not . . . part of this litigation. It's so irrelevant. They're a plaintiff in the case that asks you about your capitalization and you're saying, first tell me about yours and go back X years. Totally irrelevant."); *id.* at 168:8-12 (THE COURT: "Financial information out of the question."). Likewise, the Court has determined that the Original Tenant's purported default on the Ground Lease itself (which did not even occur) is irrelevant. *See id.* at 184:8-9 (THE COURT: "Number 6, default on the original – on the ground lease by original tenant, irrelevant, denied."); *id.* at 182:17-20 (THE COURT: ". . . tenant's default on the ground lease . . . foreclosure activity. All irrelevant, all denied.").[6]

---

[6] Indeed, the Court has already determined that that anything that took place more than two years before the Assignment is irrelevant. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. at 150:19-23 ("So let's

The Court's previous rulings excluding from discovery (1) the Loan, (2) the Original Tenant's default on the Loan, (3) the Original Tenant's finances, and (4) the Original Tenant's default on the Ground Lease, all because they are irrelevant, dictate that any argument or evidence concerning these issues should be excluded from trial under Rules 401 and 402. *Fulton v. Nisbet*, 2018 WL 565265, at *5 (D.S.C. Jan. 25, 2018) (previous ruling that a topic was "not relevant" justified granting motion *in limine* excluding reference to those issues at trial); *see also Stalnaker v. City of Charleston, W.Va.*, 934 F.2d 320 (4th Cir. 1991) (affirming the exclusion of evidence that was not probative of the issue in the case); *Muse v. Supervalu Inc.*, 2011 WL 1980607, at *24-25 (D. Md. May 20, 2011) (excluding evidence that was not relevant to the "fact at issue").

Nonetheless, Defendants have consistently attempted to place the identity of the Original Tenant, the Loan, and the Original Tenant's default at the center of their narrative. *See, e.g.,* ECF No. 410.1, Defs.' Joint Statement of Material Facts ¶¶ 11-25 (discussing the Original Tenant and the Loan). Should Defendants be allowed to present evidence and argument on these issues at trial, it would cause substantial unfair prejudice to Plaza.

If these topics are not excluded under Rules 401 and 402, they should be excluded under Rule 403 of the Federal Rules of Evidence. There is a significant risk that discussion of these topics would confuse the jury and distract it from issues it needs to decide by bringing an irrelevant backstory into the case.

The arguments that Defendants seek to advance concerning the Original Tenant and the Loan are highly prejudicial to Plaza. Not only do these arguments have no foundation in evidence, but they are designed to make Plaza appear culpable for matters involving other entities that have

---

just take a base date. 24 months, two years prior to the date of the transfer is the only operable time frame. Everything before that is out because you're just getting into collateral issues of frankly, what I would consider ancient history.").

14

no connection to the claims in this litigation. Defendants have argued on summary judgment, with no evidence, that the Original Tenant "default[ed] owing IWA approximately $27 million on a $30 million loan, and thus there is . . . a reasonable inference that the Original Tenant never intended to repay the loan, but instead intended to pocket the money and then saddle the lender with a vacant, abovemarket, and undesirable asset." *See, e.g.,* ECF No. 430, Defs.' Resp. Br. in Opp. to Summ. J. at 20. Defendants would advance the same argument at trial if they were allowed to do so.

Defendants' accusations have no foundation in evidence. They are speculative at best and pernicious at worst. How IWA was presented with the opportunity to acquire the Ground Lease is irrelevant. More importantly, the suggestion that Plaza is not entitled to relief because *a different entity defaulted* on a loan *before IWA decided to acquire the Leasehold Estate for itself* is calculated to unfairly turn sentiment against Plaza. *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1133 (4th Cir.1988) (evidence introduced to cast defendant in a negative light was properly excluded under Rule 403); *Atkinson Warehousing & Distribution Inc.*, 99 F. Supp. 2d at 667 (excluding evidence relating to the financial difficulties of a related party because the "probative value of such evidence is substantially outweighed by the danger that the jury would confuse the issues in this case and would be misled by evidence relating to the operation" of the related party). Moreover, the Court has granted summary judgment in favor of Plaza on Defendants' affirmative defenses of fraud and unclean hands, rejecting these arguments. *See* Ex. 24, Jul. 18, 2024, Hr'g Tr. 136:22-140:23. Rule 403's balancing test requires exclusion because the significant dangers of unfair prejudice posed by evidence and argument on these issues outweigh their complete lack of probative value.

**B.    The Court Should Exclude Any Argument Concerning the Negotiation or the Intent of the Estoppel Agreement.**

Defendants intend to argue that the Lender only extended financing to the Original Tenant in exchange for a purported "absolute right" to assign the Ground Lease contained in the Ground Lessor Estoppel and Non-Disturbance Agreement (the "Estoppel Agreement"), which Defendants claim that Plaza executed so that the Original Tenant could obtain the Loan. *See, e.g.* ECF No. 409, Defs.' Mot. for Summ. J. on Fraudulent Conveyance Claim at 1 (arguing that Plaza "knowingly relinquished its right as landlord to investigate the financial wherewithal of a potential assignee or to approve of a potential assignee. As consideration for this promise, IWA loaned an affiliated Camalier family entity $30 million."). As a factual matter, this is pure argument; Defendants have *no evidence* Plaza "knowingly relinquished" anything of the sort and have never identified any witness who could testify on behalf of the Lender. That perhaps explains why Defendants erroneously claim that it was IWA, and not Monumental Life, that made the Loan to the Original Tenant. IWA loaned nothing to Plaza or even to the Original Tenant. IWA did not even acquire its interest in the Loan until after the Loan was in default.

In any event, in addition to being misleading and based on conjecture, the Lender's reasons for extending financing to the Original Tenant are plainly irrelevant to this case, which does not involve the Loan. *See* § IV.A, *supra.* Accordingly, the Court should exclude argument related to the negotiation and intent of the Estoppel Agreement.

The Court has already determined that circumstances surrounding the negotiation of the Ground Lease and the Estoppel Agreement are irrelevant, except insofar as they directly pertain to the negotiation of the assignment provisions. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. 167:11-168:23 ("MR. BOSCH: IWA cannot question plaintiff regarding the amended ground lease received in 1990 and the estoppel agreement executed in 2006, other than with respect to the assignment

16

**R.A.027**

provisions. If they want to examine a witness about the ground lease or the estoppel, examine them about the assignment – THE COURT: I agree with that . . . it has to pertain to the ground lease, the assignment aspect of the ground lease. All these other things about default and so on, it's all past history."). And, as set forth above, the Court has also already determined that matters related to the Loan itself are irrelevant. *Id.* at 162:12-14. And the Court recently ruled that "[D]efendants may argue, may present evidence, about the Camaliers' and [O]riginal [T]enant's intentions in negotiating the estoppel agreement. They can argue that this earlier conduct does show that Plaza has agreed to give to IWA the absolute right, untrammeled, to assign the ground lease to whomever it wishes." *See* Ex. 24, Jul. 18, 2024, Hr'g Tr. 141:12-17. But as the Court recognized, "we have nothing directly in the record one way or another as to how the language was negotiated," *id.* at 141:22-24, and there is no testimony in the record that the parties intended to make the Ground Lease freely assignable with no restrictions whatsoever by adopting the Estoppel Agreement.

The only witness deposed in this matter with knowledge on the parties' intent in adopting the Estoppel Agreement is Charles Camalier, who testified that Plaza signed the Estoppel Agreement because it understood it was required to do so under the Ground Lease and that there were no negotiations specific to Section 12 (one of the assignment provisions). Ex. 23, 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. 38:1-13; 49:19-22.[7] And Defendants have not disclosed any witnesses with knowledge of the negotiation for or intent of the Estoppel Agreement or other evidence on this issue, and they cannot do so on the eve of trial. As such, Defendants should not be permitted to argue that Plaza intended to allow any assignment of the

---

[7] Defendants' counsel neglected to ask about Section 19 of the Estoppel Agreement, which is more relevant, but Mr. Camalier's testimony would be the same (as they are free to ask at trial).

Leasehold Estate, even if fraudulent or to a related party of the assignor that cannot perform tenant's obligations, without the support of any admissible evidence.[8]

The Court has previously questioned the viability of Defendants' argument that Plaza relinquished any right to challenge the Assignment simply by entering into the Estoppel Agreement. *See* ECF No. 30, Dec. 1, 2020, Mem. Op. at 25. Ultimately, excluding argument about the circumstances surrounding the adoption of the Estoppel Agreement would be consistent with the Court's ruling at the July 18, 2024, summary judgment hearing that ultimately "[Defendants] cannot argue that this conduct bars Plaza's present claims." *id.* at 141:17-8; *see also Fulton*, 2018 WL 565265, at *5.

Even if not excluded as irrelevant, the introduction of argument about the Lender's motivations for extending financing to the Original Tenant and the intent behind the Estoppel Agreement would work substantial prejudice against Plaza and should be excluded under Rule 403. Not only would such argument be wholly unsupported by evidence, but the implication that Plaza "bargained away" its rights not to be defrauded and not to have tenant act in good faith in exchange for a loan obtained by a different party would confuse the jury as to the proper legal standard to consider for liability and distract from the ultimate issue by bringing irrelevant back-story into the case. *In re C.R. Bard, Inc.*, *MDL, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 921-22 (4th Cir. 2016) (upholding the district court's exclusion of evidence because the evidence could create a mini-trial about an issue that was not the ultimate issue in the case and could confuse the issues). As the Court recognized, "there is not a sufficient nexus between the Camaliers' alleged inequitable conduct in negotiating and then defaulting on the loan and Plaza's present

---

[8]  Excluding argument about the circumstances surrounding the negotiations for and the intent of the Estoppel Agreement would not prevent IWA from arguing that the Assignment was permitted by the Estoppel Agreement

claims to warrant application of the unclean hands defense." *See* Ex. 24, Jul. 18, 2024, Hr'g Tr. 141:7-11. Allowing Defendants to argue otherwise, especially in the absence of any evidence concerning the parties' intentions specific to the assignment provisions, would confuse the jury and unfairly prejudice Plaza.

### C. Defendants Should be Precluded from Making Blanket References to the Entire "Camalier Family" or Referring to Plaza or the Original Tenant as a "Camalier Family Company."

Defendants have frequently referred to "the Camalier family" and "Camalier family companies." *See, e.g.,* ECF No. 410.1, Defs.' Joint Statement of Material Facts ¶¶ 7-10, 19-21, 28-29. Defendants should be precluded from making such generic references as a short-hand for Plaza or for any other entity in which the Camaliers may hold an interest because such references would confuse the jury and unfairly prejudice Plaza.

The Camalier family is not a defined entity, nor is it a party to the Ground Lease or the Estoppel Agreement. Prior to Plaza, the parties to the Ground Lease were Anne Camalier, an individual, and the Original Tenant, Rock Spring II, L.P. *See* Ex. 2, Ground Lease. Generic references to "Camalier family companies" obscure the actual identity and ownership of these entities. For example, the Original Tenant was a joint venture between COMSAT, a global telecommunications company, and Fernwood Two Corporation. Not only is characterizing the Original Tenant as a "Camalier family company" contrary to the evidence, but it unfairly characterizes the Original Tenant as having uniform interests with Plaza and with other entities or individuals with ties to the Camalier family.

To eliminate confusion and potential prejudice, Defendants should be precluded from making generic references to "the Camalier family" unless they are specifically referring to family members by name and should not be allowed to refer to or imply the existence of "Camalier family

companies." Individual members of the Camalier family should be referred to by name, as should any entities referenced at trial.

> **D.** **The Court Should Exclude Any Evidence or Argument that Members of the Camalier Family or Entities In Which the Camaliers Have an Interest Were "On Both Sides" of the Ground Lease, or that the Terms of the Ground Lease are Favorable to Tenants as a Result.**

For similar reasons, the Court should exclude any evidence or argument that the Camalier family or Camalier-related entities were "on both sides" of the Ground Lease at its inception, as well as any implication that the terms of the Ground Lease are tenant-friendly as a result. The Ground Lease was formed between the Original Tenant and Anne Camalier as landlord, before she assigned her interest to Plaza. The terms of the Ground Lease speak for themselves. IWA reviewed carefully the Ground Lease and Estoppel Agreement before acquiring the Ground Lease and had every opportunity to attempt to renegotiate any of their terms, and any argument about the terms of the underlying documents based on the identity of the parties is both irrelevant and unfairly prejudicial to Plaza.

The Court has already determined that the particular interests of the Camalier family are irrelevant. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. 162:23-163:4 (THE COURT: "I just don't see that the Camaliers, whatever they did in the past, whether they were the lender, the borrower, both, I mean, that's just not where we are. It's another issue. It's not the kind of thing you ever would, I don't think, have brought up had you not been sued in this case on the issue of the assignment. But I don't see how it impacts that decision."). And as explained above (*see* § IV.C, *supra*), the Camalier family is not a defined entity, nor is it a party to the Ground Lease, and any characterization of the Original Tenant as a "Camalier family company" is unfairly prejudicial to Plaza.

E.    **The Court Should Exclude Any Reference to the Wealth or Other Business Activities of the Camalier Family, Including Other Properties in Which the Camalier Family Has an Interest.**

The Court should also exclude any refence to the wealth or other business activities of the Camalier family, including other properties in which members of the Camalier family have an interest. These topics are not relevant to this case, which is limited to a dispute over a single property, 6560 Rock Springs Drive. Moreover, discussion of these issues may confuse the jury and pose a risk of unfair prejudice to Plaza.

The Court has already determined that the background, business activities, and real estate holdings of the Camalier family are irrelevant to this case. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. 143:7-13 (finding that "other Camalier-owned entities" are irrelevant); *see also id.* at 162:23-163:1 (THE COURT: "I just don't see that the Camaliers, whatever they did in the past, whether they were the lender, the borrower, both, I mean, that's just not where we are. It's another issue."); *id.* at 163:24-25 (THE COURT: "Why do we need to know anything about the other properties?").

If not excluded as irrelevant, the Court should exclude reference to the Camalier family's wealth and other business interests because discussion of these issues is likely to confuse the jury and cause unfair prejudice to Plaza. Again, this case involves only one property, 6560 Rock Spring Drive. The jury should not be presented evidence or arguments about other properties that it might confuse with the Property at issue here.

Moreover, orienting the jury towards the Camalier family's wealth may imply that IWA can shirk its financial obligations to Plaza without causing Plaza meaningful harm. *Prassas Cap., LLC v. Blue Sphere Corp.*, 2019 WL 2881560, at *5 (W.D.N.C. July 3, 2019) ("[T]he parties' current relative wealth . . . has no relevance to any claim or defense and would be unfairly prejudicial and should be excluded under Federal Rules of Evidence 401-03."). Likewise, revealing to the jury that the Camalier family holds interests in other properties may imply that

21

Plaza can somehow afford not to collect the ground rent it is entitled to receive under the Ground Lease. *See United States v. Mosby*, 2024 WL 96349, at *15 (D. Md. Jan. 9, 2024) ("[C]haracterization of the Florida Homes as "luxury" properties during the mortgage fraud trial would be substantially prejudicial to the Defendant, because such argument could appeal to the emotions of the jury.").

> **F.      The Court Should Exclude Reference to Previous Disputes Between Related Parties and their Counsel.**

The Court should exclude any reference to previous litigation between Rockledge Associates, LLC and IWA's parent company, Transamerica (*Rockledge Associates, LLC v. Transamerica Life Insurance Company*, Case No. PWG-16-710 (D. Md.)), as well as any other disputes between related parties and their counsel. These disputes are irrelevant, and discussion of them would risk confusing the jury and could be used to unfairly sway the jury against Plaza.

The existence of other litigation between related entities is not relevant to the outcome of this case, which involves different parties and different property. The Court has already determined that disputes related to other properties are irrelevant. *See* Ex. 1, Feb. 16, 2023, Hr'g Tr. 162:6-14 (THE COURT: "I just don't see the relevance of that for this particular case. You know, there seemed to be a series of hassles around all the properties out in Rockledge and this case doesn't become the vehicle for all of them. This is just one issue you may be litigating for eternity on different issues, but not everything happens here. Okay, I don't think it's frankly relevant and I don't think anything – I don't think you need to respond. It's irrelevant and we're not going to permit it."). And courts routinely exclude reference to and evidence regarding other lawsuits and other disputes involving the same or related parties. *See Prassas Cap., LLC*, 2019 WL 2881560, at *5 ("[U]nrelated litigation has no relevance to any claim or defense and would be unfairly prejudicial and should be excluded under Federal Rules of Evidence 401-03."); *Gaiser v. Am.'s*

*Floor Source*, 2021 WL 5354702, at *3 (S.D. Ohio Nov. 17, 2021) (excluding evidence related to "separate and unrelated lawsuit[s]" that "do not make a material fact of consequence in this case more or less likely"); *In re Smith & Nephew Birmingham HIP Resurfacing HIP Implant Prod. Liab. Litig.*, 2021 WL 2685642, at *1 (D. Md. June 29, 2021) (excluding evidence and argument about "unrelated public controversies").

If not excluded as irrelevant, Defendants should still be precluded from referencing any other disputes between related parties and their counsel because of the risk such references would confuse the jury and unfairly prejudice Plaza. Defendants have asserted that the *Rockledge* litigation caused "animosity between *Rockledge*'s counsel and IWA," and that as a result there "was concern that any communications or demands received from [Plaza]'s counsel was connected to the ongoing *Rockledge* litigation or were for future litigation against IWA," ECF No. 410.1, Defs.' Joint Statement of Material Facts ¶¶ 81, implying that RSD was somehow justified in withholding information from Plaza because different entities were involved in unrelated litigation. But the Court has ruled that Defendants were required to provide Plaza with basic information about Plaza under the Restatement. *See* ECF No. 151, Aug. 3, 2022, Mem. Op. at 16. Any suggestion to the contrary is unfairly prejudicial to Plaza.

### G. The Court Should Exclude Any Evidence or Argument Describing Plaza or its Counsel as "Litigious" or "Aggressive."

For similar reasons, Defendants should be precluded from describing Plaza or its counsel as "litigious" or "aggressive." Any such characterization is irrelevant to this case. *Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136, 142 (4th Cir. 2019) (upholding the exclusion of evidence about doctor's general reputation because it was irrelevant to the standard of care question before the jury).

23

**R.A.034**

Moreover, the implication that Plaza or any Camalier-related entity is overly litigious is both unsupported by the record and would be unfairly prejudicial to Plaza. Any such characterization would unfairly suggest to the jury that Plaza's lawsuit is not a legitimate assertion of its rights but rather a calculated effort to drag IWA into court. *Nelson v. City of Chicago*, 810 F.3d 1061, 1071 (7th Cir. 2016) ("a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant"); *EEOC v. Proctor Fin., Inc.*, 644 F. Supp. 3d 400, 411 (E.D. Mich. 2022) (even if it were somehow relevant, a showing of "apparent litigiousness" constitutes "impermissible character evidence"); *see also Innovation Ventures, LLC v. N2G Distrib. Inc.*, 763 F.3d 524, 542 (6th Cir. 2014) ("The district court did not err in concluding that the probative value of this evidence [the outcomes of plaintiff's prior suits] was substantially outweighed by its potentially deleterious impact on the trial.").

Likewise, any assertion that RSD was justified in not providing information to Plaza because litigation counsel reached out on behalf of Plaza to inquire about RSD, or that Plaza acted in bad faith by doing so, or even that it would have been more appropriate for a non-lawyer representative reach out instead (*see, e.g.,* Ex. 13, Taylor Dep. Tr. 373:22-382:19) would be unfairly prejudicial to Plaza based on evidence that has no probative value. Any such evidence and argument should be excluded.

## V.    CONCLUSION

For the foregoing reasons, Plaza respectfully requests that this Court grant its Motions *in Limine* and exclude the categories or evidence and argument identified above.

24

**R.A.035**

Dated: July 22, 2024

Respectfully submitted,
*/s/ William M. Bosch*

William M. Bosch
Anthony Cavanaugh
Alvin Dunn
Katherine Danial
Nicole Steinberg
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: 202-663-8000
Facsimile: 202-663-8007
william.bosch@pillsburylaw.com
anthony.cavanaugh@pillsburylaw.com
alvin.dunn@pillsburylaw.com
katherine.danial@pillsburylaw.com
nicole.steinberg@pillsburylaw.com

*Counsel for Plaintiff Rock Spring Plaza II, LLC*

25

# EXHIBIT 9

R.A.037



# Transcript of David Feltman, Designated Representive, Volume 1

**Date:** March 16, 2023

**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**

**Phone:** 888.433.3767

**Email::** transcripts@planetdepos.com

**www.planetdepos.com**

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2

3    ROCK SPRING PLAZA, II,      )
                                 )
          Plaintiff,             )
                                 )
4       vs.                      )    CIVIL ACTION FILE
                                 )    NO. 8:20-CV-01502-PJM
     INVESTORS WARRANTY OF       )
     AMERICA, LLC, et al.,       )
                                 )
          Defendants.            )
                                 )
5

6

7

8

9

10

11          VIDEOTAPED 30(b)(6) DEPOSITION OF

12        INVESTORS WARRANTY OF AMERICA, LLC

13         Represented by: DAVID FELTMAN

14             March 10, 2023
                 9:00 a.m.

15         1075 Peachtree Street, NE
                 Suite 2500
16             Atlanta, Georgia

17

18         Lamarra George, CCR-2582

19

20

21

22

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2         I, Lamarra George, CCR, the officer

3    before whom the foregoing deposition was

4    taken, do hereby certify that the foregoing

5    transcript is a true and correct record of

6    the testimony given; that said testimony

7    was taken by me stenographically and

8    thereafter reduced to typewriting under my

9    direction; that reading and signing was

10   requested [or not requested, as

11   appropriate]; and that I am neither

12   counsel for, related to, nor employed by

13   any of the parties to this case and have no

14   interest, financial or otherwise, in its

15   outcome.

16        IN WITNESS WHEREOF, I have hereunto

17   set my hand and affixed my notarial seal

18   this 24th day of March, 2023.

19

20   _____
     Lamarra George, CCR-2582.
21   My commission expires on
     the 1st of April 2024.
22

R.A.040

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I, DAVID FELTMAN, do hereby

4    acknowledge that I have read and examined

5    the foregoing testimony and the same is a

6    true, correct, and complete transcription

7    of the testimony given by me and any

8    corrections appear on the attached errata

9    sheet signed by me.

10

11                    _____

12                    _____
                      March ___, 2023
13

14

15

16

17

18

19

20

21

22

R.A.041

```
1    created value, that we would ultimately sell the
2    leasehold interest on the property that we held.
3         Q.    So, IWA never had a plan to dispose of its
4    leasehold interest by selling it?
5         A.    We did not have a written plan for that
6    effect, and we didn't really have a conceptual plan
7    because we did not know what the numbers were going
8    to look like because we didn't have the plan.
9         Q.    So, I think I heard you say there was
10   never any written plan encompassing an exit strategy
11   for IWA's leasehold interest, correct?
12        A.    Yes.
13        Q.    There was no written plan?
14        A.    Until the memo and the formation of the
15   joint venture and that plan.  I guess that would be
16   considered a plan.
17        Q.    Was that considered the exit strategy for
18   IWA's leasehold interest?
19             MS. DAVIS:  Objection as to form.
20             THE WITNESS:  Not the ultimate exit
21        strategy, no.  Because at the end of the
22        day, RSD -- we were going to be a member of
```

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                    186

1    RSD; we still had an economic interest in

2    RSD.  And ultimately, we wanted see RSD

3    lease up the property and sell the

4    property.

5         Q.    (By Mr. Bosch) So the formation of RSD and

6    the assignment of the ground lease to RSD was part of

7    IWA's exit strategy?

8              MS. KROPF:  Objection.  Form.

9              THE WITNESS:  To the extent that it

10   was a disposition by IWA, yes.  But that

11   was just one step in what needed to occur

12   to execute what we would think of as a

13   disposition exit strategy, so that RSD

14   could then sell the property and monetize

15   the proceeds.

16        Q.    (By Mr. Bosch) All right.  So, other than

17   the assignment of the leasehold interest, RSD, were

18   any other exit strategies considered conceptually.

19        A.    Oh, I'm sure we had discussion about

20   selling the property outright.

21        Q.    Anything else?

22        A.    I can't think of any other exit strategy

R.A.043

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                    247

1          Q.    So your understanding is that one of the

2     reasons for assigning the ground lease for this newly

3     formed entity, RSD, was to stop any future liability

4     of IWA under the ground lease?

5               MS. DAVIS:  Objection as to the

6          form.

7               THE WITNESS:  I would phrase it

8          differently.  I would say the effect was to

9          stop future liability under the ground

10         lease.

11         Q.    (By Mr. Bosch) And that was part of the

12    exit strategy?

13              MS. DAVIS:  Objection as to form.

14              THE WITNESS:  No.  The exit strategy

15         was to bring in a qualified partner to turn

16         around the property.

17         Q.    (By Mr. Bosch) And the effect was to stop

18    future liability for IWA under the ground lease?

19         A.    I believe that's right.

20         Q.    And what's the basis for that

21    understanding?

22         A.    The language of the ground lease and the

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                    307

1          Q.    About -- yes, about how much Polinger was

2     going to capitalize this SPE.

3          A.    No.

4          Q.    So on what basis did you believe that I --

5     Polinger would not capitalize this SPE?

6          A.    I didn't --

7                MS. DAVIS:  Objection as to form.

8                THE WITNESS:  I didn't say that he

9          -- they wouldn't.  Their proposal did not

10         specify amounts that they would capitalize

11         the SPE.  But putting that aside, a $20

12         million check was a nonstarter.

13         Q.    (By Mr. Bosch) Are you aware of anybody

14    other than Polinger suggesting any amount that they

15    would require in order to acquire an interest in this

16    ground lease?

17         A.    No.

18         Q.    So when you said offers come in all the

19    time, you're aware of only one potential offer for

20    the purchase of this ground lease interest?

21         A.    I was speaking about properties in

22    general, offers come in all the time.  I don't know

1    how many offers came in on this property.

2         Q.    As you sit here today --

3         A.    But the only one I'm aware of is the

4    Polinger offer.

5         Q.    I'm going to mark as IWA Exhibit 30, an

6    e-mail from Nick Koluch to you, dated January 3rd,

7    2017.

8              (Exhibit No. 30 was marked for

9         identification.)

10        Q.    (By Mr. Bosch) The subject is Polinger

11   call, 6560.  And it bears Bates No. IWA3157.  Do you

12   see that?

13        A.    Yes.

14        Q.    And you see here Nick accepted an invite

15   to discuss 6560 with you and Tom.  That's Tom

16   Schefter?

17        A.    Yes.

18        Q.    And Mr. Schefter was the head of asset

19   management at the time?

20        A.    Yes.

21        Q.    And he reported directly to you?

22        A.    Yes.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                               360

```
 1    There was no existing fraudulent transfer risk at
 2    that time.
 3          Q.    Right.  But there was -- there was a risk
 4    if they engaged in a transfer of the ground lease
 5    interest.
 6          A.    I was aware of that, yes.
 7          Q.    And that was a risk of a fraudulent
 8    conveyance or fraudulent transfer claim?
 9          A.    I was aware that was a risk.
10          Q.    And so, also at -- in or around
11    January 2017, IWA knew that forming an SPE to take a
12    transfer of IWA's interest in the ground lease might
13    give rise to a fraudulent transfer claim?
14                MS. DAVIS:  Objection as to form.
15                THE WITNESS:  Claim, yes.
16          Q.    (By Mr. Bosch) At any time, had there been
17    discussions about the statute of limitations on a
18    fraudulent transfer claim?
19          A.    I believe so.
20          Q.    What do you understand the term statute of
21    limitations to mean?
22          A.    The period of time following a transfer
```

R.A.047

1   when a claim can be made as to a fraudulent transfer.

2        Q.    When do you recall there being discussion

3   about a statute of limitations -- the statute of

4   limitations on a fraudulent transfer claim?

5        A.    I don't recall specifically, but I'm sure

6   there was when we had a discussion with counsel or

7   advice from counsel about the fraudulent transfer

8   issue -- sorry I'm getting into --

9             MS. DAVIS:  You're getting -- yeah.

10            THE WITNESS:  Sorry.

11            MS. DAVIS:  You can answer the

12        question, but don't discuss privileged

13        information --

14            THE WITNESS:  Right.

15            MS. DAVIS:  -- or advice of counsel.

16        Q.    (By Mr. Bosch) Yeah, so I'm not asking

17   what the advice was, I'm asking when did you receive

18   this advice about the statute of limitation --

19        A.    I don't recall when.

20        Q.    Sorry, sir, let me just finish the

21   question.

22        A.    Sorry.

Transcript of David Feltman, Designated Represenative, Volume 1
Conducted on March 16, 2023                              362

1        Q.    When did you receive this advice on the
2    statute of limitations on a fraudulent transfer
3    claim?
4        A.    I don't recall.
5        Q.    It was before January 2017?
6        A.    I believe so.
7        Q.    You just don't recall as you sit here
8    today how much before that -- before January 2017?
9        A.    Correct.
10       Q.    And you don't recall the specific context
11   in which the statute out of limitations was
12   discussed?
13       A.    Correct.
14       Q.    Do you recall having any discussions with
15   Mr. Taylor about the statute of limitations?
16       A.    Probably.
17       Q.    And you say "probably."  Do you have any
18   specific recollection?
19       A.    No.
20       Q.    Why would you probably have discussed the
21   statute of limitations with Mr. Taylor on a
22   fraudulent conveyance claim?

R.A.049

```
1        A.    Because if I was -- if we were having a
2   discussion about fraudulent conveyance, we probably
3   would have had also a discussion about the statute of
4   limitations.  But I don't recall that specifically.
5        Q.    Did you keep notes of your discussions
6   with Mr. Taylor?
7        A.    I don't think so.
8        Q.    Do you recall, as you sit here today, what
9   period of time the statute of limitations is for a
10  fraudulent conveyance claim?
11       A.    No.
12       Q.    Did you, at any point, know the statute of
13  limitations period for a fraudulent conveyance claim?
14       A.    I have a vague recollection.  36 months,
15  3 years.
16       Q.    And -- so, that recollection would be
17  consistent with what you probably discussed with
18  Mr. Taylor?
19            MS. DAVIS:  Objection to form.
20       Q.    (By Mr. Bosch) 36 months, statute of
21  limitations.
22            MS. DAVIS:  Objection as to form.
```

R.A.050

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                     373

```
 1   that's what happened.  And probably because it was

 2   considered unnecessary.

 3          Q.   It was unnecessary to create a single

 4   purpose LLC affiliate of IWA to be a non-managing

 5   member of New Co?

 6          A.   Yeah, but I'd like to review the operating

 7   agreement to be sure that's not where we ended up.

 8          Q.   Okay.  We'll get to it.

 9          A.   Okay.

10          Q.   The partnership term, do you see that it

11   says three years?

12          A.   Yes.

13          Q.   Why that period of time?

14          A.   I think we felt initially that that was

15   sufficient time to get the property leased up.

16          Q.   On what basis?

17          A.   Just our thoughts about if we didn't get

18   it done in three years, were we going to get it done.

19   It was just -- I think for the purposes of this, it

20   was just to pick a term.

21          Q.   And if you didn't get it done in three

22   years, then what?
```

R.A.051

Transcript of David Feltman, Designated Represenative, Volume 1
Conducted on March 16, 2023                                    374

1          A.      Then we would have the opportunity to
2     revisit the arrangement.
3          Q.      And what does that mean?
4          A.      Well, it means either force the sale of
5     the property or find some other exit plan for the
6     property.
7          Q.      And when you say "force the sale," what
8     does that mean?
9          A.      Meaning, sell the property even -- even if
10    it hadn't been leased.  But there was a -- yeah, go
11    ahead.  I'm sorry.
12         Q.      IWA had already held the ground lease for
13    five years at that point; is that right?
14         A.      Yes.
15         Q.      So on what basis did you conclude it would
16    only take three years to lease it up?
17         A.      We expected Algon to be more successful.
18         Q.      And did Algon give you any reason to
19    believe that they could be more successful?
20         A.      Well, we discussed -- yeah.
21         Q.      Did they give you a leasing plan?
22         A.      Not specifically, no.

R.A.052

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                    384

1        Q.    Right.  And so is there any reason not to

2    allow -- why you would not want Algon to communicate

3    with the landlord about the terms of the ground

4    lease?

5        A.    If there was a conversation about

6    modifying the ground lease, it would have to involve

7    a conversation about leasing.  And we didn't want to

8    disclose any leasing issues to the ground lessor

9    because they were a competitor in the market.  And

10   two, we were in litigation with the Camaliers, and we

11   did not have a good relationship, a relationship on

12   which a fruitful discussion could be held.

13       Q.    So why three years?

14             MS. KROPF:  Objection as to form.

15       Q.    (By Mr. Bosch) Why not have Algon

16   communicate with the landlord on behalf of RSD for

17   three years?

18             MS. DAVIS:  Objection as to form.

19             MS. KROPF:  Misstate -- well,

20   misstates the facts.

21             THE WITNESS:  One, we knew there was

22   this risk of a fraudulent transfer claim.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                    385

1          Q.      (By Mr. Bosch) And so why would

2    communicating between Algon and landlord give rise or

3    increase the risk of a fraudulent transfer?

4          A.      I was concerned that Algon might disclose

5    things to the landlord that we didn't think the

6    landlord needed -- information the landlord didn't

7    need and wasn't entitled to.

8          Q.      Did that include the fact that IWA

9    remained a 90 percent member in RSD?

10              MS. DAVIS:  Objection as to form.

11              THE WITNESS:  I don't recall whether

12         that was a consideration.

13         Q.      (By Mr. Bosch) So as you sit here today,

14   is it your testimony that it was not a consideration?

15         A.      No.  I just don't recall that being a

16   consideration.

17         Q.      All right.  So what was the consideration?

18   What was it that Algon might say to the landlord that

19   you thought the landlord had no right to know that

20   could give rise to a fraudulent transfer claim?

21              MS. KROPF:  Objection.  Form.

22              THE WITNESS:  Mostly surrounding

R.A.054

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                    386

1          competitive issues with the building.

2          Q.     (By Mr. Bosch) How would that give rise to

3     a fraudulent transfer claim?

4          A.     Oh, I'm sorry.  As to the fraudulent

5     transfer claim.  I think that there was a risk that

6     the landlord would look at the transaction and make a

7     fraudulent transfer claim.

8          Q.     And what was it about the transaction that

9     you thought should not be disclosed to the landlord

10    because it increased the risk of a fraudulent

11    transfer claim?

12              MS. DAVIS:  Objection as to form.

13              THE WITNESS:  Subject to

14         capitalization, the presence of IWA in the

15         partnership, I think there were a number of

16         factors that could have been a concern with

17         respect to the fraudulent transfer claim.

18         That said, I'm not a lawyer, and I don't

19         know the details of a fraudulent transfer

20         claim.  I just thought, in general, it was

21         best to keep Algon and the lessor apart.

22         Q.     (By Mr. Bosch) Because you didn't want

```
 1    Algon to disclose, for example, IWA's interest in the
 2    partnership?
 3              MS. DAVIS:  Objection as to form.
 4         Misstates evidence.
 5         Q.    (By Mr. Bosch) That was one of the
 6    considerations?
 7         A.    And other factors.
 8         Q.    Yeah, so one of -- one of the factors for
 9    restricting Algon's discussions with the landlord, is
10    you were concerned that Algon would disclose IWA's
11    interest in RSD, correct?
12              MS. DAVIS:  Objection as to form.
13         Misstates evidence.
14              THE WITNESS:  A factor, yes.
15         Q.    (By Mr. Bosch) And another factor was you
16    were concerned that Algon would disclose the
17    capitalization of RSD?
18         A.    Yes.
19         Q.    Which was limited to $3.9 million?
20         A.    Yes.  In a short capitalization, yes.
21         Q.    Which you testify --
22         A.    However --
```

R.A.056

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                406

```
1          Q.     -- term sheet.  So does that suggest to
2     you that that's Version 3 of the term sheet?
3          A.     I don't know whether that's what .3 means.
4          Q.     And the changes reflected in this markup
5     were all made by Algon; is that correct?
6          A.     I don't know.
7          Q.     Directing your attention to paragraph 4D,
8     which is the disposition agreement.  You see there,
9     there was an insertion for after 38 months if the
10    Algon member opts to sell the property?
11         A.     Yes.
12         Q.     Was that Algon's insertion, or was that
13    your proposal?
14         A.     Don't know.
15         Q.     And do you know how 38 months was
16    determined as the appropriate period of time for
17    Algon to consider a disposition?
18         A.     I think at that point, the litigation risk
19    would go away because we'd be beyond the fraudulent
20    transfer date, and also our expectation was that
21    there would be leasing activity, and by then the
22    property would be in a position to be sold.
```

# EXHIBIT 10

**R.A.058**



# Transcript of Robert W. Barron

**Date:** April 14, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2
   ROCK SPRING PLAZA II, LLC,
 3
              Plaintiff,
 4
   -vs-
 5
   INVESTORS WARRANTY OF AMERICA, LLC, et al.,
 6
              Defendants.
 7   _____/

 8

 9

10

11

12      VIDEOTAPED DEPOSITION OF ROBERT W. BARRON

13
                Friday, April 14, 2023
14              9:04 a.m. - 5:42 p.m.

15            (Conducted Remotely)

16

17

18

19   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
20   Notary Public, State of Florida
     PLANET DEPOS
21
                    -  -  -
22
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF PALM BEACH

 4

 5

 6            I, the undersigned authority, certify

 7    that ROBERT W. BARRON personally appeared before

 8    me and was duly sworn.

 9

10            Dated this 18th day of April, 2023.

11

12

13

14

15    _____
      Pamela J. Pelino, RPR, FPR, CLR
      Notary Public - State of Florida
16    My Commission No.:  HH 275669
      My Commission Expires:  June 13, 2026
17

18

19

20

21

22
```

1                C E R T I F I C A T E

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5            I, Pamela J. Pelino, Registered Professional
     Court Reporter and Notary Public in and for the State of
6    Florida at Large, do hereby certify that the
     aforementioned witness was by me first duly sworn to
7    testify the whole truth; that I was authorized to and
     did report said deposition in stenotype; and that the
8    foregoing pages are a true and correct transcription of
     my shorthand notes of said deposition.

9
             I further certify that said deposition was
10   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
11   completed as hereinabove set out.

12           I further certify that I am not attorney
     or counsel of any of the parties, nor am I a
13   relative or employee of any attorney or counsel of
     party connected with the action, nor am I
14   financially interested in the action.

15            The foregoing certification of this
     transcript does not apply to any reproduction of
16   the same by any means unless under the direct
     control and/or direction of the certifying
17   reporter.

18

19           Dated this 18th day of April, 2023.

20

21   _____
             Pamela J. Pelino, RPR, FPR, CLR
22

Transcript of Robert W. Barron
Conducted on April 14, 2023                    64

| | | |
|---|---|---|
| 1 | assignment." | 10:06:11 |
| 2 | Q.     All right.  You understood from the | 10:06:11 |
| 3 | beginning, based on your initial conversation with | 10:06:13 |
| 4 | Mr. Feltman, that IWA's objective, in forming this | 10:06:17 |
| 5 | new entity and assigning the ground lease to the | 10:06:22 |
| 6 | new entity was to get IWA off the hook? | 10:06:25 |
| 7 | MS. KROPF:  Objection as to form. | 10:06:28 |
| 8 | THE WITNESS:  That was part of the | 10:06:34 |
| 9 | mission.  That was part of the plan, | 10:06:35 |
| 10 | because -- based upon the terms of the lease. | 10:06:37 |
| 11 | The other part of the plan was the | 10:06:39 |
| 12 | reason why Algon was involved, was the hope | 10:06:41 |
| 13 | that the landlord would negotiate at some | 10:06:45 |
| 14 | point with the tenant, and they would | 10:06:50 |
| 15 | actually make it economically viable. | 10:06:53 |
| 16 | Because they were in the business to | 10:06:56 |
| 17 | make money.  So if you could make the asset | 10:06:57 |
| 18 | economically viable, that's why Algon was | 10:07:00 |
| 19 | involved, as people that have done that in | 10:07:04 |
| 20 | the past. | 10:07:07 |
| 21 | BY MR. BOSCH: | 10:07:08 |
| 22 | Q.    Do you recall there being any | 10:07:10 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**R.A.063**

Transcript of Robert W. Barron
Conducted on April 14, 2023                    65

| | | |
|---|---|---|
| 1 | discussion as to when Algon would begin having | 10:07:11 |
| 2 | these discussions with the landlord? | 10:07:14 |
| 3 | A.    I remember there was a delay in -- can | 10:07:18 |
| 4 | I have a request that -- I don't -- I can't see | 10:07:21 |
| 5 | you.  Could we take down this document?  I just | 10:07:23 |
| 6 | see a document. | 10:07:26 |
| 7 | Q.    Ah, yes, we can take this document | 10:07:28 |
| 8 | down. | 10:07:30 |
| 9 | A.    Okay.  Thank you. | 10:07:31 |
| 10 | Q.    So, Mr. Barron, do you recall there | 10:07:32 |
| 11 | being any discussion as to when Algon would begin | 10:07:40 |
| 12 | having these discussions with the landlord? | 10:07:43 |
| 13 | A.    I knew there was a -- there was a | 10:07:45 |
| 14 | discussion of a delay, to delay negotiations for a | 10:07:49 |
| 15 | time period. | 10:07:56 |
| 16 | Q.    Do you recall what that time period | 10:07:57 |
| 17 | was? | 10:08:02 |
| 18 | A.    I went back and looked at the | 10:08:02 |
| 19 | documents.  I think the term sheet had something | 10:08:04 |
| 20 | like 36 months or 38 months.  It was some "month" | 10:08:05 |
| 21 | time period. | 10:08:08 |
| 22 | Q.    Do you recall there being any | 10:08:10 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                      66

| | | |
|---|---|---|
| 1 | discussion as to why Mr. Feltman and IWA wanted to | 10:08:11 |
| 2 | delay Algon from having discussions with the | 10:08:14 |
| 3 | landlord for 36 months or so? | 10:08:17 |
| 4 | MS. KROPF:  Objection as to form. | 10:08:20 |
| 5 | THE WITNESS:  My understanding was a | 10:08:21 |
| 6 | combination of the lack -- severe lack of | 10:08:25 |
| 7 | trust with the landlord based upon this other | 10:08:30 |
| 8 | litigation, concern that the landlord would | 10:08:35 |
| 9 | not honor the terms of the lease.  And so the | 10:08:36 |
| 10 | concept of getting beyond the time period | 10:08:42 |
| 11 | for -- to try to attack the agreement based | 10:08:49 |
| 12 | upon transfer. | 10:08:53 |
| 13 | BY MR. BOSCH: | 10:08:55 |
| 14 | Q.    That was one of the purposes for | 10:08:56 |
| 15 | structuring this transaction that Mr. Feltman | 10:08:57 |
| 16 | identified from the beginning? | 10:08:59 |
| 17 | MS. KROPF:  Objection as to form. | 10:09:02 |
| 18 | THE WITNESS:  I don't know if -- I | 10:09:02 |
| 19 | don't know if in that call, that was | 10:09:10 |
| 20 | discussed.  But we got a term sheet later. | 10:09:12 |
| 21 | So I don't know if -- and, again, to me, that | 10:09:15 |
| 22 | call with him was very high level. | 10:09:17 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                          219

| | | |
|---|---|---|
| 1 | which could require a long time period as to | 14:10:07 |
| 2 | wind up the affairs of the entity. | 14:10:10 |
| 3 | BY MR. BOSCH: | 14:10:13 |
| 4 | Q.   All right.  But what happens to the | 14:10:13 |
| 5 | entity's ability to satisfy the tenant's | 14:10:15 |
| 6 | obligations under the ground lease once it's | 14:10:19 |
| 7 | dissolved? | 14:10:22 |
| 8 | MS. KROPF:  Objection as to form. | 14:10:23 |
| 9 | THE WITNESS:  If it's dissolved, they | 14:10:25 |
| 10 | still can wind up their affairs.  The issue | 14:10:26 |
| 11 | is, is that when do they end their affairs | 14:10:29 |
| 12 | post-dissolution, end the wind up. | 14:10:36 |
| 13 | BY MR. BOSCH: | 14:10:41 |
| 14 | Q.   Right.  So let's say after the | 14:10:41 |
| 15 | dissolution event, when the company is wound up, | 14:10:42 |
| 16 | after the winding-up process, what happens to the | 14:10:45 |
| 17 | company's ability to keep, observe and perform the | 14:10:49 |
| 18 | tenant's obligations under the ground lease? | 14:10:53 |
| 19 | A.   At that point, they would be turning | 14:10:57 |
| 20 | the keys over to the landlord. | 14:10:59 |
| 21 | Q.   All right.  So at the time of its | 14:11:02 |
| 22 | formation, RSD anticipated turning the keys over | 14:11:03 |

R.A.066

# EXHIBIT 11

**OPERATING AGREEMENT FOR**

**ROCK SPRINGS DRIVE, LLC**

**A MARYLAND LIMITED LIABILITY COMPANY**

{00095295.11}

RSD-005516

## OPERATING AGREEMENT
## FOR
## ROCK SPRINGS DRIVE, LLC
## A MARYLAND LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of August 31 , 2017 (the "Effective Date"), by and among Investors Warranty of America, LLC ("IWA Member") and Longshore Ventures LLC, a Delaware limited liability company ("Algon Member"), (collectively referred to as "Members" and individually as "Member"), with reference to the following facts:

### RECITALS

A. On August ___, 2017, Articles of Organization for Rock Springs Drive, LLC (the "Company"), a limited liability company organized under the laws of the State of Maryland, were filed with the Maryland Department of Taxation and Assessments.

B. The Members desire to adopt and approve this written operating agreement for the Company.

### AGREEMENT

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company under the laws of the State of Maryland upon the terms and subject to the conditions of this Agreement.

### ARTICLE 1

### DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article 1 shall have the meanings set forth elsewhere in this Agreement):

1.1 "Act" shall mean the Maryland Limited Liability Company Act, codified in the Maryland Corporations and Associations Code, Title 4A, et. seq., as the same may be amended from time to time.

1.2 "Additional Capital Contributions" shall have the meaning ascribed to it in Section 3.2.

1.3 "Affiliate" of a Member or Managing Member shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Managing Member, as applicable. The term "control," as used in the immediately preceding sentence, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

1.4 "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

[00095295.11]                                                    1

**R.A.069**

RSD-005517

1.5 "Algon Member" shall have the meaning ascribed to it in the opening paragraph of this Agreement.

1.6 "Annual Budget" shall have the meaning ascribed to it in Section 5.5.1.

1.7 "Articles" shall mean the Articles of Organization of the Company filed with the Maryland Office of Taxation and Assessments, as may be amended from time to time in accordance with this Agreement.

1.8 "Assignee" shall mean the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Article 7.

1.9 "Assigning Event" shall mean one or more of the following with respect to any Member: death, insanity, withdrawal, resignation, retirement, expulsion, Bankruptcy, dissolution, permanent disability, an event causing such Member to become a Wrongfully Withdrawing Member, Bankruptcy, or Incapacitating Event of such Member.

1.10 "Available Cash" shall mean the amount of cash generated or received by the Company from any source including, but not limited to, any proceeds from the sale of Property, financings or re-financings, operating income, insurance proceeds, or condemnation proceeds, which the Managing Member deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Managing Member deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.11 "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

1.12 "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.13 "Capital Contribution" or "Contribution" shall mean the total amount of cash and fair market value of property contributed to the Company by Members.

1.14 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.15 "Company" shall mean Rock Springs Drive, LLC, a Maryland limited liability company.

{00095295.11}

2

R.A.070

RSD-005518

1.16    "Company Minimum Gain" shall have the meaning ascribed to the term "Company Minimum Gain" in Regulations Section 1.704-2(d).

1.17    "Confidential Information" shall have the meaning ascribed to it in Section 14.20.3.

1.18    "Corporations Code" shall mean the Maryland Corporations and Associations Code, as amended from time to time, and the provisions of succeeding law.

1.19    "Diligence Materials" shall have the meaning ascribed to it in Section 5.7.

1.20    "Dissolution Events" shall have the meaning ascribed to it in Section 10.1.

1.21    "Draft Budget" shall have the meaning ascribed to it in Section 5.5.1.

1.22    "Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided by the Act, any right to information concerning the business and affairs of the Company.

1.23    "Emergency Amount" shall have the meaning ascribed to it in Section 5.5.1.

1.24    "Effective Date" shall have the meaning set forth in the opening paragraph of this Agreement.

1.25    "Expenses" shall have the meaning ascribed to it in Section 11.1.1.

1.26    "Fiscal Year" shall mean the Company's fiscal year.

1.27    "Former Member" shall have the meaning ascribed to it in Section 8.1.

1.28    "Former Member's Interest" shall have the meaning ascribed to it in Section 8.1.

1.29    "Incapacitating Event" shall have the meaning ascribed to it in Section 7.6.

1.30    "Independent Member" shall have the meaning ascribed to it in Section 5.2.1.

1.31    "Initial Capital Contribution" shall have the meaning ascribed to it in Section 3.1.

1.32    "IWA Member" shall have the meaning set forth in the opening paragraph of this Agreement.

1.33    "Landlord" shall have the meaning set forth below in Section 1.34, and any successor or assign.

1.34    "Lease" shall have that certain Amended and Restated Ground Lease Indenture, by and between Anne D. Camalier, as landlord and Rock Spring II Limited Partnership, as

{00095295.11}                                              3

**R.A.071**

RSD-005519

tenant, dated as of November 14, 1990, as amended by First Amendment to Amended and
Restated Ground Lease Indenture, dated as of September 1, 2002 by and between Rock Spring
Plaza II, LLC, a Maryland limited liability company, successor in interest to Anne D. Camalier
("Landlord") and Rock Spring II Limited Partnership, as tenant.

1.35    "Majority Interest" shall mean the vote or written consent of Members holding
more than fifty percent (50%) of the outstanding Percentage Interests in the Company.

1.36    "Management Agreement" shall have the meaning ascribed to it in Section 5.1.1.

1.37    "Management Committee" shall have the meaning ascribed to it in Section 5.2.

1.38    "Managing Member" shall mean Algon Member or any other Person that
succeeds it as the Managing Member of the Company pursuant to the terms of this Agreement.

1.39    "Material Transaction" shall have the meaning ascribed to it in Section 5.7.

1.40    "Member" shall mean each Person who is an initial signatory to this Agreement,
has been admitted to the Company as a Member in accordance with the Articles and this
Agreement or is an Assignee who has become a Member in accordance with Article 7, and has
not become the subject of a Dissolution Event or ceased to be a Member in accordance with
Article 8 or for any other reason.

1.41    "Member Nonrecourse Debt" shall have the meaning ascribed to the term
"Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.42    "Member Nonrecourse Deductions" shall mean items of Company loss,
deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member
Nonrecourse Debt.

1.43    "Membership Interest" shall mean a Member's entire interest in the Company
including the Member's Economic Interest, the right to vote on or participate in the management,
and the right to receive information concerning the business and affairs, of the Company.

1.44    "Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions
of the Company in the aggregate or separately stated, as appropriate, determined in accordance
with the method of accounting at the close of each Fiscal Year on the Company's information tax
return filed for federal income tax purposes.

1.45    "Ninety Percent (90%)-in-Interest" shall mean approval of Members holding at
least 90% of the Percentage Interest of the Company.

1.46    Operating Costs and Expenses" shall mean any and all costs incurred by or on
behalf of the Company to operate the Company and to own, operate, and maintain the Property
including, but not limited to, real estate taxes, insurance premiums, utility charges, property
management fees, landscaping costs, and maintenance charges.

{00095295.11}                                           4

**R.A.072**

RSD-005520

1.47    "Organization Costs" shall mean all costs and expenses incurred in connection with the formation and organization of the Company including out-of-pocket legal and accounting costs and expenses and filing fees.

1.48    "Partnership Representative" shall have the meaning ascribed to it in Section 9.7.

1.49    "Percentage Interest" shall mean the percentage ownership interest of the Company owned by a Member as set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit A hereto.

1.50    "Person" shall mean an individual, company, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.51    "Proceeding" shall have the meaning ascribed to it in Section 11.1.2.

1.52    "Property" shall mean the leasehold interest in that certain office building known as 6560 Rock Springs Drive, Bethesda, Maryland, as represented by the Lease.

1.53    "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

1.54    "Regulatory Allocations" shall have the meaning ascribed to it in Section 6.2.7.

1.55    "75%-in-Interest" shall have the meaning ascribed to it in Section 5.1.1.

1.56    "Special Purpose Entity" shall have the meaning ascribed to it in Section 12.2.

1.57    "Remaining Members" shall have the meaning ascribed to it in Section 8.1.

1.58    "Revised Annual Budget" shall have the meaning ascribed to it in Section 5.5.2.

1.59    "Suspended Distribution" shall have the meaning ascribed to it in Section 6.4.3.

1.60    "Tax Matters Partner" (as defined in Code Section 6231) shall be the Managing Member, or any successor or replacement appointed in accordance with this Agreement.

1.61    "Taylor" shall mean Troy T. Taylor.

1.62    "Transfer" shall have the meaning ascribed to it in Section 7.1.

1.63    "Unreturned Capital Contributions" means an amount (not below zero) equal to the aggregate Initial Capital Contribution and Additional Capital Contribution made by a Member to the Company in accordance with the terms of this Agreement, less distributions received by that Member pursuant to Section 6.4.A(i).

1.64    "Variance Amount" shall have the meaning ascribed to it in Section 5.5.1.

{00095295.11}    5

R.A.073

RSD-005521

1.65 "Wrongfully Withdrawing Member" shall have the meaning ascribed to it in in Section 4.3.

## ARTICLE 2

## ORGANIZATIONAL MATTERS

2.1 Formation. The Members have formed a Maryland limited liability company by filing the Articles and entering into this Agreement, which Agreement shall be deemed effective as of the Effective Date. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2 Name. The name of the Company shall be "Rock Springs Drive, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managing Member deems appropriate or advisable. The Managing Member shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managing Member considers appropriate or advisable.

2.3 Term. The term of this Agreement commenced on the filing of the Articles and shall be terminated as provided in Section 10.1.

2.4 Office and Agent. The Company shall continuously maintain an office or registered agent in the State of Maryland. The principal office of, and mailing address for, the Company shall be 2457 Collins Avenue, PH2, Miami Beach, Florida 33140 or as the Managing Member may determine. The Company may also have such offices, anywhere within or outside of the State of Maryland, as the Managing Member determines from time to time, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Managing Member.

2.5 Addresses of the Members and the Managing Member. The respective addresses of the Members are set forth on Exhibit A. A Member may change his address upon notice thereof to the Managing Member in accordance with Section 14.13.

2.6 Purpose and Business of the Company. The primary purpose of the Company is to acquire, operate, manage, entitle, maintain and hold the Property and any other Company assets for investment, and to engage in any and all other purposes necessary, convenient or incidental thereto. Although such specification of purpose shall not constitute a limitation on the powers of the Company, the Company shall not undertake or carry out any other purpose or business unless specifically otherwise approved by a vote of the Majority of the Members.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

3.1 Initial Capital Contributions. Each Member has made an Initial Capital Contribution to the Company as of the Effective Date as set forth on Exhibit A ("Initial Capital

{00095295.11} 6

RSD-005522

Contribution"), which Initial Capital Contributions will include the IWA Member's contribution of the Property.

3.2　Additional Capital and Funds.

3.2.1　Operating Capital Contributions. Subject to the terms and conditions of this Agreement, the IWA Member shall periodically during the term of this Agreement, make additional Capital Contributions ("Additional Capital Contributions") to pay Operating Costs and Expenses, all as identified in the Annual Budget approved by the IWA Member. The amount to be contributed by the IWA Member pursuant to this Section 3.2.1 or otherwise shall not exceed $3,900,000, which shall include the amount contributed to the Company by the IWA Member as its initial Capital Contribution as specified on Exhibit A. The Independent Member shall approve any such request for Additional Capital Contribution, and the amount of any such Additional Capital Contribution shall not exceed the anticipated costs and expenses (net of anticipated revenue) of the Company for the next succeeding fiscal quarter as set forth in the Annual Budget. For the period commencing on the Effective Date through December 31, 2017, it is not anticipated that the Company will have an approved Annual Budget, and the IWA Member shall make Capital Contributions to fund Operating Costs and Expenses, based upon those Operating Costs and Expenses as approved by the IWA Member. From and after January 1, 2018, Additional Capital Contributions shall be made based upon an Approved Annual Budget as described above in this Section 3.2.1. The Managing Member shall call for such Additional Capital Contributions no more than thirty (30) days and no less than ten (10) days prior to the date any such Additional Capital Contribution is due and payable. Any such request for an Additional Capital Contribution shall be made on a form approved by the IWA Member. The Algon Member, whether in its capacity as a Member or as the Managing Member or otherwise, shall not be required to make any Additional Capital Contributions to the Company or to use its own funds to pay any Operating Costs and Expenses. All contributions made pursuant to this Section 3.2.1 shall be deemed Additional Capital Contributions credited to the Capital Account of the Member which made the Contribution.

3.2.2　No Other Obligation. Except as set forth above in Section 3.2.1, no Member shall be obligated to contribute additional capital to the Company.

3.3　No Rights In Third Parties. The Managing Member's right under this Article 3 to request Additional Capital Contributions is personal to the Managing Member and the IWA Member. Nothing in this Article 3 (whether express or implied) shall be construed to entitle any third party (including, without limitation, a creditor of the Company) to (i) substitute its own judgment for the Managing Member's and the Independent Director's judgment in determining if and when the Company requires additional funds, (ii) compel the IWA Member to contribute capital or loan funds to the Company, or (iii) otherwise exercise the Managing Member's right to obtain funds for the Company pursuant to this Article 3.

3.4　Capital Accounts. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv). If a

{00095295.11}　　　　　　　　　　7

**R.A.075**

RSD-005523

Member transfers all or a part of its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.5    No Interest. No Member shall be entitled to receive any interest on its Capital Contributions.

## ARTICLE 4

### MEMBERS

4.1    Limited Liability. Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2    Admission of Additional Members. The Managing Member, with the approval of at least 90%-in-Interest, may admit additional Members to the Company. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are reasonably determined by the Managing Member and approved by all of the Members. Notwithstanding the foregoing, Assignees may only be admitted as substitute Members in accordance with Article 7.

4.3    Withdrawals or Resignations. No Member may voluntarily withdraw or resign or retire from the Company. If any Member withdraws, retires, or resigns in violation of this Section 4.3 (the "Wrongfully Withdrawing Member"), its Membership Interest shall terminate pursuant to Section 4.4. Such Wrongfully Withdrawing Member shall thereafter receive distributions and allocations of Net Profit and Net Loss in accordance with Article 6 as an Assignee.

4.4    Termination of Membership Interest. With respect to a Wrongfully Withdrawing Member or upon the transfer of a Member's Membership Interest in violation of Article 7, the Membership Interest of such Member shall be terminated by the Managing Member (or the other Member if the Wrongfully Withdrawing Member is the Managing Member) and thereafter that Member shall be an Assignee only unless such Membership Interest is purchased by the Company and/or remaining Members as provided in Article 8. Each Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the Effective Date.

4.5    Competing Activities. The Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members shall not be obligated to present any investment opportunity or

{00095295.11}    8

RSD-005524

prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims which they may otherwise have against the other Members and their officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

4.6     Transactions With The Company. Except as otherwise specifically set forth herein, a Member may not transact any business with the Company.

4.7     Remuneration To Members. Except as otherwise specifically provided in this Agreement, no Member is entitled to remuneration for acting in the Company business.

4.8     Members Are Not Agents. Pursuant to Section 5.1.1 and the Articles, the management of the Company is vested in the Managing Member. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Managing Member, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.9     Voting Rights. Except as expressly provided in this Agreement or required by the Act, Members shall have no voting, approval or consent rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

    4.9.1   Unanimous Approval. All Members must approve any action described herein which requires the unanimous approval of the Members before the Company or the Managing Member may take any such action.

    4.9.2   Approval by Members Holding a 90%-in-Interest. Except as set forth in Section 4.9.1 or elsewhere in this Agreement requiring a different vote threshold, in all other matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of holders of at least 90%-in-Interest adopted at a duly called meeting or pursuant to a written consent containing the requisite approval shall be sufficient to authorize or approve such act.

    4.9.3   Approval Standard. Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Managing Member or 90%-in-Interest may be given or withheld, conditioned or delayed as the Managing Member or 90%-in-Interest may determine in their sole discretion.

4.10    Meetings of Members.

{00095295.11}                                    9

**R.A.077**

RSD-005525

4.10.1 Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within or outside the State of Maryland as the Managing Member may fix from time to time. No annual or regular meetings of Members are required. At any Members' meeting, the Managing Member shall preside at the meeting and act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute books of the Company.

4.10.2 Power to Call Meetings. Meetings of the Members may be called by the Managing Member, or upon written demand of Members holding more than twenty percent (20%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

4.10.3 Notice of Meeting. Written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.10.4 not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to a Managing Member by any person entitled to call a meeting of Members, the Managing Member shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

4.10.4 Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail, or nationally recognized overnight delivery service, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. If no such address appears on the Company's books or is given, notice shall be deemed to have been given if sent to that Member by first-class mail or nationally recognized overnight delivery service to the Company's principal executive office. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by nationally recognized overnight delivery service.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Managing Member or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

4.10.5 Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

{00095295.11} 10

**R.A.078**

RSD-005526

4.10.6 Quorum. The presence in person or by proxy of Members holding a 90%-in-Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a 90%-in-Interest.

4.10.7 Adjourned Meeting; Notice. Any Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.10.6. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Managing Member shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

4.10.8 Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice.

4.10.9 Action by Written Consent without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is signed and delivered to the Company by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted. All such consents shall be filed with the Managing Member or the secretary, if any, of the Company and shall be maintained in the Company records. Any Member giving a written consent, or the Member's proxy holders, may revoke the consent by a writing received by the Managing Member or

**R.A.079**

RSD-005527

secretary, if any, of the Company before written consents of the number of votes required to authorize the proposed action have been filed.

4.10.10 Telephonic Participation by Member at Meetings. Members may participate in any Members' meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

4.10.11 Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, a Managing Member, or Members representing more than ten percent (10%) of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date is fixed:

(a) The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b) The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(c) The record date for determining Members for any other purpose shall be at the close of business on the day next proceeding the day on which the Managing Member adopts the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(d) The determination of Members of record who are entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Managing Member or the Members who called the meeting fix a new record date for the adjourned meeting, but the Managing Member or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

4.10.12 Proxies. Every Member entitled to vote for the Managing Member or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Managing Member or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless revoked by the

{00095295.11} 12

RSD-005528

person executing it, before the vote pursuant to that proxy, by a writing delivered to the
Company stating that the proxy is revoked, or by a subsequent proxy executed by, or
attendance at the meeting and voting in person by, the person executing the proxy; or
written notice of the death or incapacity of the maker of that proxy is received by the
Company before the vote pursuant to that proxy is counted; provided, however, that no
proxy shall be valid after the expiration of eleven (11) months from the date of the
proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on
its face that it is irrevocable shall be governed by the Act.

4.11    Certificate of Membership Interest.

           4.11.1 Certificate. A Membership Interest may be represented by a
certificate of membership. The exact contents of a certificate of membership may be
determined by the Managing Member.

           4.11.2 Cancellation of Certificate. Except as herein provided with
respect to lost, stolen, or destroyed certificates, no new certificates of membership shall
be issued in lieu of previously issued certificates of membership until former certificates
for a like number of Membership Interests shall have been surrendered and canceled.
All certificates of membership surrendered to the Company for transfer shall be
canceled.

           4.11.3 Replacement of Lost, Stolen, or Destroyed Certificate. Any
Member claiming that his certificate of membership is lost, stolen, or destroyed may
make an affidavit or affirmation of that fact and request a new certificate. Upon the
giving of a satisfactory indemnity to the Company as reasonably required by the
Managing Member, a new certificate may be issued of the same tenor and representing
the same Percentage Interest of membership as was represented by the certificate alleged
to be lost, stolen, or destroyed.

## ARTICLE 5

## MANAGEMENT AND CONTROL OF THE COMPANY

           5.1.1   Management. Subject to the restrictions in this Article 5, the
powers of the Company shall be exercised by or under the authority of, and the business
and affairs of the Company shall be managed under the direction and control of, the
Managing Member. The Algon Member is hereby designated as the Managing Member.
The Managing Member may exercise on behalf of the Company, and may delegate to a
Manager, the rights set forth in this Article 5 (and subject to the limitations as set forth
in this Article 5). The Managing Member shall operate the Company in compliance
with the terms of the Lease. If the Managing Member delegates its duties and
responsibilities hereunder, the Managing Member shall remain responsible for the
actions and omissions of a Manager. Except for situations in which the approval of the
Members is expressly required by this Agreement or by the Act, the Managing Member
shall have full, complete and exclusive authority, power, and discretion to manage and
control the business, property and affairs of the Company, to make all decisions

{00095295.11}                                    13

**R.A.081**

RSD-005529

regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs. The Members hereby approve the selection of Longshore Ventures LLC, a Delaware limited liability company (the "Manager"), as the Manager pursuant to the terms of that certain Management Agreement, attached hereto as Exhibit B ("Management Agreement"). Any Managing Member may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Managing Member is a party. The resignation of any Managing Member shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Managing Member who is also a Member shall not affect the Managing Member's rights as a Member and shall not constitute a withdrawal of a Member, except as otherwise provided herein. Any Managing Member may be removed at any time with or without cause, for any reason or no reason, by the affirmative vote of Members holding at least 75% of the outstanding Percentage Interests in the Company ("75%-in-Interest") at a meeting called expressly for that purpose, or by the written consent of a 75%-in-Interest. Any removal shall, except as set forth in Section 7.8, be without prejudice to the Managing Member's rights as a Member or constitute a withdrawal of a Member. Any vacancy in the position of Managing Member occurring for any reason may be filled by the affirmative vote or written consent of 90%-in-Interest.

5.2    Management Committee.

5.2.1    There shall be a committee formed of representatives of the Members (the "Management Committee") consisting of three (3) members. The Management Committee shall be comprised of two (2) Persons designated by the IWA Member and one Person designated by Members holding at least 75%-in-Interest ("Independent Member"). The Members hereby appoint David Feltman, Blaine Shaffer, and Greg Dryden as the initial members of the Management Committee, with Greg Dryden designated as the Independent Member.

5.2.2    The IWA Member shall have the exclusive right to remove, with or without cause, any and all members and alternates that it appoints to the Management Committee and to fill any vacancy created by the death, disability, removal or resignation of any such representative.

5.2.3    Each member on the Management Committee shall hold office until his or her successor shall have been appointed and qualified or until his or her earlier resignation, removal, death or disability.

(a)    Any Management Committee member may call a special meeting of the Management Committee for any matter that the member determines in good faith is appropriate for consideration at this meeting. Meetings of the Management Committee may be held at the principal office of the Company or by conference call or at such reasonable time and place as shall be designated in the notice of such meeting. Each member of the Management Committee shall be given at least three (3) days' notice of any meeting of the Management

{00095295.11}    14

**R.A.082**

Committee (and notice of the agenda to be discussed at such meeting); provided that notice of a meeting of the Management Committee may be delivered by electronic mail, provided, further that (i) attendance at such meeting shall be deemed a waiver of such notice (unless a specific objection regarding inadequate notice is raised) and (ii) notice to any member may be waived in writing or by electronic mail by such representative at any time.

(b)     Subject to the delivery of proper notification of a meeting (or waiver of such notice), attendance by a majority of the members in office at any time shall constitute a quorum. An action shall be deemed approved by the Management Committee if it has been approved by a majority of the members present at any meeting of the Management Committee at which a quorum is present. Any member may be present at any meeting in person or by means of telephone or similar communication equipment allowing all persons participating in the meeting to hear and speak to each other.

(c)     Any action required or permitted to be taken at any meeting of the Management Committee may be taken without a meeting if a majority of the members consent to such action in writing.

5.3     Powers of Managing Member.

5.3.1   Powers of Managing Member. Without limiting the generality of Section 5.1.1, but subject to Section 5.3.2 and to the express limitations set forth elsewhere in this Agreement, the Managing Member (and the Manager if the Managing Member delegates its duties hereunder to a Manager) shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act including, without limitation, the power to:

(a)     Manage, lease, and operate the Property;

(b)     Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved up to Fifty Thousand Dollars ($50,000); and

(c)     Retain legal counsel, accountants, engineers, consultants, auditors, and other professionals in connection with the Company business and to pay such remuneration as the Managing Member may determine.

5.3.2   Limitations on Power of Managing Member. The Managing Member (and the Manager) shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of 90%-in-Interest of the Members:

(a)     The sale, exchange or other disposition of all, or any portion, of the Property;

{00095295.11}                                      15

**R.A.083**

RSD-005531

(b) The merger of the Company with another limited liability company or limited partnership; provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without its express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act;

(c) Incur any indebtedness unless identified and approved in the Annual Budget;

(d) The merger of the Company with a corporation or a general partnership or other Person;

(e) The establishment of different classes of Members;

(f) The filing of any bankruptcy petition, assignment for the benefit of creditors, or initiating any other insolvency proceeding, soliciting or consenting to the filing of an involuntary bankruptcy, or pursuing similar actions pursuant to any insolvency laws, or providing any consent, approval, or acquiescence to the entry of an order, decree, or agreement for any of the foregoing matters;

(g) Any material change related to the Property, or the proposed usage or entitlement of the Property;

(h) Any act which would make it impossible to carry on the ordinary business of the Company;

(i) Amendment of this Agreement or the Articles;

(j) Approval of the Annual Budget, and any Revised Annual Budget;

(k) Admission of a new Member;

(l) Initiate negotiations or re-negotiations for any contract or agreement involving the receipt or payment by the Company of $50,000 or more, including such contract with the Landlord under the Lease (other than communication related to the payment or performance under the Lease); provided that the Managing Member (or Manager) may discuss leasing terms with any potential new tenant for the Property;

(m) Conducting any construction on the Property;

(n) Entry into any lease or sublease of all or any portion of the Property; or

(o) Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

5.4 Performance of Duties; Liability of Managing Member. A Managing Member shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit,

{00095295.11} 16

R.A.084

RSD-005532

gross negligence, reckless or intentional misconduct, or a knowing violation of law by the
Managing Member. The Managing Member shall perform its managerial duties in good faith, in
a manner it reasonably believes to be in the best interests of the Company and its Members, and
with such care, including reasonable inquiry, as an ordinarily prudent person in a like position
would use under similar circumstances. For the avoidance of doubt, any action taken or
decision not to act by Managing Member pursuant to, or in accordance with, the vote of any two
members of the Management Committee at a duly held meeting of the Management Committee
where the members of the Management Committee either have actual (not constructive)
knowledge of, or have been provided with all material facts related to the subject matter of the
particular matter that is the subject of the vote with respect to which the Managing Member has
actual (not constructive) knowledge concerning the matter in question, shall not constitute a
breach by Managing Member of any term or provision of this Agreement.

In performing its duties, the Managing Member shall be entitled to rely on information,
opinions, reports, or statements, including financial statements and other financial data, of the
following persons or groups unless the Managing Member has actual (not constructive)
knowledge concerning the matter in question that would cause such reliance to be unwarranted
and provided that the Managing Member acts in good faith and after reasonable inquiry when the
need therefor is indicated by the circumstances:

> 5.4.1   One or more officers, employees or other agents of the Company
> whom the Managing Member reasonably believes to be reliable and competent in the
> matters presented;

> 5.4.2   Any attorney, independent accountant, or other person as to
> matters which the Managing Member reasonably believes to be within such person's
> professional or expert competence;

> 5.4.3   A committee upon which the Managing Member does not serve,
> as to matters within its designated authority, which committee the Managing Member
> reasonably believes to be competent; or

> 5.4.4   Any vote of any two members of the Management Committee at a
> duly held meeting of the Management Committee where the members of the
> Management Committee either have actual (not constructive) knowledge of, or have
> been provided with all material facts related to the subject matter of the particular matter
> that is the subject of the vote with respect to which the Managing Member has actual
> (not constructive) knowledge concerning the matter in question, with respect to any
> action or decision not to take action with respect to the Company or the Property.

5.5   Annual Budgets. The Managing Member shall deliver to the Members for
approval the following at the times indicated below:

> 5.5.1   Commencing on November 1, 2017, not later than November 1st
> of each year, the Managing Member will prepare and present to the Members a draft
> budget (an "Draft Budget") for the operation of the Company for the ensuing year
> beginning as of January 1st of such ensuing year, setting forth the anticipated income,

{00095295.11}                                      17

**R.A.085**

RSD-005533

operating expenses, and capital expenditures of the Company for such ensuing year, including a projected balance sheet giving effect to the Draft Budget. The Draft Budget shall specifically identify costs and expenses, if any, to be paid to the Managing Member (and any Affiliate of the Managing Member, which Affiliate shall be specifically identified in the Draft Budget). The Draft Budget's projection of cash receipts and disbursements shall include projections and recommendations as to the use of projected cash flow in excess of short-term operating requirements and recommendations as to the sources and amounts of additional cash that may be required to meet operating and capital requirements for such ensuing year. The Managing Member shall call a meeting of all of the Members for the purpose of discussing, approving or rejecting the Draft Budget as proposed or as modified within fourteen (14) days after the delivery of the Draft Budget (or such other time as may be agreed to by the Members). The Draft Budget shall become effective only when approved by 90%-in-Interest and shall become the "Annual Budget." Except as set forth in Section 3.2.1, the Managing Member is authorized to pay, or commit the Company to pay, any amount that is included within the Annual Budget, but only up to the dollar amount specified in the Annual Budget; provided however, that the Managing Member shall be permitted to pay, or commit the Company to pay, (a) a commercially reasonable amount to pay for bona fide emergency expenses in the emergency situation in which human life or property is in danger, provided that Managing Member communicates as soon as reasonably possible with the IWA Member with respect to such situation and the amount of such expenditure (the "Emergency Amount") *plus* (b) an amount up to the lesser of: (i) $20,000, or (ii) 10% of the aggregate costs and expenses identified in the Annual Budget ("Variance Amount"). This Emergency Amount and the Variance Amount may be used by the Managing Member to pay costs and expenses, on behalf of the Company, regardless of whether the particular item is included or not included within the Annual Budget, except that the Emergency Amount and the Variance Amount shall not be used to make any payment to the Managing Member or any of its Affiliates. Notwithstanding the foregoing, prior to the approval of the Annual Budget for calendar year 2018, the Managing Member is authorized to pay, or commit the Company to pay, the Operating Costs and Expenses which are funded by the IWA Member by an Additional Capital Contribution to the Company pursuant to Section 3.2.1.

5.5.2  If the Managing Member anticipates that it will pay costs and expenses exceeding the costs and expenses (including the Emergency Amount and the Variance Amount) set forth in the Annual Budget for the year; and (ii) the Managing Member promptly (and in all cases within 30 days) shall submit a revised budget (a "Revised Annual Budget"), for the operation of the Business for the current fiscal year, setting forth (A) actual income, operating expenses, and capital expenditures for the period from the start of such then current year until the date of such Revised Annual Budget, and (B) anticipated income, operating expenses, and capital expenditures for the remainder of such then current year, including a projected balance sheet giving effect to the Revised Annual Budget. Any Member may call a meeting of the Members for the purpose of discussing, approving or rejecting the Revised Annual Budget as proposed or as modified within fourteen (14) days after the delivery of the Annual Revised Budget (or such other time as may be agreed to by the Members). The Revised Budget shall be

{00095295.11}                                    18

RSD-005534

approved only once it is unanimously approved by the Members and then shall become the then-current "Annual Budget".

5.6    Payment of Organization Costs. The Company shall pay directly, or reimburse Members for, any payments by them of any Organization Costs. Organization Costs shall include all reasonable fees and expenses incurred or paid by a Member for outside legal and accounting services and all fees and expenses in connection with preparing and filing all certificates and other instruments necessary to form the Company. The Company shall pay the actual out of pocket Organization Costs of the Algon Member, up to a maximum of Fifty Thousand Dollars ($50,000).

5.7    Material Transaction.    At least fourteen (14) days prior to committing the Company to: (a) funding any capital expenditures with respect to the Property, (b) selling, leasing, exchanging, or otherwise disposing of any Property or portion thereof, (c) acquiring any new investments, properties, leases, drilling rights, interest in a joint venture, acquisitions, or add-on acquisitions, or (d) conducting any bid or auction in connection with any disposition of any Property (each such activity in sections (a) through (d) are referred to as a "Material Transaction"), the Managing Member shall notify the IWA Member of any such proposed Material Transactions, and provide the IWA Member (and its agents or representatives) with any reports, studies, comparable transaction information, analysis, consultant reports, budgets, and other reports and information in the possession or control of the Managing Member, or otherwise considered by the Managing Member in determining whether to commit the Company to undertake any such Material Transaction (the "Diligence Material"). At the request of the IWA Member, Managing Member shall initiate a call with the IWA Member (including its agents and representatives) to discuss the proposed Material Transaction at least two (2) Business Days prior to committing the Company to any such Material Transaction.

5.8    Devotion of Time. The Managing Member is not obligated to devote all of its time or business efforts to the affairs of the Company. The Managing Member shall devote whatever time as it deems appropriate for the operation of the Company.

5.9    Competing Activities. The Managing Member and its officers, directors, shareholders, partners, members, Managing Members, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Managing Member shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Managing Member shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Managing Member and its Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Managing Member's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Managing Member and

{00095295.11}                                  19

**R.A.087**

RSD-005535

its officers, directors, shareholders, partners, members, Managing Members, agents, employees, and Affiliates as a result of any of such activities.

5.10    Transactions between the Company and the Managing Member. Subject to the terms set forth in Sections 5.1.1 and 5.3, the Managing Member shall be entitled to hire and retain its Affiliates to perform such services as the Managing Member deem necessary and desirable with respect to the Company's purpose, and to pay compensation to such Affiliates at competitive rates for similar services provided by non-Affiliates, except that the Managing Member shall not pay any compensation to an Affiliate for brokerage services provided by the Affiliate in connection with a sale or financing of the Company or any of its assets or a lease of any of the Company's assets (including the Property).

5.11    Liability of Managing Member Limited to Managing Member's Assets. Except as set forth in Section 11.3.1, under no circumstances will any director, officer, shareholder, member, managing member, partner, employee, agent or Affiliate of any Managing Member have any personal responsibility for any liability or obligation of the Managing Member (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Managing Member will be limited to the assets of the Managing Member as they may exist from time to time. In no event shall the Managing Member be obligated to use any of its own funds (or to loan any funds to the Company), in each case, to pay any Operating Costs and Expenses of the Company or any other Expenses of the Company.

5.12    Payments to Managing Member. Except as specified in Management Agreement approved by the Members, no Managing Member or Affiliate of a Managing Member is entitled to remuneration for services rendered or goods provided to the Company.

5.13    Officers. The Managing Member, with the approval of a Majority Interest of the Members, may appoint officers at any time.

5.14    Limited Liability. Except as set forth in Section 11.3.1, no person who is a Managing Member or officer or both a Managing Member and officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Managing Member or officer or both a Managing Member and officer of the Company.

5.15    Membership Interests of Managing Member. Except as otherwise provided in this Agreement, a Membership Interest held by the Managing Member shall entitle the Managing Member, as a Member, to all the rights of a Member, including without limitation the economic, voting, information and inspection rights of a Member.

## ARTICLE 6

## ALLOCATIONS OF PROFITS AND LOSSES; DISTRIBUTIONS

6.1    Allocations of Net Profits and Net Losses.

**R.A.088**

RSD-005536

6.1.1   Allocation of Net Profit. Except as otherwise provided in Section 6.2, Net Profits shall be allocated to the Members in the following order of priority:

(a)   First, to the IWA Member in an amount equal to its Unreturned Capital Contribution; then

(b)   Second, to the IWA Member until the IWA Member receives a Ten Percent (10%) annual rate of return on its Capital Contributions, compounded on an annual basis; then

(c)   Third, 90% to the IWA Member and 10% to the Algon Member until the IWA Member receives a Fifteen Percent (15%) annual rate of return on the IWA Member Capital Contribution, compounded on an annual basis; then

(d)   Fourth, 80% to the IWA Member and 20% to the Algon Member.

6.1.2   Losses. Except as provided in Section 6.2, Net Losses shall be allocated to the Members in the following order of priority:

(a)   First, to the Members in the amount of and in proportion to any Net Profits previously allocated to them under Section 6.1.1(a) through (b) above (to the extent such Net Profits have not been offset by prior Net Loss allocations under this subsection (a));

(b)   Thereafter, to the Members in proportion to their respective Percentage Interests.

6.1.3   Adjustment. If, due to differences between Net Profit and Net Loss in the aggregate on the one hand, and distributions under Section 6.4 or Section 10.5 on the other hand, there is a difference between the two calculations in the aggregate at the time of Company dissolution, then subject to any mandatory tax allocations, the Net Profit or Net Loss and all other items of Company income, gain, loss, deduction, or credit for that final year shall be allocated to the Members in accordance with their respective percentages of such items in aggregate distributions.

6.2   Special Allocations.

6.2.1   Limited Negative Capital Accounts From Loss Allocations. Notwithstanding Sections 6.1.1 and 6.1.2 immediately above, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of "Membership Minimum Gain" (which term shall have the meaning set forth in Treasury Regulations Section 1.704-2(d)) that would be realized on a foreclosure of the Membership's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.2.1).

{00095295.11}                    21

R.A.089

RSD-005537

6.2.2 Minimum Gain Chargeback. If there is a net decrease in Membership Minimum Gain during any Membership fiscal year, each Member shall be specially allocated items of Membership income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Membership Minimum Gain that is allocable to the disposition of Membership property subject to a "Nonrecourse Liability" (which term shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2)), which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2.2 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 6.2.2. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 6.2.2 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

6.2.3 Chargeback of Minimum Gain Attributable To Member Nonrecourse Debt. If there is a net decrease in Membership Minimum Gain attributable to a "Member Nonrecourse Debt" (which term shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(4)) during any Membership fiscal year, each Member who has a share of the Membership Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Membership income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Membership Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Membership property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2.3 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 6.2.3. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section 6.2.3 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

6.2.4 Nonrecourse Deductions. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in accordance with their respective Percentage Interests.

6.2.5 Member Nonrecourse Deductions. Those items of Membership loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

{00095295.11}                 22

RSD-005538

6.2.6    Qualified Income Offset. If a Member receives any adjustments,
allocations, or distributions described in Treasury Regulation Section 1.704-
1(b)(2)(ii)(d)(4), (5) or (6), whether or not expected or unexpected, or any other event
creates a deficit balance in such Member's Capital Account in excess of such Member's
share of Membership Minimum Gain, items of Membership income and gain shall be
specially allocated to such Member in an amount and manner sufficient to eliminate
such excess deficit balance as quickly as possible. Any special allocations of items of
income and gain pursuant to this Section 6.2.6 shall be taken into account in computing
subsequent allocations of income and gain pursuant to this Section 6 so that the net
amount of any item so allocated and the income, gain, and losses allocated to each
Member pursuant to this Section 6 to the extent possible, shall be equal to the net
amount that would have been allocated to each such Member pursuant to the provisions
of this Section 6 if such unexpected adjustments, allocations, or distributions had not
occurred.

6.2.7    Curative Allocations. The special allocations set forth in Section
6.2.1 through Section 6.2.6 above ("Regulatory Allocations") are intended to comply
with certain requirements of the Treasury Regulations. It is the Members' intent that, to
the extent possible, all Regulatory Allocations be offset with either (i) other Regulatory
Allocations, or (ii) special allocations of other items of Membership income, gain, loss
or deduction pursuant to this Section 6.2.7. Therefore, notwithstanding any other
provision of this Section 6.2.7 to the contrary (other than the Regulatory Allocations),
the Managing Member shall make such offsetting special allocations in whatever
manner the Managing Member determines reasonably appropriate so that, after such
offsetting allocations are made, each Member's Capital Account balance is, to the extent
possible, equal to the Capital Account balance such Member would have had if the
Regulatory Allocations were not part of this Agreement and all tax items were allocated
pursuant to Section 6.1 above. In exercising its discretion under this Section 6.2.7, the
Managing Member shall take into account future Regulatory Allocations under Sections
6.2.1 through 6.2.6 above, although not yet made, are likely to offset other Regulatory
Allocations previously made in accordance with the provisions of this Section 6.2.7.

6.3    Allocation Rules.

6.3.1    Notwithstanding any other provision in this Section 6, in
accordance with Code Section 704(c) and the Treasury Regulations promulgated there
under, income, gain, loss, and deduction with respect to any property contributed to the
capital of the Membership shall, solely for tax purposes, be allocated among the
Members so as to take account of any variation between the adjusted basis of such
property to the Membership for federal income tax purposes and its fair market value on
the date of contribution, as determined by the Managing Member. Allocations pursuant
to this Section 6.3.1 are solely for purposes of federal, state, and local taxes. As such,
they shall not affect or in any way be taken into account in computing a Member's
Capital Account or share of profits, losses, or other items of distributions pursuant to any
provision of this Agreement. In accordance with Code Section 704(c) and the
Regulations thereunder, income, gain, loss, and deduction with respect to any Property
contributed to the capital of the Company shall, solely for tax purposes, be allocated

{00095295.11}                                       23

RSD-005539

among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using the allocation method selected by the Tax Matter Member.

6.3.2 For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

6.3.3 The Members are aware of the income tax consequences of the allocations made by this Section 6 and hereby agree to be bound by the provisions of this Section 6 in reporting their shares of Company income and loss for income tax purposes.

6.3.4 Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752 3(a) (3), the Members' interests in Company profits are in proportion to their Percentage Interests.

6.3.5 In the event the value of any Company asset is adjusted pursuant to the Regulations, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its new value in the same manner as under Code Section 704(c) and the Regulations thereunder.

6.3.6 Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement.

6.3.7 In the event of the assignment or transfer of all or any part of the Membership Interest of a Member, the allocable share, with respect to the Membership Interest so assigned, of Net Profits, Net Losses and distributions shall be allocated between the assignor and the assignee using the closing of the books method of allocation.

6.3.8 The Company shall elect to deduct expenses incurred in connection with organizing the Company ratably over a sixty (60) month period as provided in Section 709 of the Code.

6.3.9 This Agreement has been drafted in a manner which is intended to comply with the principles of Sections 704 (based on the Member's interests in the Company with respect to allocations under Section 704(b)), 706 and 752 of the Code. Therefore, if the Company is advised that the allocations provided in this Section 6 are unlikely to be respected for federal income tax purposes, the Managing Member is hereby granted the power to amend the allocation provisions of this Agreement, including making any special allocations of items of gross income of deduction on advice of accountants and legal counsel, to the minimum extent necessary to achieve the

{00095295.11}                    24

RSD-005540

foregoing results; provided, however, that no such amendment shall have any materially adverse effect upon any Member and no such amendment shall change the manner of making distributions under Section 6.4 or Section 10.5.

6.3.10 No election shall be made by the Company or any Member or Managing Member for the Company to be excluded from the application of any provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

6.4    Distributions.

6.4.1   Distributions of Available Cash. Except as provided in Section 10.5, all distributions of Available Cash shall be made to the Members as follows:

(a)    First, to the IWA Member until its Unreturned Capital Contribution is Zero Dollars ($0); then

(b)    Second, to the IWA Member until the IWA Member receives a Ten Percent (10%) annual rate of return on its Capital Contributions, compounded on an annual basis; and

(c)    Third, 90% to the IWA Member and 10% to the Algon Member until the IWA Member receives a Fifteen Percent (15%) annual rate of return on the IWA Member Capital Contribution, compounded on an annual basis; and

(d)    Fourth, 80% to the IWA Member and 20% to the Algon Member. For purposes of clarification, the distribution to the Algon Member includes any distribution otherwise payable to the Algon Member in connection with its ownership of the Membership Interest held by the Algon Member.

6.4.2   In-Kind Distributions. Company property (other than cash) shall not be distributed in-kind to the Members without the prior written approval of the Managing Member and all of the Members. If any Company property is distributed to the Members in-kind, any Member entitled to receive any interest in such property shall receive such interest as a tenant-in-common with such other Member or Members so entitled. The amount of such Distribution shall be the fair market value of such property as of the date of the Distribution, which fair market value shall be determined either by unanimous agreement of the Members. The Capital Accounts of the Members shall be adjusted to reflect the amount of Net Profits or Net Losses that would have been realized by the Company pursuant to the terms of this Agreement had the Company sold the property being distributed for the agreed fair market value immediately prior to such Distribution.

6.4.3   Limitation on Certain Distributions. Notwithstanding Sections 6.4.1 and 6.4.2 hereof, the aggregate Distributions to a Member pursuant to such Sections during any Fiscal Year shall be limited to the maximum amount that can be distributed to a Member without creating a deficit balance in its Capital Account that is in excess of the amount its deemed obligated to restore pursuant to the penultimate

{00095295.11}                                25

**R.A.093**

RSD-005541

sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations. For purposes of the previous sentence, the deficit balance in a Member's Capital Account created by a distribution shall be equal to its Capital Account as of the end of the prior Fiscal Year, increased by its Capital Contributions, if any, during the current Fiscal Year, without giving effect to any allocations of Profit or Losses or any items thereof for the current Fiscal Year. Any distribution prevented by this Section 6.4.3 (a "Suspended Distribution") shall be set aside by the Company and shall reduce Available Cash. However, for purposes of distributions to the other Member pursuant to Sections 6.4.1 and 6.4.2 hereof, Suspended Distributions which would otherwise have been made to the Member with the negative Capital Account shall be treated as actually having been made. All or a portion of any Suspended Distribution shall be made to the Member (or the successor-in-interest of the Member) to whom, but for this Section 6.4.3, the Suspended Distribution would have been made at the earliest possible time that such Distribution can be made without violating the provisions of this Section 6.4.3, at which time such distribution (a) shall increase Available Cash, and (b) except to the extent already taken into account pursuant to the previous sentence, shall be treated as a distribution pursuant to Section 6.4.1 or Section 6.4.2 hereof, as the case may be.

6.4.4 Limitations on Distributions. Notwithstanding any provisions to the contrary in this Section 6.4, no Distributions may be made by the Company if, after giving effect to the Distribution: (a) the Company has previously incurred any expenses which have not been paid or satisfied in full and/or the Members reasonably determine that the Company will incur expenses in the foreseeable future; (b) the Company would not be able to pay its secured and unsecured debt obligations as they become due in the usual course of business; and/or (c) the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the Distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the Distribution.

6.4.5 Excess Distributions. A Member or Managing Member who approves a Distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the Distribution that exceeds what could have been distributed without violating this Agreement or the Act, if it is established that the Member or Managing Member did not act in compliance with this Section 6.4.5. Any Member or Managing Member who is so liable shall be entitled to compel contribution from: (a) each other Member or Managing Member who also is so liable; and (b) each Member for the amount the Member received with knowledge of facts indicating that the Distribution was made in violation of this Agreement or the Act.

6.4.6 Amounts Withheld. All amounts withheld pursuant to any provision of any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 6.4.6 for all purposes under this Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and

{00095295.11}                          26

**R.A.094**

RSD-005542

local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

6.4.7    Limitations on Distributions. Except as otherwise provided in Sections 6 and 10 hereof, no Member shall demand or receive a return on or of its Capital Contributions or withdraw from the Company.

## ARTICLE 7

### TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests. Except as otherwise provided in this Article 7, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his Membership Interest (collectively, "transfer") except with the prior written consent of all of the Members, which consent may be given in the sole discretion of each Member. Transfers in violation of this Article 7 shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    Intentionally Omitted.

7.3    Substitution of Members. An Assignee of a Membership Interest shall have the right to become a substitute Member only if the requirements of Sections 7.1 and 7.2, the Assignee executes an instrument satisfactory to the Managing Member accepting and adopting the terms and provisions of this Agreement, and the Assignee pays any reasonable expenses in connection with his admission as a new Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4    Permitted Transfers. Notwithstanding anything contained in this Article 7, a Member may transfer, in its sole and absolute discretion, its Membership Interest to any of its Affiliates; provided that any such transfer shall not release the Member from its obligations in this Agreement including, but not limited to, the obligation to make Additional Capital Contributions.

7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest or an Economic Interest shall be effective as of the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Managing Member shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement.

7.6    Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person

{00095295.11}    27

## R.A.095

or property ("Incapacitating Event"), the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his legal representative or successor.

7.7    No Effect to Transfers in Violation of Agreement. Upon an Assignment Event or any transfer of a Membership Interest in violation of this Article 7, the Member or the transferee (as applicable) shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

Upon and contemporaneously with any transfer (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100, all remaining rights and interests retained by the Member that immediately before the transfer were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article 7 is not unreasonable under the circumstances existing as of the date hereof.

7.8    Call Rights. In the event that either: (a) the Management Agreement is terminated in accordance with the terms of such Management Agreement for any reason, or (b) the Managing Member is terminated as the Managing Member pursuant to this Agreement, then, the IWA Member shall have the right, but not the obligation, to purchase the Membership Interest owned or held by the Algon Member (or by any assignee or transferee), for a purchase price of One Thousand Dollars ($1,000).

## ARTICLE 8

### TERMINATION OF MEMBERSHIP INTEREST

8.1    Withdrawal. Upon an Assigning Event of a Member, such Member shall be treated as a "Former Member", and the Company and/or the other Members ("Remaining Members") shall have the right to purchase, and if such right is exercised, the Former Member shall sell all of its Membership Interest, the "Former Member's Interest" as provided in this Article 8.

{00095295.11}                                  28

R.A.096

RSD-005544

8.2    Purchase Price. Except as otherwise provided in Section 7.8 which should prevail over the terms of this Article 8, the purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 3.4. Notwithstanding the foregoing, if the event causing the Member to become a Former Member results from a material breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such material breach.

8.3    Notice of Intent to Purchase. Within thirty (30) days after the Managing Member has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.2, each Remaining Member shall notify the Managing Member in writing of his desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.4    Election to Purchase Less Than All of the Former Member's Interest. If any Remaining Member elects to purchase none or less than all of his pro rata share of the Former Member's Interest, then the Remaining Members may elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire Interest of the Former Member, the Company may purchase any remaining share of the Former Member's Interest. If the Remaining Members and the Company do not elect to purchase all of the Former Member's Interest, such Interest shall be that of an Economic Interest only.

8.5    Payment of Purchase Price. The purchase price shall be paid by the Company or the Remaining Members in cash at the closing of the purchase and sale of the Former Member's Interest.

8.6    Closing of Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article 8 shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or Maryland legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.7    Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

{00095295.11}                                        29

**R.A.097**

RSD-005545

## ARTICLE 9

### ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1     Books and Records. The books and records of the Company shall be kept, and
the financial position and the results of its operations recorded, in accordance with generally
accepted accounting principles in the United States. The books and records of the Company
shall fairly present the financial condition and operations of the Company, shall reflect all the
Company transactions, and shall be appropriate and adequate for the Company's business. The
Company shall maintain at its principal office in Maryland all of the following:

9.1.1   A current list of the full name and last known business or
residence address of each Member and Assignee set forth in alphabetical order, together
with the Capital Contributions, Capital Account and Percentage Interest of each Member
and Assignee;

9.1.2   A current list of the full name and business or residence address
of the Managing Member;

9.1.3   A copy of the Articles and any and all amendments thereto
together with executed copies of any powers of attorney pursuant to which the Articles
or any amendments thereto have been executed;

9.1.4   Copies of the Company's federal, state, and local income tax or
information returns and reports, if any, for the six (6) most recent taxable years;

9.1.5   A copy of this Agreement and any and all amendments thereto
together with executed copies of any powers of attorney pursuant to which this
Agreement or any amendments thereto have been executed;

9.1.6   Copies of the financial statements of the Company, if any, for the
six (6) most recent Fiscal Years; and

9.1.7   The Company's books and records as they relate to the internal
affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2     Delivery to Members and Inspection.

9.2.1   Upon the request of any Member or Assignee, the Managing
Member shall promptly deliver to the requesting Member or Assignee, at the expense of
the Company, a copy of the information required to be maintained under Sections 9.1.1,
9.1.2 and 9.1.3, and a copy of this Agreement.

9.2.2   Each Member, Managing Member and Assignee has the right,
upon reasonable request for purposes reasonably related to the interest of the Person as
Member, Managing Member or Assignee, to:

{00095295.11}                          30

**R.A.098**

RSD-005546

      (a)    inspect and copy during normal business hours any of the Company records described in Sections 9.1.1 through 9.1.7; and

      (b)    obtain from the Managing Member, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

      9.2.3   Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, may make a written request to the Managing Member for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managing Member that the statement that the financial statements were prepared from the books and records of the Company and fairly and accurately reflect the business and operations of the Company for the period covered. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days after the date of the request.

      9.2.4   Any request, inspection or copying by a Member or Assignee under this Section 9.2 may be made by that Person or that Person's agent or attorney.

      9.2.5   The Managing Member shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by a Managing Member pursuant to a power of attorney from the Member.

      9.2.6   The Managing Member shall, within forty-five (45) calendar days after the end of each fiscal quarter during the Company's fiscal year, furnish unaudited financial statements of the Company consisting of (i) a consolidated statement of income of the Company and its subsidiaries (if any) for such quarterly period and for the period from the beginning of the fiscal year to the end of such quarter, (ii) a consolidated statement of cash flows for such period, (iii) a consolidated balance sheet as of the end of such quarterly period, (iv) a statement of each member's equity, and (v) a breakdown of actual revenues and costs compared to budgeted revenues and costs for the quarter and year to date;

      9.2.7   The Managing Member shall, within ninety (90) calendar days after the end of each fiscal year, furnish financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries (if any) for such fiscal year; (ii) a consolidated statement of cash flows for such period; (iii) a consolidated balance sheet as of the end of such fiscal year; (iv) a statement of each member's equity, (v) a breakdown of actual revenues and costs compared to actual revenues and costs for the year, (vi) a breakdown of payments made to the Managing Member (or any Affiliate); and (vii) any other information as is reasonably necessary to complete the tax returns of the Members. These financial statements shall be reviewed financial statements and prepared by an independent certified public accountant and shall be audited; and

{00095295.11}           31

R.A.099

9.2.8   Such other reports and financial statements as the Managing
Member shall determine, or as the IWA Member, Members or the Management
Committee shall reasonably request from time to time.

9.3   Financial and Other Information. The Managing Member shall provide such
financial and other information relating to the Company or any other Person in which the
Company owns, directly or indirectly, an equity interest, as a Member may reasonably request.
The Managing Member shall distribute to the Members, promptly after the preparation or receipt
thereof by the Managing Member, any financial or other information relating to any Person in
which the Company owns, directly or indirectly, an equity interest, including any filings by such
Person under the Securities Exchange Act of 1934, as amended, that is received by the Company
with respect to any equity interest of the Company in such Person.

9.4   Filings. The Managing Member, at Company expense, shall cause the income tax
returns for the Company to be prepared and timely filed with the appropriate authorities. The
Managing Member, at Company expense, shall also cause to be prepared and timely filed, with
appropriate federal and state regulatory and administrative bodies, amendments to, or
restatements of, the Articles and all reports required to be filed by the Company with those
entities under the Act or other then current applicable laws, rules, and regulations. If the
Managing Member is required by the Act to execute or file any document fails, after demand, to
do so within a reasonable period of time or refuses to do so, any Member may prepare, execute
and file that document with the Maryland Department of Taxation and Assessments. The
Managing Member shall deliver K-1 Statements to the Members within ninety (90) days from
the end of the fiscal year end of the Company.

9.5   Bank Accounts. The Managing Member shall maintain the funds of the Company
in one or more separate bank accounts in the name of the Company, and shall not permit the
funds of the Company to be commingled in any fashion with the funds of any other Person.

9.6   Accounting Decisions and Reliance on Others. All decisions as to accounting
matters, except as otherwise specifically set forth herein, shall be made by the Managing
Member. The Managing Member may rely upon the advice of their accountants as to whether
such decisions are in accordance with accounting methods followed for federal income tax
purposes.

9.7   Tax Matters for the Company Handled by Managing Member and Tax Matters
Partner. The Tax Matters Partner shall from time to time cause the Company to make such tax
elections and to oversee the tax affairs of the Company as it deems to be in the best interest of
the Company and its Members. The Managing Member shall prepare tax returns and statements,
K-1 Statements, and similar documents which are to be filed with any taxing authorities on
behalf of the Company, or used by the Members to prepare their respective tax returns.
Notwithstanding the foregoing, the Managing Member and the Tax Matters Partner shall obtain
the prior approval of all of the Members before taking any of the following actions: (a) filing any
tax return or statement with any taxing authority on behalf of the Company or any Member, (b)
issuing a final K-1 Statement to the Members, (c) granting an extension, waiver, suspension, or
tolling of any statute of limitations, (d) consenting to a settlement, consent decree, or similar
document with any taxing authority, or (e) making an agreement or election with any taxing

{00095295.11}                                    32

**R.A.100**

RSD-005548

authority which is reasonably likely to affect the rights of the Company or any Member. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Managing Member, as the case may be, a Majority Interest may designate another to be Tax Matters Partner. Beginning on January 1, 2018, the Managing Member shall constitute the "partnership representative" under Section 6223 of Chapter 63 of the Code (as in effect pursuant to the Bipartisan Budget Act), and the Managing Member shall take any and all action required under the Code or Treasury Regulations, as in effect from time to time, to designate itself the "partnership representative." To the extent permitted by the Code and the Treasury Regulations, the Managing Member, in its capacity as "partnership representative" shall be bound by the obligations and restrictions imposed on the Tax Matters Partner pursuant to this Section 9.7. Upon the promulgation of Treasury Regulations implementing subchapter C of Chapter 63 of the Code (as revised by the Bipartisan Budget Act), the Managing Member will evaluate and consider options available with respect to preserving the allocation of responsibility and authority described in this Section 9.7, while conforming with the applicable provisions of the revised partnership audit procedures. Any action taken by the Managing Member pursuant to this Section 9.7, including an election permitted under the Bipartisan Budget Act, shall be made only with the consent of a Majority in Interest of the Members. The Managing Member and the Members agree to work together in good faith to amend this Agreement if either party determines than an amendment is required to maintain the intent of the parties with respect to the obligations and limitations of the Tax Matters Partner.

## ARTICLE 10

### DISSOLUTION AND WINDING UP

10.1    Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following ("Dissolution Events"):

10.1.1 August 1, 2026; or

10.1.2 The entry of a decree of judicial dissolution pursuant to the Act;

or

10.1.3 The vote or written consent of 90%-in-Interest of the Members.

10.2    Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Managing Member who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Maryland Department of Taxation and Assessments and file the Certificate as required by the Act.

10.3    Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managing Member who have

{00095295.11}                    33

RSD-005549

not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 10.5. The Person winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Person winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    Distributions in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article 6, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  The fair market value of such asset shall be determined by the Managing Member and as approved by the Majority Interest of Members.

10.5    Order of Payment Upon Dissolution.  After determining that all the known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with the distribution provisions set forth in Section 6.4.  Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

10.6    Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his positive Capital Account balance and shall have no recourse for his Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managing Member or any other Member.

10.7    Certificate of Cancellation.  The Managing Member or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Maryland Department of Taxation and Assessments, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the affairs of the Company.

10.8    No Action for Dissolution.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event.  The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1.  This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests.  Accordingly, except where the Managing Member has failed to liquidate the Company as required by this Article 10, each Member hereby waives and renounces

{00095295.11}                                34

**R.A.102**

RSD-005550

his right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE 11

### INDEMNIFICATION AND INSURANCE

11.1    Definitions. For purposes of this Article 11, the following definitions shall apply:

11.1.1 "Expenses" shall include, without limitation, attorneys' fees, disbursements and retainers, court costs, transcript costs, fees of accountants, experts and witnesses, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness or other participant in a Proceeding.

11.1.2 "Proceeding" includes any action, suit, arbitration, alternative dispute resolution mechanism, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative or investigative in nature, except a proceeding initiated by a Person pursuant to Section 11.12 of this Agreement to enforce such Person's rights under this Agreement.

11.2    Indemnification of the Managing Member and Officers.

11.2.1 The Company and the IWA Member, jointly and severally, shall indemnify, defend, and hold harmless, the Managing Member, the Manager, any member, manager, officer or employee of the Managing Member or the Manager, and any officer of the Company (collectively, the "Algon Indemnified Parties") and IWA Member and any member, manager, officer or employee of IWA Member (collectively, the "IWA Member Indemnified Parties") who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (other than a Proceeding by or in the right of the Company or a Proceeding where any Algon Indemnified Party or the IWA Member Indemnified Party is the indemnifying party pursuant to this Article 11) by reason of the fact that such Algon Indemnified Party is the Managing Member of the Company, or is the Manager or is or was an agent of the Company including, without limitation, any claims brought by the Landlord or its successors and assigns under, or with respect to, the Lease arising out of any action by the IWA Member, the Company, Managing Member and/or the Manager ("Landlord-Initiated Action"), or that any IWA Indemnified Party is a member of the Company or an agent of the Company, against all Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by or levied against an Algon Indemnified Party or an IWA Member Indemnified Party in connection with such

{00095295.11}                        35

RSD-005551

Proceeding. The termination of any Proceeding, whether by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such Algon Indemnified Party or such IWA Member Indemnified Party did not act in good faith and in a manner which he or it reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that the Algon Indemnified Party or the IWA Member Indemnified Party had reasonable cause to believe that his or its conduct was unlawful. Without limiting the foregoing, each Algon Indemnified Party shall be deemed to have acted in good faith and in the best interests of the Company if such Algon Indemnified Party takes action or fails to take action and such action or inaction (i) is approved by a vote of the Management Committee as set forth in Section 5.4, or (ii) is approved by IWA Member where the IWA Member has actual (not constructive) knowledge of, or has been provided with all material facts related to the subject matter of the approval with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question. Notwithstanding anything to the contrary in this Section 11.2.1, the Company's obligation to indemnify any IWA Member Indemnified Party shall not be limited, restricted, or terminated by the fact that the IWA Member is providing indemnification pursuant to this Section 11.2.1.

(a)    Notwithstanding anything to the contrary in this Section 11.2.1, in the event a court of competent jurisdiction determines in a Final Order (hereinafter defined) that any Algon Indemnified Party or any IWA Member Indemnified Party engaged in fraud, gross negligence or willful misconduct and such determination is not subject to appeal (each, "Judicially Determined Misconduct"), then, neither the Company nor the IWA Member shall have any obligation to provide indemnification to any Algon Indemnified Parties or IWA Member Indemnified Parties for Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to such Judicially Determined Misconduct by such Algon Indemnified Party.

(b)    Prior to the Final Order stating that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, the Company and IWA Member shall indemnify and defend the Algon Indemnified Parties or IWA Member Indemnified Parties as set forth in this Article 11. In particular, from and after the Final Order that determines that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, such Algon Indemnified Party and such IWA Member Indemnified Party, as the case may be, shall reimburse the actual out-of-pocket Expenses, amounts paid in settlement, judgements, fines, penalties, and interest incurred by the Company and/or the IWA Member defending such Algon Indemnified Party and such IWA Member Indemnified Party for such Judicially Determined Misconduct.

11.2.2  The Company and the IWA Member, jointly and severally, shall indemnify, defend, and hold harmless, Algon Indemnified Party and IWA Member Indemnified Party, who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding by or in the right of the Company to procure a judgment in his or its favor by reason of the fact that such Algon Indemnified Party is the Managing Member of the Company, or is the Manager or is or was an agent of the Company or such IWA Member Indemnified Party is a member of the Company

{00095295.11}                    36

RSD-005552

or an agent of the Company, against any Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by such Algon Indemnified Party and such IWA Member Indemnified Party in connection with such Proceeding, except that no indemnification shall be made with respect to any claim, issue or matter as to which such Algon Indemnified Party or IWA Member Indemnified Party shall have been adjudged liable to the Company unless and only to the extent that the court in which such Proceeding was brought or other court of competent jurisdiction shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Algon Indemnified Party or such IWA Member Indemnified Party, as the case may be, is fairly and reasonably entitled to indemnification for such Expenses which such court shall deem proper. Without limiting the foregoing, each Algon Indemnified Party shall be deemed to have acted in good faith and in the best interests of the Company if such Algon Indemnified Party takes action or fails to take action and such action or inaction (i) is approved by a vote of the Management Committee as set forth in Section 5.2 and Section 5.4.4, or (ii) is approved by IWA Member where the IWA Member has actual (not constructive) knowledge of, or has been provided with all material facts related to the subject matter of the approval with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question.

(a)    Notwithstanding anything to the contrary in this Section 11.2.2, in the event a court of competent jurisdiction determines in a Final Order that any Algon Indemnified Party or any IWA Member Indemnified Party engaged in Judicially Determined Misconduct, then, neither the Company nor the IWA Member shall have any obligation to provide indemnification to any Algon Indemnified Parties or any IWA Member Indemnified Party for Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to such Judicially Determined Misconduct by such Algon Indemnified Party.

(b)    In connection with any indemnification initiated pursuant to this Section 11.2, prior to the Final Order stating that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, the Company and Investors Warranty of America shall indemnify and defend the Algon Indemnified Parties and the IWA Member Indemnified Parties as set forth in this Article 11. In particular, from and after the Final Order that determines that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, such Algon Indemnified Party and such IWA Member Indemnified Party, as the case may be, shall reimburse the actual out-of-pocket Expenses, amounts paid in settlement, judgements, fines, penalties, and interest incurred by the Company and/or the IWA Member defending such Algon Indemnified Party and such IWA Member Indemnified Party for such Judicially Determined Misconduct.

11.3    Indemnification by Managing Member and Taylor.

11.3.1    The Managing Member and Taylor shall, jointly and severally, indemnify, defend, and hold harmless the Company (including any officer, employee, member, agent, or representative) and the IWA Member Indemnified Parties (collectively, the "Company Indemnified Parties") who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding arising out of,

{00095295.11}                                    37

RSD-005553

related to, or in connection with and any Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to (i) the Managing Member causing the Company to voluntarily commence any case or proceeding under title 11 of the United States Code without the consent of the Management Committee, (ii) the Managing Member's filing, on behalf of the Company, of an answer consenting to or otherwise acquiescing or joining in any involuntary petition filed against it by any other Person under title 11 of the United States Code or any other federal or state bankruptcy or insolvency law without the prior written consent of the Management Committee, (iii) the Managing Member causing the Company to directly or indirectly solicit the filing of an involuntary petition against it by any other Person under title 11 of the United States Code or any other Federal or state bankruptcy or insolvency law; (iv) the intentional violation by the Manager or the Managing Member of Section 14.20 of this Agreement; and (v) the fraud, gross negligence or willful misconduct of Taylor, Manager or the Managing Member in connection with the performance of his or its obligations under this Agreement or the Management Agreement.

11.3.2 The Managing Member shall indemnify, defend, and hold harmless the Company Indemnified Parties who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding arising out of, related to, or in connection with and any Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to (i) any actions taken or not taken by the Managing Member (or any Affiliate or agent of the Managing Member) which constitute a material breach of this Agreement which is not cured by the Managing Member as set forth in this Agreement and (ii) any actions taken or not taken by the Manager (or any Affiliate or agent of the Manager) which constitute a material breach of the Management Agreement which is not cured by the Manager as set forth in this Agreement.

11.3.3 In the event there is a conflict between the provisions in this Section 11.3 and the provisions in Section 11.2, (i) the provisions in this Section 11.3 shall prevail and control in connection with any dispute between IWA Member and Algon Member which does not involve a third party claim against any Member, the Managing Member, Manager, Taylor or the Company or any of their respective members, managers, officers or employees and (ii) the provisions in Section 11.2 shall prevail and control in connection with any Landlord-Initiated Action, and (iii) the Parties shall use the dispute resolution provisions in Section 14.22 to resolve any other conflict between the provisions in Section 11.2 and Section 11.3 involving any third party claim against any Member, the Managing Member, the Manager, Taylor or the Company or any of their respective members, managers, officers or employees.

11.4 Successful Defense. Notwithstanding any other provision of this Agreement, to the extent that any Algon Indemnified Party or any Company Indemnified Party has been successful on the merits or otherwise in defense of any Proceeding referred to in Section 11.2, or in defense of any claim, issue or matter therein, such Algon Indemnified Party or such Company Indemnified Party shall be indemnified against Expenses actually and reasonably incurred in connection therewith.

{00095295.11}                                    38

RSD-005554

11.5   Intentionally deleted.

11.6   Payment of Expenses in Advance. Notwithstanding anything to the contrary set forth in this Agreement, Expenses incurred by any Algon Indemnified Party, any IWA Member Indemnified Party or any Company Indemnified Party in connection with a Proceeding shall be paid by the Company in advance of the final disposition of such Proceeding upon receipt of a written undertaking by or on behalf of such Algon Indemnified Party, such IWA Member Indemnified Party or Company Indemnified Party to repay such amount if it shall ultimately be determined that such Algon Indemnified Party, such IWA Member Indemnified Party or such Company Indemnified Party is not entitled to be indemnified by the Company as authorized in this Article 11; provided however that this Section 11.6 shall not apply to the indemnification obligations set forth in Section 11.3.1.

11.7   Indemnification of Other Agents. Subject to Section 11.6, the Company may, but shall not be obligated to, indemnify any Person (other than any Algon Indemnified Party or any Company Indemnified Party) who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (including any Proceeding by or in the right of the Company) by reason of the fact that such Person is or was an agent of the Company (including Members who are not an Algon Indemnified Party, an IWA Member Indemnified Party or Company Indemnified Party), against all Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by such Person in connection with such Proceeding under the same circumstances and to the same extent as is provided for or permitted in this Article 11 with respect to an Algon Indemnified Party, an IWA Member Indemnified Party and a Company Indemnified Party.

11.8   Indemnity Not Exclusive. The indemnification and advancement of Expenses provided by, or granted pursuant to, the provisions of this Article 11, shall not be deemed exclusive of any other rights to which any Person seeking indemnification or advancement of Expenses may be entitled under any agreement, vote of Managing Member or Members, or otherwise, both as to action in such Person's capacity as an agent of the Company and as to action in another capacity while serving as an agent. All rights to indemnification under this Article 11 shall be deemed to be provided by a contract between the Company and each Algon Indemnified Party, IWA Member Indemnified Party and Company Indemnified Party who serves in such capacity at any time while this Agreement and relevant provisions of the Act and other applicable law, if any, are in effect. Any repeal or modification hereof or thereof shall not affect any such rights then existing.

11.9   Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Article 11 or of the Act. The Managing Member shall obtain and maintain any insurance, for and on behalf of the Company, which is required by the Lease. In the event a Person shall receive payment from any insurance carrier or from the plaintiff in any action against such Person with respect to indemnified amounts after payment on account of all or part of such indemnified amounts having been made by the Company pursuant to this Article 11, such Person shall reimburse the

{00095295.11}      39

RSD-005555

Company for the amount, if any, by which the sum of such payment by such insurance carrier or such plaintiff and payments by the Company to such Person exceeds such indemnified amounts; provided, however, that such portions, if any, of such insurance proceeds that are required to be reimbursed to the insurance carrier under the terms of its insurance policy shall not be deemed to be payments to such Person hereunder. In addition, upon payment of indemnified amounts under the terms and conditions of this Agreement, the Company shall be subrogated to such Person's rights against any insurance carrier with respect to such indemnified amounts (to the extent permitted under such insurance policies). Such right of subrogation shall be terminated upon receipt by the Company of the amount to be reimbursed by such Person pursuant to the first sentence of this Section 11.9.

11.10  Heirs, Executors and Administrators. The indemnification and advancement of Expenses provided by, or granted pursuant to, this Article 11 shall continue as to a Person who has ceased to be a Managing Member, Member, Manager or an agent of the Company and shall inure to the benefit of such Person's heirs, executors and administrators.

11.11  Right to Indemnification Upon Application.

11.11.1  Any indemnification or advance under this Article 11 shall be made promptly, and in no event later than sixty (60) days, after the Company's receipt of the written request of the Algon Indemnified Party, IWA Member Indemnified Party or Company Indemnified Party therefor, until, in the case of an indemnification, a court by Final Order has determined that such Algon Indemnified Party, IWA Member Indemnified Party or Company Indemnified Party has not met the relevant standard for indemnification set forth in Section 11.2.

11.11.2  The right of a Person to indemnification or an advance of Expenses as provided by this Article 11 shall be enforceable in any court of competent jurisdiction. Neither the failure by the Managing Member or Members of the Company or its independent legal counsel to have made a determination that indemnification or an advance is proper in the circumstances, nor any actual determination by the Managing Member or Members of the Company or its independent legal counsel that indemnification or an advance is not proper, shall be a defense to the action or create a presumption that the relevant standard of conduct has not been met. The burden of proving that indemnification or an advance is not proper shall be on the Company. In any such action, the Person seeking indemnification or advancement of Expenses shall be entitled to recover from the Company any and all expenses of the types described in the definition of Expenses in Section 11.1.1 of this Agreement actually and reasonably incurred by such Person in such action, but only if he prevails therein.

11.12  Limitations on Indemnification. No payments pursuant to this Agreement shall be made by the Company:

11.12.1  To indemnify or advance funds to any Person with respect to a Proceeding initiated or brought voluntarily by such Person and not by way of defense, except as provided in Section 11.11.2 with respect to a Proceeding brought to establish or enforce a right to indemnification under this Agreement, otherwise than as required

{00095295.11}                                40

RSD-005556

**R.A.108**

under Maryland law, but indemnification or advancement of Expenses shall be provided by the Company as set forth in this Article 11; or

11.12.2 If a court of competent jurisdiction determines by Final Order that any indemnification or advance of Expenses hereunder is unlawful.

11.13 Partial Indemnification. If a Person is entitled under any provision of this Article 11 to indemnification by the Company for a portion of any Expenses incurred by such Person in any Proceeding but not, however, for the total amount thereof, the Company shall nevertheless indemnify such Person for the portion of such Expenses, amounts paid in settlement, judgments, fines, penalties or interest to which such Person is entitled.

11.14 Waivers. The IWA Member and Taylor each hereby unconditionally and irrevocably waives as a condition to the performance by the IWA Member or Taylor, as the case may be, of the indemnification obligations set forth in this Article 11: (a) all notices which may be required by statute or otherwise, including notices of acceptance, default, presentment or demand, (b) all indemnification, suretyship and guaranty defenses of every nature available under the laws of any state, and (c) any defense based on an election of remedies by the indemnified party. The IWA Member and Taylor each individually waive any right to require Algon Member or Taylor, or the IWA Member, as the case may be, to first proceed against any other indemnitor, guarantor or person liable on the indemnification obligations set forth herein or exhaust any other remedies available.

11.15 Personal Liability of Taylor. Notwithstanding anything to the contrary set forth in this Agreement or otherwise, the personal liability of Taylor under this Agreement, under the Management Agreement or with respect to the Managing Member, the Manager or the Company shall be limited to the terms and provisions of Section 11.3.1 of this Agreement.

11.16 Mutual Waiver. Each of the parties to this Agreement hereby mutually waive any claim for consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, arising out of, or relating to, and/or in connection with any breach of this Agreement, the Management Agreement, the management of the Company, the management of the Property or otherwise.

11.17 Notice and Cure Period for Breach of this Agreement and Management Agreement. Prior to making any demand for indemnification under this Agreement with respect to an alleged breach of this Agreement, written notice and opportunity to cure shall be provided to such breaching party as follows: Any Member that believes that the Managing Member, the Manager (under the Management Agreement), Taylor or any other Member or Person has breached the terms of this Agreement or the Management Agreement, as the case may be, then, such Member shall send written notice of such alleged breach to such party, with a copy to the Managing Member. The breaching party shall have thirty days from the date of such notice to cure such alleged breach and, if the nature of such breach or alleged breach may not reasonably be cured in a thirty day time period, then, such breaching party shall have a reasonable time to cure such breach, provided that such party is diligently and in good faith pursuing such cure. Notwithstanding the foregoing, the notice and cure set forth in this Section 11 shall not apply in the case of any claim arising out of or related to any claim made by any third party.

{00095295.11}                                      41

RSD-005557

## ARTICLE 12

### SPECIAL PURPOSE ENTITY

12.1    Special Purpose Entity/Separateness. The Managing Member shall operate the Company such that the Company shall, at all times, be a Special Purpose Entity.

12.2    "Special Purpose Entity" shall mean a limited liability company which at all times on and after the date hereof:

12.2.1  was, is and will be organized solely for the purpose of holding, selling, leasing, transferring, exchanging, managing and operating the Property (and no other property) and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

12.2.2  has not been, is not, and will not be engaged, in any business unrelated to ownership, management or operation of the Property;

12.2.3  has not had, does not have, and will not have, any assets other than those related to the Property;

12.2.4  subject to the obligation of the IWA Member to make Additional Capital Contributions as required herein, has paid and shall pay its debts and liabilities from its then available assets, as the same shall become due (provided, however, the forgoing shall not require Managing Member or the Manager, to make Additional Capital Contributions to the Company);

12.2.5  has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns;

12.2.6  has maintained and will maintain its own records, books, resolutions and agreements;

12.2.7  has not commingled, and will not commingle, its funds or assets with those of any other Person and has not participated and will not participate in any cash management system with any other Person;

12.2.8  has held and will hold its assets in its name;

12.2.9  has conducted and shall conduct its business in its name, except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

12.2.10  has maintained and will maintain its books, bank accounts, balance sheets, financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP;

{00095295.11}                                    42

RSD-005558

12.2.11 has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations; provided, that in each case, the IWA Member makes Additional Capital Contributions to the Company as required herein (provided, however, the foregoing shall not require the Managing Member or Manager, to make Additional Capital Contributions to the Company);

12.2.12 has observed and will observe all limited liability company formalities, as applicable;

12.2.13 has had no and will have no indebtedness (including loans, whether or not such loans are evidenced by a written agreement) other than related to the Lease and unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of the Company;

12.2.14 has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted or required pursuant to this Agreement;

12.2.15 has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

12.2.16 has not pledged and will not pledge its assets for the benefit of any other Person;

12.2.17 has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name and not as a division or part of any other Person;

12.2.18 has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

12.2.19 has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

12.2.20 has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

12.2.21 other than capital contributions and distributions permitted under the terms of this Agreement, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with any of its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party; and

{00095295.11} 43

R.A.111

RSD-005559

12.2.22  does not and will not have any of its obligations guaranteed by any
Affiliate.

## ARTICLE 13

### INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managing
Member, the other Members, and the Company as follows:

13.1    Preexisting Relationship or Experience.  (i) It has a preexisting personal or
business relationship with the Company or one or more of its officers or control persons, or (ii)
by reason of its business or financial experience, or by reason of the business or financial
experience of its financial advisor who is unaffiliated with and who is not compensated, directly
or indirectly, by the Company or any affiliate or selling agent of the Company, it is capable of
evaluating the risks and merits of an investment in the Membership Interest and of protecting its
own interests in connection with this investment.

13.2    No Advertising.  It has not seen, received, been presented with, or been solicited
by any leaflet, public promotional meeting, newspaper or magazine article or advertisement,
radio or television advertisement, or any other form of advertising or general solicitation with
respect to the sale of the Membership Interest.

13.3    Investment Intent.  It is acquiring the Membership Interest for investment
purposes for its own account only and not with a view to or for sale in connection with any
distribution of all or any part of the Membership Interest.  No other person will have any direct
or indirect beneficial interest in or right to the Membership Interest.

13.4    Purpose of Entity.  If the Member is a corporation, partnership, limited liability
company, trust, or other entity, it was not organized for the specific purpose of acquiring the
Membership Interest.

13.5    Economic Risk.  It is financially able to bear the economic risk of an investment
in the Membership Interest, including the total loss thereof.

13.6    No Registration of Membership Interest.  It acknowledges that the Membership
Interest has not been registered under the Securities Act of 1933, as amended (the "Securities
Act"), or qualified under any applicable blue sky laws in reliance, in part, on his representations,
warranties, and agreements herein.

13.7    Membership Interest in Restricted Security.  It understands that the Membership
Interest is a "restricted security" under the Securities Act in that the Membership Interest will be
acquired from the Company in a transaction not involving a public offering, and that the
Membership Interest may be resold without registration under the Securities Act only in certain
limited circumstances and that otherwise the Membership Interest must be held indefinitely.  In
this connection, it understands the resale limitations imposed by the Securities Act and is
familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in
order for that Rule to be available for resale of "restricted securities," including the requirement

{00095295.11}                                    44

RSD-005560

that the securities must be held for at least two years after purchase thereof from the Company prior to resale (three years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. It understands that the Company has not made such information available to the public and has no present plans to do so.

13.8    No Obligation to Register. It represents, warrants, and agrees that the Company and the Managing Member are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him in complying with any exemption from registration and qualification.

13.9    No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article 7 of this Agreement, it will not make any disposition of all or any part of the Membership Interest which will result in the violation of the Securities Act, or any other applicable securities laws.

13.10    Investment Risk. It acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him of its entire investment in the Company, that it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

13.11    Investment Experience. It is an experienced investor in unregistered and restricted securities of limited liability companies or limited Memberships constituting speculative and high-risk ventures.

13.12    Restrictions on Transferability. It acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible to liquidate its investment in the Company.

13.13    Information Reviewed. It has received and reviewed all information, it considers necessary or appropriate for deciding whether to purchase the Membership Interest, including, without limitation, the Lease. It has had an opportunity to ask questions and receive answers from the Company and its Managing Member and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to it.

13.14    Consultation with Attorney. It has been advised to consult with its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent it considers necessary.

13.15    Tax Consequences. It acknowledges that the tax consequences to its investing in the Company will depend on his particular circumstances, and neither the Company, the Managing Member, the Members, nor the Members, shareholders, members, Managing

{00095295.11}    45

RSD-005561

Members, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to it of an investment in the Company. It will look solely to, and rely upon, its, its own advisers with respect to the tax consequences of this investment.

13.16 No Assurance of Tax Benefits. It acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

13.17 Indemnity. It shall defend, indemnify and hold harmless the Company, the Managing Member, each and every other Member, and any officers, directors, shareholders, Managing Members, members, employees, Members, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Managing Member, each and every other Member, and any officers, directors, shareholders, Managing Members, members, employees, Members, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE 14

## MISCELLANEOUS

14.1 Counsel to the Company. Counsel to the Company may also be counsel to any Managing Member or any Affiliate of the Managing Member. The Managing Member may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the applicable Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company Counsel selected by the Managing Member does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.

14.2 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Managing Member with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managing Member or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or the Managing Member or have any force or effect whatsoever.

{00095295.11}                                     46

RSD-005562

14.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

14.4    Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and the Managing Member and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement. The Members agree that Taylor is an express third party beneficiary of Articles 11 and 14 of this Agreement.

14.5    Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference any statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.6    Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.7    Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his counsel.

14.8    References to this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

14.9    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Maryland in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 14.13 of this Agreement, and that when so made shall be as if served upon it, him personally within the State of Maryland.

14.10    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

14.11    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

14.12    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be

**R.A.115**

RSD-005563

necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.13  Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include electronic mail or facsimile or overnight courier, if such notice is either (a) confirmed to be received by the recipient via electronic mail or facsimile sent to such sender or (b) sent via overnight courier to arrive on the following business day) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member or the Managing Member at the address specified in Exhibit A hereto.  Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

14.14  Amendments.  All amendments to this Agreement will be in writing and signed by the IWA Member, provided however that (i) Article 11 and Article 14 shall not be amended without the prior written consent of all of the Members, (ii) no amendment of this Agreement shall impose any additional obligations upon Managing Member, Manager or Taylor without their prior written consent and (iii) in the event Algon Member ceases to be a Member of the Company, then, Article 11 and Article 13 shall not be amended in any manner which adversely affects the rights of Algon Member, Managing Member, Manager and Taylor under such Articles.  In the absence of any opinion of counsel as to the effect thereof, no amendment to this Agreement or the Articles shall be made which violates the Act or is likely to cause the Company to be taxed as a corporation.

14.15  Reliance on Authority of Person Signing Agreement.  If a Member is not a natural person, neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14 16  No Interest in Company Property; Waiver of Action for Partition.  No Member has any interest in specific property of the Company.  Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to the property of the Company.

14.17  Multiple Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.18  Attorney Fees.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.  Any judgment or order entered in such action shall contain a specific provision

{00095295.11}                                    48

RSD-005564

providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law. For the purposes of this Section: attorney fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

14.19  Time is of the Essence. All dates and times in this Agreement are of the essence.

14.20  Confidential Information.

14.20.1  Except as reasonably necessary for the Algon Member, Managing Member, or the Manager to perform the services hereunder or under the Management Agreement, the Algon Member, Managing Member and the Manager will not use or disclose to others (other than to the Management Committee or IWA Member, its members, officers, employees and its Affiliates) any Confidential Information (hereinafter defined) without the prior written consent of either (i) the IWA Member or (ii) the Management Committee.

14.20.2  Notwithstanding the foregoing, the Algon Member, Managing Member, and Manager may disclose such Confidential Information in accordance with a judicial or other governmental order, provided the Algon Member shall give the IWA Member reasonable notice prior to such disclosure. Whether or not a protective order or other remedy is requested or obtained by IWA Member or the Company, the Algon Member, Managing Member, and Manager will disclose only that portion of the Confidential Information which the Algon Member, Managing Member, or Manager, as the case may be, is legally required to disclose. For the avoidance of doubt, neither the Algon Member, Managing Member nor Manager shall be required to request or obtain a protective order with respect to any such disclosure order.

14.20.3  For purposes of this Agreement, the term "Confidential Information" shall mean any and all information which is proprietary to the Company and which is not generally available to the public including, without limitation, the Company's financial condition, existing and potential business relationships, marketing plans, sales and development plans, profit margins, financial information, financial statements, prospective tenant information, employment information or agreements, potential product offerings, any and all proprietary information, trade secrets, programs and opportunities, strategies, contracts and licenses, and any copies, reproductions, summaries, extracts, analysis, studies or other derivative works prepared by, or on behalf of, the Company incorporating, or developed from, the Confidential Information so disclosed.

14.20.4  The term "Confidential Information" does not include any information that (a) was disclosed by the Management Committee or by IWA Member or any of its members, officers, employees or Affiliates to a third party recipient in question, or (ii) has been disclosed to the third party recipient in question from any Person other than

{00095295.11}                                    49

RSD-005565

the Algon Member, Managing Member or Manager without a breach of an obligation of
confidentiality running directly or indirectly to the disclosing party; or (iii) has been
disclosed pursuant to a requirement of a governmental agency, law or court order.

14.21  Remedies Cumulative.  The remedies under this Agreement are cumulative and
shall not exclude any other remedies to which any person may be lawfully entitled.

14.22  Arbitration.  Any dispute under Section 11.3.3 (a "Dispute"), shall be settled by
arbitration administered by the American Arbitration Association ("AAA") in accordance with
its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator may
be entered in any court having jurisdiction thereof.  The arbitration shall be held in New York,
New York and shall be conducted before a single arbitrator, independent of the parties hereto and
appointed from AAA's National Roster in accordance with AAA's Commercial Arbitration
Rules.  The law applicable to the arbitration, including the administration and enforcement
thereof, shall be the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and the law governing this
Agreement.  The non-prevailing party in any arbitration shall bear the cost of the arbitration,
including the fees and expenses of the arbitrator and shall be responsible for its own and the
prevailing party's out-of-pocket costs and expenses incurred in connection with the arbitration.
Each party shall bear the cost of preparing and presenting its case.  Limited discovery shall be
permitted prior to the arbitration hearing as follows:  (i) exchange of witness lists; (ii) exchange
of documentary evidence and documents relating to or arising out of the issues to be arbitrated;
(iii) depositions of party witnesses; and (iv) such other depositions as may be allowed by the
arbitrator upon a showing of good cause.  Depositions shall be conducted in accordance with the
Federal Code of Civil Procedure.  The arbitration award (the "Award") shall be presented to the
parties in writing, and upon request of any party, shall specify the factual and legal bases for the
Award.  The judgment upon any Award rendered in such arbitration shall be binding on the
parties and may be entered in any court having jurisdiction.  The Award may be confirmed and
enforced in any court of competent jurisdiction.  Any post-Award proceedings shall be governed
by the Federal Arbitration Act.  Notwithstanding any of the foregoing, (a) each party may,
without inconsistency with this arbitration provision, apply to any court having jurisdiction with
respect to any interim provisional, injunctive or other equitable relief until the Award is rendered
or the controversy is otherwise resolved, or (b) if the claim that is the subject of Section 11.3.3 is
being litigated or arbitrated in a formal legal proceeding, either party may, but shall not be
obligated, to present the dispute under Section 11.3.3 to the court or arbitrator(s), as the case may
be, to resolve any such dispute pursuant to Section 11.3.3.

RSD-005566

All of the Members of the Company have executed this Agreement, effective as of the Effective Date.

INVESTORS WARRANTY OF AMERICA, LLC

By: _____

Title: _____

**David Feltman**
**Authorized Signatory**

LONGSHORE VENTURES LLC

By: _____

Title: _____

**Agreed to as to Section 11.3.1, Section 11.15, Section 11.16, and Section 14.22 only:**

_____

Troy T. Taylor, an individual

R.A.119

RSD-005567

**EXHIBIT A**
**CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESSES OF MEMBERS**
**AND THE MANAGING MEMBER AS OF THE EFFECTIVE DATE**



1.                                                                98%

2.                                                    $0           2%

RSD-005568

**R.A.120**

# EXHIBIT 12

**R.A.121**

<u>6560 Rock Springs Drive – Term Sheet</u>

1. <u>Joint Venture:</u>  A newly formed Maryland bankruptcy remote single-purpose limited liability company ("**Newco**")

    A. Newco will be formed to own, lease, market, operate and sell the leasehold interest in an office building known as 6560 Rock Springs Drive, Bethesda, Maryland (the "**Property**").

    B. Newco's managing member ("**Algon Member**") will be a newly-formed single purpose entity controlled by Algon Holding, a newly-formed single purpose Maryland limited liability company ("**Algon Holding**").  An affiliate of the Algon Member ("**Manager**") will manage the Property, but will be required to obtain the consent of the IWA Member (as defined below) and the Independent Director (as defined below) to take certain action relating to the Property, including, but not limited to, incurring indebtedness, liquidating or dissolving Newco, selling the Property, filing a petition for bankruptcy protection, and operating outside of an agreed upon annual budget.   The Managing Member can be removed upon the affirmative vote of Members holding at least 75% of the membership interest of Newco.

    C. Newco's sole non-managing member will be a newly formed limited liability company controlled by Investors Warranty of America, LLC ("**IWA Member**").

    D. Newco will have a Board of Managers which will be comprised of three Members, two selected by the IWA Member, and one selected by Members holding at least 75% of the membership interest in Newco (the "**Independent Director**").

    E. The IWA Member shall make an initial Capital Contribution of [$250,000], of which no more than $50,000 shall be used for organizational expenses. <u>+ travel</u>

2. <u>Contributions and Ownership Interest:</u>

    A. The IWA Member will contribute the Property to Newco as its initial capital contribution and will be issued a 98% membership interest in Newco.

    B. The Algon Member will contribute management, accounting, operational and restructuring expertise and will be issued a 2% membership interest in Newco.  This 2% membership interest will be in the form of a "profits interest" and will vest 38 months after the Initial Closing of the proposed transaction ("**Closing**"), provided that the Management Agreement (as defined below) remains in effect on the date that is 38 months after the Closing and has not been terminated, and the Algon Member has not breached the Operating Agreement of Newco ("**Operating Agreement**").

    C. The IWA Member will commit to fund to Newco up to $＿＿＿＿＿＿＿ over the term of Newco as and when needed for organizational expenses, <u>including the Algon Member formation expenses</u> (subject to the $50,000 cap), property expenses (including operating and leasing costs) and the Manager's fees and costs (as discussed below).  Capital calls must be approved by the Independent Director.  Capital calls may only be made for current expenses

IWA0022511

that are then due and owing or that will become due and owing in the next fiscal quarter and no amounts may be called for reserves.

D.  The Algon Member will have no capital contribution requirements.

3.  <u>Manager Fees and Costs</u>;

A.  Newco shall retain the Manager to perform the management services hereunder and these services will be performed pursuant to a Management Agreement between Newco, on the one hand, and the Manager on the other hand ("**Management Agreement**").  For its services to Newco, Newco shall pay a management fee of $15,000 per month ("**Management Fee**") to the Manager.  Notwithstanding the use of an affiliate to perform management services, the Algon Member shall remain liable for any actions (or inaction) taken in connection with the management and operation of the Property. ~~One half of each monthly Management Fee ($7,500) will be paid into an escrow and released, upon the approval of the Independent Director, at the end of the 38~~<sup>~~th~~</sup>~~ month from the Closing, provided that the Algon Member has not committed a default under the Operating Agreement and the Management Agreement remains in effect at the end of the 38~~<sup>~~th~~</sup>~~ month.~~

B.  The Algon Member and the Manager will manage the Property and Newco at their respective sole expense. The Algon Member and the Manager will be responsible for all of their day-to-day overhead expenses of managing the Property and Newco, including compensation of employees, occupancy, utilities, internal accounting, reporting to members and recurring expenses related to the management of the Property and Newco. <u>Discuss with Paul, reporting requirements.</u>

C.  Direct Property operating expenses ~~(excluding administrative and management expenses)~~ <u>excluding third-party accounting and tax services,</u> including leasing expenses, ground rent payments and other expenses required by the ground lease (i.e. insurance, taxes and maintenance of the Property) to be paid by Newco from cash flow from the Property (if any), capital commitments from the IWA Member, debt, or a sale of the Property. All other <u>administrative and management</u> expenses will be borne by the Algon Member <u>except for third-party expenses approved by the ID</u>.

4.  <u>Management Responsibilities and Obligations.</u>

A.  Asset Management: The Algon Member will be responsible for all asset management, Property management, Property leasing, and Property disposition services as follows:

B.  Property Management:  The Manager and Newco will enter into the Management Agreement.  This Management Agreement shall have a three-year term, with options to extend up to five (5) one-year extensions upon the approval of the IWA Member.  The Algon Member remains responsible for the Manager's performance in accordance with the terms of the Management Agreement.  To the extent that the Algon Member or the Manager wish to

**R.A.123**

IWA0022512

subcontract any services, the IWA Member shall have the right to approve any subcontracting agreement and terms. The IWA Member will have the right to require Newco to terminate the Management Agreement with the Manager at any time for cause, or upon 30 days' prior written notice without cause or reason.  10 business days or deemed approved.

C. Leasing Agreement: The Algon Member will select and engage a third--party leasing agent and the leasing agent and Newco will enter into a Leasing Agreement on terms acceptable to the IWA Member. The IWA Member will have consent right over the terms of any leases of the Property.

D. Disposition Agreement:  After 38 months, if the Algon member opts to sell the property then Tthe Algon Member will select and engage a selling broker and Newco will enter into a Brokerage Agreement on terms acceptable to the IWA Member.

5. Distributions: Waterfall of cash after payment of expenses shall be as follows:

First, return of all capital contributed to Newco by the IWA Member;

Second, then to IWA Member until the IWA Member achieves a rate of return on capital contributions made by the IWA Member compounded on an annual basis that would result in an annually compounded 10% annual rate of return to the IWA Member;

Third, then 90—% to IWA Member and 10—% to Algon Member until the IWA Member achieves a rate of return on capital contributions made by the IWA Member compounded on an annual basis that would result in an annually compounded 15—% annual rate of return to the IWA Member; and

Fourth, thereafter 80—%% to IWA Member and 20—% to Algon Member.

6. Ground Lease Negotiations: The Ground Lease shall remain in effect, and the Algon Member and the Manager will be prohibited for the first 38 months of the term of Newco from entering into any discussions or negotiations with ground lessor regarding the terms of the Ground Lease or the terms of Newco, unless the IWA Member grants prior written consent.

7. Algon Member Indemnification:  Algon Holdings, the Algon Member, and the principal at Algon (i.e. Troy Taylor) shall indemnify, defend, and hold harmless the IWA Member (including its officers, directors, agents, affiliates, employees, and representatives) for items related to the operation of the Property and the management of Newco, along with such other things as a premature bankruptcy filing, violation of non-disclosure provisions, waste, breach of the Operating Agreement, breach of the Management Agreement, etc.  Add indemnification language

IWA0022513

8. <u>Indemnification</u>:  If the Algon Member is named in any litigation brought by the ground lessor where the Algon Member or the Manager (or any affiliate of either) has not caused, or allegedly caused, the basis for the claim, the IWA Member will indemnify and defend the Algon Member at IWA Member's expense. <u>No. Carve outs only</u>

9. <u>Key Person</u>: The failure of Troy Taylor to be actively involved in the management of Newco, Manager, the Property, or the Algon Member for any reason shall be deemed a default by the Algon Member under the Operating Agreement and the Manager under the Management Agreement.

10. <u>Debt restrictions</u>:  Algon Member may not incur debt on behalf of Newco or involving the Property without the consent of IWA Member

11. <u>Additional capital restrictions</u>: Algon Member needs the consent of IWA Member to raise additional capital.

12. <u>New investor restrictions</u>: Algon Member needs consent of IWA Member to raise capital from a new investor or to admit a new member into Newco. The Algon Member shall be restricted from transferring its interest in Newco, and any such transfer, without the consent of the IWA Member shall constitute a breach of the Operating Agreement by the Algon Member. The Algon Member's interest in Newco shall be subject to a right of first refusal in favor of the IWA Member.

13. <u>Transfer</u>: The Algon Member agrees that it will (a) consent to the transfer of all or any portion of IWA Member's interest in Newco to any subsidiary of AEGON USA Realty Advisors, LLC, or any affiliate of IWA Member or AEGON USA Realty Advisors, LLC (the "**Transferee**"), and (b) approve the admission of such transferee as a substituted member.

14. <u>Side Letter</u>: The Algon Member shall provide the IWA Member with a copy of all letter agreements or similar agreements (each a "**Side Letter**") entered into between the Algon Member or Newco and any member.  Neither Newco, nor the Algon Member shall enter into any Side Letter with any existing or future member that has the effect of establishing rights or otherwise benefiting such member in a manner more favorable in any material respect than the rights and benefits established in favor of the IWA Member unless, in any such case, IWA Member has been offered the opportunity to receive such rights and benefits of such Side Letter.

15. <u>Reporting</u>: The Algon Member and Newco agree to provide the IWA Member with all reports that the IWA Member may reasonably request in order to comply with its internal reporting standards and conditions and the form of these reports shall be in the form requested by the IWA Member.  Without limiting the generality of the foregoing, ~~Newco agrees to provide to the IWA Member a valuation report as of the last day of each calendar quarter, which report provides the fair market value~~ of IWA

**R.A.125**

IWA0022514

Member's ownership interest in Newco, along with the reports identified on <u>Appendix A</u> attached hereto.  <u>Algon does to want to produce GAAP quarterly.  Appraisal to be ordered?</u>

16. <u>Form of Capital Contributions</u>: In making any request to the IWA Member for a capital contribution, the Algon Member shall make the request on a form (and shall follow the instructions on the form) approved by the IWA Member.

17. <u>Diligence Material</u>: At least fourteen (14) days prior to committing Newco to: (a) funding any capital expenditures with respect to the real property (including capital projects), (b) selling, leasing, exchanging, or otherwise disposing of Newco's real property or portion thereof, or (c) conducting any bid or auction in connection with any disposition of any Newco asset (each such activity in sections (a) through (c) are referred to as a "**Material Transaction**"), the Algon Member shall notify the IWA Member of any such proposed Material Transactions, and provide the IWA Member (and its agents or representatives) with any reports, studies, comparable transaction information, analysis, consultant reports, budgets, and other reports and information in the possession or control of the Algon Member, or otherwise considered by the Algon Member in determining whether to commit Newco to undertake any such Material Transaction (the "**Diligence Material**").  At the request of the IWA Member, the Algon Member shall initiate a call with IWA Member (including its agents and representatives) to discuss the proposed Material Transaction at least two (2) business days prior to committing Newco to any such Material Transaction.  The IWA Member shall have the opportunity, but not the obligation, to review the Diligence Material and to request the Algon Member to initiate a call.

18. <u>No Contract</u>: This term sheet is not a contract. It is intended only to serve as a basis for further negotiations and to guide the initial drafting of a contract. No contract shall exist and no binding obligations or liabilities shall be created by this term sheet or by an oral or written representations or other statements of a party, unless and until the parties have duly executed and delivered a written, integrated lease. Without limiting the scope of the preceding sentence, neither a change of position by a party during negotiations, including, but not limited to, the expenditure of time or money, nor any other action taken by a party in anticipation of a transaction shall impose any obligation or liability on the other party. Either party may end negotiations at any time for any reason.

18. <u>Jordi – ABC process.  How do we bury the entity?</u>

> **Formatted:** Normal, Left,  No bullets or numbering

> **Formatted:** Font: (Default) Calibri, Complex Script Font: Times New Roman

IWA0022515

### Appendix A

Financial Reporting Guidelines

The IWA Member requires the following financial reports:

1. Annual audited GAAP Financial Statements delivered 90 days after the end of the year and quarterly financial statements within 60 days of the end of each quarter. These Financial Statements should include a Balance Sheet, Statement of Operations, Statement of Cash Flows, Statement of Equity and individual Statement of Equity. The annual audit will be completed by an independent well known accounting firm.

2. The IWA Member needs a quarterly estimate of the fair market value of its ownership interest in Newco. This estimate will incorporate any "waterfall provisions" found in the legal agreements. Supporting calculations and discussion of the valuation methodologies used will also be requested. Such estimate shall be provided without warranty or liability in any respect to the Algon Member.

3. The IWA Member shall have the right to have an annual independent third party review of any payments to the Algon Member or its affiliate(s) in accordance with the legal documents.

4. The IWA Member will be provided annually with a Schedule K-1, a copy of Newco's tax return, a description of any tax elections made, details of any reportable transactions (or a statement that there are no known reportable transactions), and a timely response to any other reasonable requests for required tax information.

**R.A.127**

IWA0022516

# EXHIBIT 13

**R.A.128**



# Transcript of Troy Taylor

**Date:** April 6, 2023

**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**

**Phone:** 888.433.3767

**Email:** transcripts@planetdepos.com

**www.planetdepos.com**

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3                  CIVIL ACTION FILE

4                NO: 8:20-CV-01502-PJM

5    ---------------------------------------x
     ROCK SPRING PLAZA II, LLC,
6                       Plaintiff,

7


8    INVESTORS WARRANTY OF AMERICA, LLC,

9    et al.

10                      Defendants.
     ---------------------------------------x
11


12


13        VIDEOTAPED DEPOSITION OF TROY TAYLOR

14                  Miami, Florida

15             Thursday, April, 6, 2023

16


17   REPORTED BY:
                  BOBBIE ZELTMAN
18                Professional Realtime Court Reporter
                  and Notary for New York and Florida
19


20


21


22   Job Number   484448

Transcript of Troy Taylor
April 6, 2023                                          479

```
 1                C E R T I F I C A T E

 2     STATE OF FLORIDA     )
                                  : ss.
 3     COUNTY OF BROWARD    )

 4               I, BARBARA R. ZELTMAN, a Professional
          Realtime Court Reporter and Notary Public,
 5        within and for the State of Florida, do
          hereby certify:
 6               That TROY TAYLOR, the witness whose

 7        deposition is hereinbefore set forth, was

 8        duly sworn by me remotely and that such

 9        transcript is a true record of the

10        testimony given by the witness.

11               I further certify that I am not

12        related to any of the parties to this

13        action by blood or marriage, and that I

14        am in no way interested in the outcome of

15        this matter.

16               IN WITNESS WHEREOF, I have hereunto

17        set my hand this 12th day of April, 2023.

18

19                    Barbara Zeltman

20                    BARBARA R. ZELTMAN
                      Professional Realtime Reporter
21                    and Notary Public
                      COMM NO. HH 133639
22                    EXP:  August 9, 2025
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

R.A.131

Transcript of Troy Taylor
April 6, 2023

146

| | | |
|---|---|---|
| 1 | Q    What did Longshore Ventures provide | 11:35:16 |
| 2 | as financial consideration for its interest | 11:35:20 |
| 3 | in RSD? | 11:35:24 |
| 4 | MS. KROPF:  Objection as to | 11:35:27 |
| 5 | form. | 11:35:27 |
| 6 | A    The services of Mr. Rubin and | 11:35:30 |
| 7 | myself. | 11:35:31 |
| 8 | BY MR. BOSCH: | 11:35:31 |
| 9 | Q    My question was what financial | 11:35:33 |
| 10 | consideration? | 11:35:35 |
| 11 | A    Our time and effort. | 11:35:36 |
| 12 | Q    Other than your time and effort -- | 11:35:38 |
| 13 | A    There was no monetary exchange if | 11:35:41 |
| 14 | that's what you are asking. | 11:35:44 |
| 15 | Q    Yes, that's what I meant by | 11:35:45 |
| 16 | financial consideration. | 11:35:46 |
| 17 | A    There's no monetary. | 11:35:47 |
| 18 | Q    And your time and effort, isn't | 11:35:51 |
| 19 | that something that's being compensated for | 11:35:54 |
| 20 | your time here? | 11:35:57 |
| 21 | A    No. | 11:35:58 |
| 22 | Q    Your time here today is not being | 11:35:58 |

Transcript of Troy Taylor
April 6, 2023                                                281

| | | |
|---|---|---|
| 1 | release transfer or termination of the | 02:22:21 |
| 2 | ground lease? | 02:22:23 |
| 3 | MS. KROPF:  Objection as to | 02:22:25 |
| 4 | form. | 02:22:25 |
| 5 | A    We had discussions after Mr. | 02:22:34 |
| 6 | Feltman left in 2019 about amending the | 02:22:37 |
| 7 | scope of the assignment to potentially | 02:22:51 |
| 8 | consider approaching the ground lessor and | 02:22:54 |
| 9 | opening up some dialogue. | 02:23:05 |
| 10 | BY MR. BOSCH: | 02:23:07 |
| 11 | Q    That was not within the scope of | 02:23:07 |
| 12 | your engagement? | 02:23:10 |
| 13 | A    We didn't think so. | 02:23:15 |
| 14 | Q    And why did you think that you were | 02:23:17 |
| 15 | not supposed to approach the landlord? | 02:23:19 |
| 16 | A    We thought that basically there | 02:23:23 |
| 17 | would need to be -- in spite of the fact | 02:23:25 |
| 18 | that -- here is the problem we had -- and we | 02:23:27 |
| 19 | discussed this earlier in the day. | 02:23:31 |
| 20 | But IWA and the management | 02:23:33 |
| 21 | committee felt that the Camaliers were, as | 02:23:35 |
| 22 | we discussed, dishonest, untrustworthy | 02:23:37 |

R.A.133

Transcript of Troy Taylor
April 6, 2023                                    282

```
1   litigious, etc cetera, et cetera, et cetera.        02:23:41

2           And after -- you know, as I                 02:23:43

3   mentioned, after you reached out, there was         02:23:44

4   a litigator reaching out.  I didn't push            02:23:46

5   them on basically us going to sit down and          02:23:49

6   talk to the ground lessor.                          02:23:51

7           I can tell you that in every                02:23:53

8   assignment I've ever had in the past, we            02:23:54

9   would have basically gone to sit down with          02:23:57

10  Mr. Camalier.  But the fact that he didn't          02:24:01

11  reach out to me, the fact that you were             02:24:03

12  reaching out to us as a litigator, your             02:24:05

13  letters were very -- looked like they were          02:24:08

14  building a litigation file versus just kind         02:24:12

15  of a business discussion.  That had me sit          02:24:14

16  back.                                               02:24:19

17          However, when we got to 2019, we            02:24:20

18  had been in this thing, like, you know,             02:24:23

19  several years, and my feeling was, you know         02:24:25

20  what, it's time we basically go down and sit        02:24:27

21  down with these guys and have a discussion.         02:24:30

22  And this was I think after the GSA lease            02:24:33
```

Transcript of Troy Taylor
April 6, 2023

| | | |
|---|---|---|
| 1 | situation in early 2019 and kind of take | 02:24:36 |
| 2 | everybody's temperature of what do they | 02:24:41 |
| 3 | really want to do, what don't they want to | 02:24:45 |
| 4 | do, not what they were willing to do, not | 02:24:47 |
| 5 | that we were told what they would do, and | 02:24:52 |
| 6 | see if there was any kind of rational | 02:24:54 |
| 7 | business discussion that doesn't involve the | 02:24:57 |
| 8 | lawyers sitting around this table. | 02:25:00 |
| 9 | Q    And you understood that you would | 02:25:02 |
| 10 | need to revise the scope of your -- | 02:25:03 |
| 11 | A    And -- | 02:25:07 |
| 12 | MS. KROPF:  Let him finish his | 02:25:07 |
| 13 | question. | 02:25:07 |
| 14 | Q    And you understood that you would | 02:25:07 |
| 15 | need to revise the scope of your engagement | 02:25:07 |
| 16 | on behalf of RSD to allow you to sit down | 02:25:08 |
| 17 | with a landlord to take everybody's | 02:25:11 |
| 18 | temperature? | 02:25:13 |
| 19 | MS. KROPF:  Objection as to | 02:25:14 |
| 20 | form. | 02:25:14 |
| 21 | A    When we initially got involved, at | 02:25:15 |
| 22 | some point Mr. Feltman insinuated -- and | 02:25:17 |

Transcript of Troy Taylor
April 6, 2023

284

| | | |
|---|---|---|
| 1 | again not guaranteed, not written, that the | 02:25:20 |
| 2 | reason he got us involved was that at some | 02:25:23 |
| 3 | point there would be some type of situation | 02:25:24 |
| 4 | that required us to play restructuring | 02:25:27 |
| 5 | adviser, not property manager and that | 02:25:30 |
| 6 | basically if we were going to now put our | 02:25:32 |
| 7 | restructuring hat on, candidly we wanted to | 02:25:35 |
| 8 | get paid. | 02:25:39 |
| 9 | BY MR. BOSCH: | 02:25:39 |
| 10 | Q    But as of 2019 that hat was not | 02:25:40 |
| 11 | going to be put on just yet? | 02:25:42 |
| 12 | A    That hat was not to be put on | 02:25:44 |
| 13 | because we needed to have the approval of | 02:25:45 |
| 14 | the management committee to have | 02:25:48 |
| 15 | conversations, let alone toss ideas back and | 02:25:51 |
| 16 | forth, et cetera, et cetera. | 02:25:53 |
| 17 | Q    So by 2019, after the | 02:25:55 |
| 18 | correspondence that had been engaged with | 02:25:58 |
| 19 | Mr. Barron, you decided that it was time to | 02:25:59 |
| 20 | revisit the scope of your engagement? | 02:26:02 |
| 21 | A    More importantly we thought that it | 02:26:05 |
| 22 | was time to go proactively sit down and talk | 02:26:08 |

Transcript of Troy Taylor
April 6, 2023                                             373

| | | |
|---|---|---|
| 1 | evidence that landlord acted in bad faith in | 03:47:12 |
| 2 | seeking information from RSD's legal counsel | 03:47:19 |
| 3 | about the principals in RSD? | 03:47:22 |
| 4 |     A   Yes. | 03:47:25 |
| 5 |     MS. KROPF:  Objection as to | 03:47:26 |
| 6 | form. | 03:47:26 |
| 7 | BY MR. BOSCH: | 03:47:26 |
| 8 |     Q   And what evidence do you have? | 03:47:27 |
| 9 |     A   I have evidence that if you don't | 03:47:29 |
| 10 | act in a commercially reasonable manner | 03:47:32 |
| 11 | where you come from that's bad faith. | 03:47:35 |
| 12 |     Q   I'm asking what specifically did | 03:47:38 |
| 13 | landlord do that was commercially | 03:47:40 |
| 14 | unreasonable. | 03:47:42 |
| 15 |     A   They had their litigation attorney | 03:47:43 |
| 16 | reach out and in a situation that was not a | 03:47:45 |
| 17 | litigation situation. | 03:47:49 |
| 18 |     Q   Anything else? | 03:47:51 |
| 19 |     A   No. | 03:47:52 |
| 20 |     Q   What evidence do you have that the | 03:47:52 |
| 21 | landlord acted in bad faith in seeking | 03:47:54 |
| 22 | information from RSD legal counsel about | 03:47:56 |

Transcript of Troy Taylor
April 6, 2023

374

| | | |
|---|---|---|
| 1 | RSD's ability to fulfill the tenant's | 03:48:00 |
| 2 | obligations under the ground lease? | 03:48:03 |
| 3 | MS. KROPF:  Objection as to | 03:48:05 |
| 4 | form. | 03:48:05 |
| 5 | A    They didn't act commercially | 03:48:05 |
| 6 | reasonable and they acted in bad faith. | 03:48:07 |
| 7 | They asked a simple business question and | 03:48:09 |
| 8 | they sent a first chair litigator, which is | 03:48:11 |
| 9 | just not how you do business. | 03:48:15 |
| 10 | BY MR. BOSCH: | 03:48:16 |
| 11 | Q    Other than the fact that the | 03:48:16 |
| 12 | communication to RSD's lawyer was through | 03:48:18 |
| 13 | litigation counsel? | 03:48:19 |
| 14 | A    You don't need anything more than | 03:48:19 |
| 15 | that.  It's like a missile going through the | 03:48:21 |
| 16 | building. | 03:48:23 |
| 17 | Q    So you don't have any other | 03:48:24 |
| 18 | evidence other than the fact that it was a | 03:48:25 |
| 19 | litigation counsel who was communicating | 03:48:27 |
| 20 | with RSD's legal counsel? | 03:48:29 |
| 21 | A    Correct. | 03:48:30 |
| 22 | Q    And you're saying if litigation | 03:48:48 |

R.A.138

Transcript of Troy Taylor
April 6, 2023                                    375

| | | |
|---|---|---|
| 1 | counsel had not reached out to RSD's lawyer, | 03:48:49 |
| 2 | you would have disclosed the business | 03:48:54 |
| 3 | principals of RSD? | 03:48:56 |
| 4 | MS. KROPF:  Objection as to | 03:48:57 |
| 5 | form.  It's been asked and answered. | 03:48:57 |
| 6 | I'm instructing him not to answer. | 03:48:59 |
| 7 | You've asked that at least three times | 03:49:01 |
| 8 | today and I'm instructing him not answer. | 03:49:03 |
| 9 | It's improper under the local rules to | 03:49:06 |
| 10 | ask questions when they've already been | 03:49:08 |
| 11 | answered. | 03:49:10 |
| 12 | (Directive.) | 03:49:21 |
| 13 | BY MR. BOSCH: | 03:49:21 |
| 14 | Q     Was it commercially unreasonable | 03:49:22 |
| 15 | for the landlord to ask for information | 03:49:24 |
| 16 | about the source of funding for RSD? | 03:49:27 |
| 17 | A     It was not commercially | 03:49:33 |
| 18 | unreasonable for the landlord to have | 03:49:34 |
| 19 | multiple questions of RSD.  Multiple | 03:49:36 |
| 20 | questions. | 03:49:40 |
| 21 | But if they genuinely wanted to | 03:49:41 |
| 22 | have a business dialogue, there's a proper | 03:49:44 |

R.A.139

Transcript of Troy Taylor
April 6, 2023

376

| | | |
|---|---|---|
| 1 | way to do business and there's an improper | 03:49:47 |
| 2 | way to do business. | 03:49:49 |
| 3 | Proper way to do business is | 03:49:50 |
| 4 | principal to principal or one of his | 03:49:52 |
| 5 | executives or maybe even a real estate | 03:49:54 |
| 6 | attorney, but what made it commercially | 03:49:56 |
| 7 | unreasonable and bad faith was having | 03:49:59 |
| 8 | litigation attorney who was already -- and | 03:50:02 |
| 9 | it want just any litigation attorney, it was | 03:50:05 |
| 10 | a litigation attorney from a major, major | 03:50:07 |
| 11 | firm who's already involved in litigation | 03:50:11 |
| 12 | with IWA existing. | 03:50:14 |
| 13 | It just sent red flags up every | 03:50:18 |
| 14 | which way but Sunday. | 03:50:21 |
| 15 | Q    Do you agree that it also sends red | 03:50:22 |
| 16 | flags up when IWA sends a notice of | 03:50:26 |
| 17 | assignment and says ask questions to a | 03:50:29 |
| 18 | lawyer? | 03:50:30 |
| 19 | A    I can see how that might cause some | 03:50:31 |
| 20 | concern. | 03:50:32 |
| 21 | Q    Right.  And so was it unreasonable, | 03:50:33 |
| 22 | then, for Mr. Camalier to ask his lawyer to | 03:50:35 |

Transcript of Troy Taylor
April 6, 2023

377

| | | |
|---|---|---|
| 1 | contact RSD's lawyer to ask "who is RSD?" | 03:50:38 |
| 2 | A    It was not unreasonable at all for | 03:50:42 |
| 3 | Mr. Camalier to either do it himself or ask | 03:50:45 |
| 4 | a lawyer to do it.  But I've been doing | 03:50:48 |
| 5 | business for -- and deals for north of 25 | 03:50:53 |
| 6 | years and I've never ever, ever, ever, ever, | 03:50:55 |
| 7 | ever, ever had a first call come from a | 03:50:57 |
| 8 | litigator in a situation that was a business | 03:50:59 |
| 9 | discussion.  Ever. | 03:51:02 |
| 10 | Q    But you'd never ever, ever, done a | 03:51:02 |
| 11 | transaction like this before? | 03:51:06 |
| 12 | MS. KROPF:  Objection as to | 03:51:08 |
| 13 | form. | 03:51:08 |
| 14 | A    I've done a bunch of unique | 03:51:08 |
| 15 | transactions, and having a litigator reach | 03:51:10 |
| 16 | out just sends a certain message, and I | 03:51:12 |
| 17 | think that in hindsight, when you go to your | 03:51:15 |
| 18 | hotel room tonight and think about it, | 03:51:20 |
| 19 | you'll say to yourself, gee, I should have | 03:51:21 |
| 20 | had my real estate attorney make that call. | 03:51:21 |
| 21 | BY MR. BOSCH: | 03:51:21 |
| 22 | Q    In hindsight would it have been a | 03:51:25 |

Transcript of Troy Taylor
April 6, 2023

378

| | | |
|---|---|---|
| 1 | good idea for RSD just to come clean and say | 03:51:27 |
| 2 | IWA is 98 percent member -- | 03:51:31 |
| 3 | MS. KROPF: Objection. Asked | 03:51:34 |
| 4 | and answered. I'm instructing him | 03:51:34 |
| 5 | not to answer it again. You've asked | 03:51:36 |
| 6 | that exact question. | 03:51:38 |
| 7 | (Directive.) | 03:51:39 |
| 8 | BY MR. BOSCH: | 03:51:39 |
| 9 | Q    Was it good faith for IWA not to | 03:51:40 |
| 10 | disclose to the landlord that it remained | 03:51:46 |
| 11 | interested in the ground lease through RSD? | 03:51:47 |
| 12 | MS. KROPF: Objection as to | 03:51:48 |
| 13 | form. | 03:51:49 |
| 14 | A    I think once you had a | 03:51:50 |
| 15 | counter-party that's acting in bad faith and | 03:51:54 |
| 16 | commercially unreasonable, that I wouldn't | 03:51:58 |
| 17 | tell them anything. | 03:51:59 |
| 18 | BY MR. BOSCH: | 03:52:00 |
| 19 | Q    You're saying it's bad faith to | 03:52:01 |
| 20 | communicate through a litigator? | 03:52:03 |
| 21 | MS. KROPF: Objection as to | 03:52:05 |
| 22 | form. | 03:52:05 |

Transcript of Troy Taylor
April 6, 2023

379

| | | |
|---|---|---|
| 1 | A      Totally bad faith.  If you're | 03:52:06 |
| 2 | trying to have to business conversation and | 03:52:07 |
| 3 | your first salvo is with a litigator that | 03:52:09 |
| 4 | you're already in litigation with?  I mean, | 03:52:13 |
| 5 | if you can't see the optics of that, that | 03:52:14 |
| 6 | are very poor.  You know, it's pretty black | 03:52:17 |
| 7 | and white to me. | 03:52:19 |
| 8 | BY MR. BOSCH: | 03:52:21 |
| 9 | Q      So why not reach out to Mr. | 03:52:21 |
| 10 | Camalier and say, "Don't have your litigator | 03:52:23 |
| 11 | reach out.  I am the business principal"? | 03:52:24 |
| 12 | A      So why didn't he call me? | 03:52:25 |
| 13 | Q      I'm asking.  Why didn't IWA? | 03:52:28 |
| 14 | Did you have a conversation with | 03:52:28 |
| 15 | anybody at RSD about acting in good faith, | 03:52:30 |
| 16 | calling Mr. Camalier and saying we are still | 03:52:34 |
| 17 | interested in RSD? | 03:52:37 |
| 18 | MS. KROPF:  Objection as to | 03:52:41 |
| 19 | form. | 03:52:41 |
| 20 | A      I think I've said this before, but | 03:52:41 |
| 21 | maybe I wasn't clear.  My apologies. | 03:52:43 |
| 22 | The management committee and IWA as | 03:52:47 |

**PLANET DEPOS**
888.433.3767 | WWW.PLANETDEPOS.COM

**R.A.143**

Transcript of Troy Taylor
April 6, 2023

380

| | | |
|---|---|---|
| 1 | the member had a very bad impression of the | 03:52:52 |
| 2 | Camaliers. | 03:52:55 |
| 3 | BY MR. BOSCH: | 03:52:56 |
| 4 | Q    I get that.  And I'm asking now, | 03:52:57 |
| 5 | after the litigator reaches out to the | 03:52:58 |
| 6 | lawyer for RSD and starts asking, who are | 03:53:01 |
| 7 | the business principals and what is your | 03:53:04 |
| 8 | ability to perform, was it in good faith? | 03:53:07 |
| 9 | A    Yes. | 03:53:11 |
| 10 | Q    Was it in good faith for none of | 03:53:12 |
| 11 | the principals of RSD to reach out directly | 03:53:15 |
| 12 | to Mr. Camalier and say, you know what, your | 03:53:18 |
| 13 | litigator is contacting us, but we still | 03:53:21 |
| 14 | have an interest and we're funding RSD? | 03:53:23 |
| 15 | A    Once somebody -- | 03:53:25 |
| 16 | MS. KROPF:  Objection as to | 03:53:26 |
| 17 | form. | 03:53:26 |
| 18 | A    Once somebody slaps you across the | 03:53:27 |
| 19 | face, it's a whole different discussion. | 03:53:29 |
| 20 | And once you slapped them across the face, | 03:53:31 |
| 21 | could someone theoretically have done that? | 03:53:33 |
| 22 | Absolutely, but after you're slapped across | 03:53:36 |

Transcript of Troy Taylor
April 6, 2023

381

| | | |
|---|---|---|
| 1 | the face, there's no appetite to basically | 03:53:38 |
| 2 | be the good guy when the other guy on the | 03:53:41 |
| 3 | other side of the table is making it clear | 03:53:44 |
| 4 | that he is going to act in bad faith, act | 03:53:46 |
| 5 | commercially unreasonable, hide behind his | 03:53:48 |
| 6 | litigator.  There's nothing to discuss. | 03:53:50 |
| 7 | BY MR. BOSCH: | 03:53:51 |
| 8 | Q     What about the communications that | 03:53:53 |
| 9 | I had with Mr. Barron were in bad faith? | 03:53:54 |
| 10 | MS. KROPF:  Objection as to | 03:54:00 |
| 11 | form. | 03:54:00 |
| 12 | A     Any time -- the fact that you -- | 03:54:01 |
| 13 | that if this was a commercial discussion -- | 03:54:03 |
| 14 | which you're alleging it is -- and instead, | 03:54:08 |
| 15 | your letters read like you're building a | 03:54:10 |
| 16 | litigation file, you're a first chair | 03:54:15 |
| 17 | litigator, at least from -- and maybe my | 03:54:19 |
| 18 | impressions are all wrong, but my impression | 03:54:20 |
| 19 | is that when a litigator reaches out, the -- | 03:54:23 |
| 20 | basically the entire landscape changes. | 03:54:25 |
| 21 | And the management committee didn't | 03:54:27 |
| 22 | want to give anything more than what was | 03:54:29 |

Transcript of Troy Taylor
April 6, 2023

382

| | | |
|---|---|---|
| 1 | legally required. | 03:54:31 |
| 2 | And normally I would have pushed | 03:54:32 |
| 3 | back on that, because I personally thought | 03:54:33 |
| 4 | that was an unreasonable position based on | 03:54:35 |
| 5 | going into the deal, and I felt that | 03:54:37 |
| 6 | basically a lot of the IWA feeling and a lot | 03:54:41 |
| 7 | of the management feeling was basically | 03:54:44 |
| 8 | based on conspiracy theories. | 03:54:46 |
| 9 | And that while the Camaliers may | 03:54:49 |
| 10 | not be choir boys, you should engage with | 03:54:52 |
| 11 | them. | 03:54:54 |
| 12 | However, once the assignment | 03:54:55 |
| 13 | happened and the first shot came from you as | 03:54:58 |
| 14 | a litigator, that just reinforced the fact | 03:55:00 |
| 15 | that, gee, you know, my partner's actually | 03:55:04 |
| 16 | -- may be on to something and I need to sit | 03:55:04 |
| 17 | back and respect their wishes because, you | 03:55:08 |
| 18 | know what, they're just showing their true | 03:55:10 |
| 19 | colors. | 03:55:13 |
| 20 | BY MR. BOSCH: | 03:55:13 |
| 21 | Q    "Their true colors" meaning that | 03:55:13 |
| 22 | they intended to file a lawsuit -- | 03:55:16 |

# EXHIBIT 14

**R.A.147**



**AEGON**
USA Realty Advisors, LLC

August 31, 2017

***Via Federal Express***
Tracking No. 7701 4324 3157

Rock Spring Place II, LLC
c/o Rock Spring Properties
6500 Rock Spring Drive, Suite 500
Bethesda, Maryland 20817

**RE:**  Amended and Restated Ground Lease Indenture dated November 14, 1990 (the "**Lease**") between Anne D. Camalier (the "**Landlord**") and Investors Warranty of America, LLC (formerly known as Investors Warranty of America, Inc.), as successor-in-interest to Rock Spring II Limited Partnership (the "**Tenant**")

To Whom It May Concern:

Pursuant to Sections 12 and 19 of the Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006, Tenant has entered into an Assumption and Assignment of Ground Lease, dated August 31, 2017, with Rock Springs Drive, LLC, a Maryland limited liability company.

If you have any questions, please contact Robert Barron at the following:

Berger Singerman
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Phone 954-712-5145

Sincerely,

Investors Warranty of America, LLC

By _____
Typed name _____
Its _____

**David Feltman**
**Authorized Signatory**

Aegon USA Realty Advisors, LLC
4333 Edgewood Road, N E
Cedar Rapids, IA 52499

P +1 319 355-8511
www.aegonrealty.com

Camalier0000853

**R.A.148**

8/30/2017                                https://www.fedex.com/shipping/html/en/PrintIFrame.html

**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



Camalier0000854

**R.A.149**

# EXHIBIT 15

**R.A.150**

| | |
|---|---|
| **Date:** | Wed, 17 Jul 2019 7:20:30 AM -0400 |
| **Sent:** | Wed, 17 Jul 2019 7:20:28 AM -0400 |
| **Subject:** | RE: MD property tax |
| **From:** | prubin@algongroup.com |
| **To:** | 'Van Gorp, Greg' <gvangorp@Aegonusa.com>; 'Troy Taylor' <troy@algongroup.com>; |
| **CC:** | 'Johnson, Brenda' <bdjohnson@Aegonusa.com>; |

All,

FYI, the Tax bill will continue to come to IWA because Dave, with attorney's blessing, preferred to not have the transfer of ownership recorded in County records. I have spoken to the County, who will not change the address without a recorded document.

Paul F. Rubin
Longshore Ventures LLC
Cell: 215-570-8716

**From:** Van Gorp, Greg <gvangorp@Aegonusa.com>
**Sent:** Tuesday, July 16, 2019 4:55 PM
**To:** prubin@algongroup.com; 'Troy Taylor' <troy@algongroup.com>
**Cc:** Johnson, Brenda <bdjohnson@Aegonusa.com>
**Subject:** FW: MD property tax

Attached is a 7/1/2019-6/30/2020 property tax bill from Montgomery County for the property at 6560 Rock Springs Drive.

**Greg Van Gorp**
Realty Accounting
T 319 355 8661

**From:** Jordan, William
**Sent:** Tuesday, July 16, 2019 11:30 AM
**To:** Van Gorp, Greg <gvangorp@Aegonusa.com>
**Subject:** MD property tax

Greg – would this be for you? Thanks, Bill

William R Jordan | Senior Accountant - Tax | CFO Tax
o: 319-355-7051
e: william.jordan@transamerica.com | w: www.transamerica.com

Transamerica
6400 C Street SW Mail Stop 2H Cedar Rapids, IA 52499-3210

CONFIDENTIALITY: This message and accompanying documents are intended only for use by the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this document is not the intended recipient, you are hereby notified you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this document in error, please notify sender immediately and destroy the original transmission.

Archiving Notice: Recipients should be aware that all emails exchanged with sender are automatically archived and may be accessed at any time by duly authorized persons and may be produced to other parties, including public authorities, in compliance with applicable laws.

**R.A.151**

RSD-014780

# EXHIBIT 16

23



# Transcript of Paul Rubin, Designated Representative

**Date:** April 7, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

2                IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF MARYLAND

4                        CIVIL ACTION FILE

5                     NO: 8:20-CV-01502-PJM

6         ---------------------------------------x
          ROCK SPRING PLAZA II, LLC,
7                             Plaintiff,

8

9         INVESTORS WARRANTY OF AMERICA, LLC,

10        et al.

11                            Defendants.
          ---------------------------------------x
12

13        VIDEOTAPED DEPOSITION OF ROCK SPRINGS DRIVE, LLC

14          by and through its Designated Representative,

15                        PAUL RUBIN

16                      Miami, Florida

17                  Friday, April, 7, 2023

18

19        REPORTED BY:
                        BOBBIE ZELTMAN
20                      Professional Realtime Court Reporter
                        and Notary for New York and Florida
21

22        Job Number   484450

Transcript of Paul Rubin, Designated Representative
April 7, 2023                                    325

1                    C E R T I F I C A T E

2    STATE OF FLORIDA     )
                                    : ss.
3    COUNTY OF BROWARD    )

4             I, BARBARA R. ZELTMAN, a Professional
         Realtime Court Reporter and Notary Public,
5        within and for the State of Florida, do
         hereby certify:
6             That PAUL RUBIN, the witness whose

7        deposition is hereinbefore set forth, was

8        duly sworn by me remotely and that such

9        transcript is a true record of the

10       testimony given by the witness.

11            I further certify that I am not

12       related to any of the parties to this

13       action by blood or marriage, and that I

14       am in no way interested in the outcome of

15       this matter.

16            IN WITNESS WHEREOF, I have hereunto

17       set my hand this 12th day of April, 2023.

18

19                    *Barbara Zeltman*

20                    BARBARA R. ZELTMAN
                      Professional Realtime Reporter
21                    and Notary Public
                      COMM NO. HH 133639
22                    EXP:  August 9, 2025

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

R.A.155

Transcript of Paul Rubin, Designated Representative
April 7, 2023                                          265

| | | |
|---|---|---|
| 1 | become aware that it was not recorded until | 01:50:13 |
| 2 | after the fact. | 01:50:15 |
| 3 |    Q    I got that. | 01:50:17 |
| 4 |        When did you first learn that the | 01:50:19 |
| 5 | transfer or your assignment of the | 01:50:20 |
| 6 | ground lease had not been recorded? | 01:50:21 |
| 7 |    A    I'm not sure.  I either learned of | 01:50:27 |
| 8 | it -- became aware of it either when your | 01:50:30 |
| 9 | letter came or it's also possible -- when I | 01:50:35 |
| 10 | paid the real estate tax bill, either in | 01:50:42 |
| 11 | 2017 or 2018, my recollection is not firm on | 01:50:45 |
| 12 | it, I called the County and I asked them, | 01:50:49 |
| 13 | could they redirect real estate bill to | 01:50:55 |
| 14 | Rock Springs Drive, and they said the | 01:50:58 |
| 15 | assignment was not recorded, you'd have to | 01:51:00 |
| 16 | record it. | 01:51:03 |
| 17 |    Q    I missed that.  They said what? | 01:51:05 |
| 18 |    A    That the name in the records for | 01:51:08 |
| 19 | the leasehold was IWA and it had not -- | 01:51:11 |
| 20 | nobody had recorded an assignment, so as | 01:51:15 |
| 21 | long as that was the case, they were going | 01:51:18 |
| 22 | to continue to send the real estate tax bill | 01:51:20 |

# EXHIBIT 18

# ARNOLD & PORTER
# KAYE SCHOLER

William M. Bosch
+1 202.942.5501 Direct
William.Bosch@apks.com

September 29, 2017

*Via Telecopier*

Robert W. Barron, Esq.
Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301

> Re:    *Rock Spring Plaza II LLC*

Dear Robert:

Per your request, I am attaching wiring instructions. Also, as confirmation of identity, I am providing a point of contact with the Ground Lessor. For day to day communications concerning the Ground Lease, I encourage the Ground Lessee to reach out directly to both Jody Rice and Cyndi Kuntz by email (or by phone, as necessary).

> Jody Rice
> Rock Spring Properties
> 6500 Rock Spring Drive, Suite Five
> Bethesda, MD 20817
> Office: (301) 564-1500 ext 114 (Cyndi is ext 118)
> Cell: (301) 466-4249
> Email: jody.rice@rsplimited.com

> Cyndi Kuntz
> Rock Spring Properties
> 6500 Rock Spring Drive, Suite Five
> Bethesda, MD 20817
> Office: (301) 564-1500 ext 118
> Email: Cyndi@rsplimited.com

Please let me know if I can be of further assistance.

Very truly yours,

William M. Bosch

Attachment
cc: (w/o attachment) Jody Rice (via email)

Camalier0000967

# EXHIBIT 19

# Arnold & Porter

William M. Bosch
+1 202.942.5501 Direct
William.Bosch@arnoldporter.com

February 22, 2018

***Via Federal Express***

Robert W. Barron, Esq.
Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301

      ***Re:***    **Amended and Restated Ground Lease Indenture dated November 14,**
               **1990 (the "Ground Lease") between Anne D. Camalier ("Landlord")**
               **and Investors Warranty of America, LLC (formerly known as**
               **Investors Warranty of America, Inc.), as successor-in-interest to Rock**
               **Spring II Limited Partnership ("Tenant")**

Dear Mr. Barron:

      I am writing on behalf of the Landlord in connection with the above-referenced
Ground Lease for the property located at 6560 Rockledge Drive, Bethesda, Maryland (the
"Property"). It has been almost six months since we last communicated, and we have
heard nothing further about your client's identity or intentions for the Property. Landlord
is growing increasingly concerned about the financial and structural viability of the
Property, given that there evidently is and has been no commercial activity there.

      As you may recall, I contacted you by telephone in September 2017 following
Landlord's receipt of notice from the above-referenced Tenant, dated August 31, 2017.
That notice, a copy of which is attached to this letter, advised that Tenant's interest in the
Ground Lease had been assigned to and assumed by Rock Springs Drive, LLC, a
Maryland limited liability company (the "Assignee"). Because you were identified as the
point of contact for Assignee, I reached out to inquire as to the identity and intentions of
the Assignee.

      You agreed to contact your clients about brokering an introduction. In the
interim, you requested that I identify a point of contact with the Ground Lessor and
confirmation of identity, which I did by letter dated September 29, 2017 (also attached).
Since then, we have received no further communication from you, from Assignee or from
Tenant. Nor have we been able to confirm that the assignment of the Ground Lease was
recorded in the land records of Montgomery County, Maryland, much less that
recordation taxes have been paid. Furthermore, there has been no business activity at the
Property (as noted) since notice of the assignment was provided approximately six (6)
months ago.

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW | Washington, DC 20001-3743 | www.arnoldporter.com

Camalier0000964

**R.A.160**

# Arnold & Porter

Robert W. Barron, Esq.
February 22, 2018
Page 2

The lack of communication and activity from Assignee is giving Landlord reasonable insecurity with respect to Assignee's ability to perform under the Ground Lease, including without limitation its financial ability to pay rent, taxes, insurance, utilities, and to maintain the Property in first class operating condition and repair.  In addition, there is a genuine and realistic concern about waste; we understand, for example, that substantial roof repairs may be necessary.

Landlord's concerns are driven not just by business considerations, but also by important legal issues that warrant your cooperation.  By way of illustration, the identity of the members of Rock Springs Drive, LLC is essential for Landlord to comply with OFAC regulations, *see* 31 C.F.R. parts 500–599, the USA Patriot Act, Public Law 105-56, 115 Stat. 272 (2001), and various Executive Orders and other laws that place restrictions on Landlord's dealings with certain entities.  *See* Ground Lease Section 5.3 (requiring Tenant to perform and comply with all laws, rules, orders, ordinances, regulations, and requirements).  Given the location of this Property proximate to government facilities and across the street from a school, we trust that you will appreciate Landlord's sensitivity to this issue.

Accordingly, Landlord has asked me to follow-up with a second request for information as to Assignee's identity and intentions.  Landlord also has indicated willingness to meet in person with the principals of Assignee to discuss how best to advance their mutual interests with respect to the Ground Lease and the Property.  That meeting can take place in Florida if more convenient.

Thank you in advance for your cooperation and anticipated reply.

Sincerely,

William M. Bosch

Attachments

# EXHIBIT 20

# BERGER SINGERMAN

Robert W. Barron
(954) 712-5145
RBarron@bergersingerman.com

March 30, 2018

***Via Federal Express***

William M. Bosch, Esq.
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743

RE:  Amended and Restated Ground Lease Indenture dated November 14, 1990
(the "Ground Lease") between Anne D. Camalier ("Landlord") and Rock
Springs Drive, LLC, a Maryland limited liability company ("Tenant").
Response to Your Letter dated February 22, 2018

Dear Mr. Bosch:

I have received your letter with respect to the referenced Ground Lease.  This firm represents
Rock Springs Drive, LLC, the "Tenant" under the Ground Lease and we have been authorized by
the Tenant to provide this response to you.  As you noted in your letter, the Landlord was
advised, by letter dated August 31, 2017, that the prior tenant under the Ground Lease had
assigned its interest in the Ground Lease to Tenant.  Accordingly, your client has been advised of
the identity of the Tenant – ***Rock Springs Drive, LLC, a Maryland limited liability company*** -
since it received such letter.

You also noted in your letter that "there evidently is and has been no commercial activity there"
and that "there has been no business activity at the Property (as noted) since notice of the
assignment was provided approximately six (6) months ago."  We disagree with these assertions.

We are advised that, since receiving the assignment of the prior tenant's interest under the
Ground Lease, Tenant entered into various contracts with certain of the vendors providing
services to the building which is the subject of the Ground Lease (the "Building") (which
vendors had previously been retained by CBRE Group, Inc. or its affiliate ("CBRE") on behalf
of the prior tenant) in order to properly maintain the Building in accordance with the terms of the
Ground Lease.  We understand that these contracts include, without limitation, services for (i)
on-site maintenance, (ii) landscaping/snow removal, (iii) elevator maintenance, (iv) fire alarm
and sprinkler system maintenance, and (v) the security alarm.

We are also advised that, in addition to entering into the foregoing contracts, Tenant has retained
third party firms to conduct various inspections of portions of the Building, including, without
limitation, (a) roof inspection, (b) underground storage tank inspection, and (c) fire extinguisher

Camalier0000971

**R.A.163**

March 30, 2018
Page 2

inspection. With respect to the roof inspection, we understand that the roof inspector recommended repairs to the roof of the Building, the approximate cost of which are estimated not to exceed $20,000 in the aggregate, and Tenant plans to retain a contractor to undertake such repairs shortly. As you know, under the Ground Lease, Tenant is not required to obtain consent from the Landlord with respect to non-structural repairs unless the cost of the repairs exceeds $500,000 (as increased annually as set forth in Section 7.2 of the Ground Lease). Clearly, an estimated $20,000 roof repair cost is not a material issue under the terms of Section 7.2 of the Ground Lease.

We are advised that Tenant is currently evaluating the existing ad valorem assessment with respect to the Building to determine whether to commence an ad valorem tax appeal with respect to the Building. We understand that Tenant has requested a proposal from a third party firm (which had previously represented a prior tenant of the Building with respect to an ad valorem assessment appeal regarding the Building) with respect to a potential tax appeal, but that no final decision has been made at this time with respect to such potential tax appeal.

We understand that CBRE was the previous leasing agent for the Building. After numerous meetings and conversations with representatives of CBRE, we are advised that Tenant has determined not to engage CBRE as the exclusive leasing agent for the Building at this time. We understand that Tenant has interviewed representatives of Cushman & Wakefield with respect to providing leasing services for the Building and Tenant has determined not to engage Cushman & Wakefield as the exclusive leasing agent for the Building at this time. However, we understand that Tenant advised both CBRE and Cushman & Wakefield that Tenant is ready to work with each firm, on a non-exclusive basis, if CBRE and/or Cushman & Wakefield wanted to introduce prospective subtenant(s) to Tenant with respect to all or a portion of the Building. We are advised that, on a strategic, proprietary and confidential basis, Tenant continues to evaluate the rental market for the Building and the proposed leasing strategy for the Building in view of such market, and to formulate its business plan for the Building.

Finally, Tenant has informed us that, since obtaining the assignment of the prior tenant's interest under the Ground Lease, it has paid the monthly rental obligations under the Ground Lease in a timely fashion and that it is not aware of any failure by it to perform under the Ground Lease. In addition, we are advised that the Landlord has not provided to Tenant any oral or written notice of any allegation of the failure by Tenant to perform its obligations under the Ground Lease. As you know, the Landlord has covenanted and agreed in Section 9.2 of the Ground Lease that Tenant shall peaceably and quietly have, hold and enjoy the leased premises and all rights, appurtenances and privileges belonging or appertaining thereto, without hindrance or molestation.

In your letter, you noted that the assignment of the Ground Lease was not recorded in the land records of Montgomery County, Maryland. We have been informed that the customary legal practice in Maryland is not to record an assignment of a lease in the land records of the county in which the leasehold estate is located and that there is no legal requirement to record such assignment. **If Landlord or your firm has contrary information to the effect that Maryland law requires an assignment of a commercial lease to be recorded in the land records of the**

≣ BERGER SINGERMAN

Camalier0000972

March 30, 2018
Page 3

county in which the leasehold estate is located, please provide such information to us for
our review as soon as possible.

In your letter, you noted the lack of communication and activity from the Tenant under the
Ground Lease.  We trust that the information provided above with respect to the Tenant's
activity with respect to the Building will alleviate the Landlord's concerns with respect to the
Tenant's activity with respect to the Building.   Regarding your request for additional
communication, we are not aware of any requirement under the Ground Lease to provide to the
Landlord any additional information regarding the Tenant's strategic and proprietary commercial
activity and business plans with respect to the property demised by the Ground Lease.  We
understand that Landlord or its affiliates may own other commercial office buildings in the
market area and it is important for Tenant to keep confidential its proprietary business
information and its business plans with respect to the Building.

Be advised that Tenant desires to comply with the terms of the Ground Lease.  **If Landlord
believes that Tenant is not complying with the terms of the Ground Lease, please advise the
Tenant by written notice, with reasonable specificity, in order that it may evaluate such
allegation and take the appropriate action to correct any situation which may not be in
compliance with the terms of the Ground Lease.**

In your letter, you noted that it is "essential for Landlord to comply with OFAC regulations."
We are not aware that any OFAC regulations or any "various Executive Orders and other laws"
which were mentioned in your letter require a tenant under a commercial lease to provide any
information to its landlord under such regulations, orders or laws.  We are also not aware of any
term of the Ground Lease which requires any additional disclosure to be made by Tenant to the
Landlord.  **Please provide us with the text of the applicable regulation, order or laws that
you referenced in your illustration in order that we may review such legal text and make a
determination as to whether any additional disclosure is required.**

Tenant appreciates your offer to meet in person with the principals of Tenant, but Tenant does
not have any reason to meet with the Landlord with respect to the Ground Lease and/or the
Building at this time.   Accordingly, Tenant respectfully declines such request at this time.

≡ BERGER SINGERMAN

Camalier0000973

March 30, 2018
Page 4

**Please provide the information requested in this letter with respect to the Ground Lease for our review and consideration.** If you fail to provide such requested information to Tenant and/or the undersigned, Tenant will assume that Landlord has no legal basis for the assertions which were made in your letter related to the information requested.

Sincerely,

Berger Singerman LLP

Robert W. Barron

8424251-3

☰ BERGER SINGERMAN

Camalier0000974

# EXHIBIT 21

23

ROCK SPRINGS DRIVE, LLC: W18227132

---

 **Notice**                                                                 

**Coronavirus (COVID-19) resources for businesses:** https://businessexpress.maryland.gov/coronavirus

On March 12th, Governor Hogan issued and executive order, which requires that the Maryland State Department of Assessments and Taxation (SDAT) to extend all expiration and renewal dates to the 30th day after the date by which the state of emergency is terminated. SDAT is automatically extending the Annual Report Filing and/or Personal Property Return **filing date from April 15 to July 15th** for all entities.

---

**Department ID Number:**

W18227132

**Business Name:**

ROCK SPRINGS DRIVE, LLC

**Principal Office:**

1519 YORK ROAD

LUTHERVILLE MD 21093

**Resident Agent:**

COGENCY GLOBAL INC.

1519 YORK ROAD

LUTHERVILLE MD 21093

**Status:**

ACTIVE

**Good Standing:**

THIS BUSINESS IS IN GOOD STANDING

**Business Type:**

DOMESTIC LLC

**Business Code:**

20 ENTITIES OTHER THAN CORPORATIONS

**Date of Formation/ Registration:**

08/25/2017

**State of Formation:**

MD

**Stock Status:**

N/A

**Close Status:**

N/A

**R.A.168**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| Plaintiff, | |
| v. | Civil No. **20-1502 PJM** |
| **INVESTORS WARRANTY OF AMERICA, LLC,** *et al.,* | |
| Defendants. | |

### ORDER

The United States Court of Appeals for the Fourth Circuit having issued an order dated July 9, 2024 granting in part and denying in part Defendant Investors Warranty of America, LLC ("IWA")'s Petition for a Writ of Mandamus, it is, this **23** day of July, 2024, consistent with the Fourth Circuit's order, by the United States District Court for the District of Maryland,

**ORDERED:**

1. The Court's Memorandum Order dated May 2, 2024 (ECF No. 405) is **VACATED**.

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

**R.A.169**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROCK SPRING PLAZA II, LLC | |
| Plaintiff, | |
| v. | Civil Action No. 8:20-cv-01502-PJM |
| INVESTORS WARRANTY OF AMERICA, LLC, et al., | |
| Defendants. | |

**PLAINTIFF ROCK SPRING PLAZA II, LLC'S OPPOSITION TO DEFENDANTS
ROCK SPRINGS DRIVE, LLC AND INVESTORS WARRANTY OF AMERICA, LLC'S
MOTION IN LIMINE TO EXCLUDE INFORMATION PROTECTED BY THE
<u>ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE</u>**

Plaintiff Rock Spring Plaza II, LLC ("Plaza") submits this response in opposition to

Defendants Rock Springs Drive, LLC's ("RSD") and Investors Warranty of America, LLC's

("IWA") Motion In Limine to Exclude Information Protected by the Attorney-Client Privilege and

Work Product Doctrine (ECF No. 480) (the "Privilege Motion").

Defendants' Privilege Motion is overbroad, unnecessary, and impossible to implement. To

be clear, Plaza of course intends to comply with the Fourth Circuit's Order. But Defendant's

Privilege Motion seeks to preclude Plaza from offering three large, undefined categories of

evidence and argument at trial that extend far beyond the narrow selection of crime-fraud

documents that was before the Fourth Circuit on mandamus review. Most importantly, the

Privilege Motion would require Plaza to refrain from asking any questions that are "reasonably

expected to elicit a privilege objection" – a standard that is impracticable to say the least, especially

given that Defendants' counsel controls what questions will elicit a privilege objection. To be safe,

Plaza's counsel would have to refrain from asking any question that goes remotely close to the

line, but there are important topics where careful parsing of the particular question asked will be

necessary to determine whether or not it seeks privileged information in response – especially in a case where one party's attorney also served in a business capacity. For this reason alone, Defendants' motion is contrary to the Fourth Circuit's clear rulings on the necessary particularity of motions in limine.

"Expected" objection is a particularly inappropriate metric for admissibility in this case given defense counsel's near-constant objection on privilege grounds throughout this litigation. For example, Defendants moved to quash the deposition of Robert Barron, the attorney-mouthpiece of RSD, and, after the Court denied the motion to quash, counsel directed him not to answer questions about RSD that do not involve communications seeking or providing legal advice, and instead implicate Mr. Barron's business activities on behalf of RSD. By naming Mr. Barron as the point of contact for RSD on a business matter and improperly asserting privilege when Plaza seeks to explore important evidence of concealment of basic information about RSD, its intentions, and its ability to perform, Defendants are using his status as an attorney as an excuse to withhold from Plaza information to which it is entitled. This is not a legitimate invocation of privilege. Plaza should be able to ask questions at trial and point out Defendants' deliberate strategy of obfuscation to the jury. Accordingly, Defendants' Privilege Motion should be denied.

## I.    BACKGROUND

On mandamus review, the Fourth Circuit ruled that Plaza is "not entitled to receive [IWA's] privileged information, directly or indirectly, in any manner and is not entitled to use IWA's privileged information, directly or indirectly, in any way, including in briefing, in argument to the court or to the jury, or at trial." *In re Investors Warranty of America, LLC*, Case No. 24-1434, Order (4th Cir. July 9, 2024) ("Fourth Circuit Order"). The only "privileged information" that was before the Fourth Circuit or subject to the Fourth Circuit Order were the three documents that this

Court concluded were subject to the crime-fraud exception in its August 17, 2023, Memorandum Opinion.[1]

## II.    ARGUMENT

### A.    The Court Should Not Preemptively Disallow Any Line of Questioning That May Elicit a Privilege Objection.

The most sweeping request contained in Defendants' Privilege Motion asks this Court to prevent Plaza from asking any "questions that are reasonably expected to elicit an objection from defense counsel on the grounds of privilege or work product" (Mot. at 5) – not just an objection based on the Fourth Circuit Order, but any privilege objection at all. Subjecting Plaza to an Order that can only be measured on a completely amorphous standard would inevitably hinder Plaza from asking a much broader range of questions and would foreclose legitimate lines of inquiry based only on the likelihood that defense counsel will object. The Court should deny the Privilege Motion and resolve any privilege objections that do arise at trial, in the context in which they arise, as it would in any case.

Defendants do not define what privileged information or work product they are referring to in their motion. When a motion in limine "does not identify any specific evidence or testimony that it seeks to exclude," it "is subject to denial on this ground alone." *Brightview Grp., LP v. Teeters*, 2022 WL 846208, at *9 (D. Md. Mar. 22, 2022) (citing, *inter alia*, *A.Hak Indus. Servs. BV v. Techcorr USA LLC*, 2014 WL 12591696, at *1 (N.D.W. Va. Dec. 18, 2014) ("[W]hen a motion in limine seeks to exclude a general category of evidence, the best course of action is to deny the motion and see how the case unfolds, because a blanket exclusion could likely preclude

---

[1] Although the Fourth Circuit vacated this Court's production orders, it has made no determination that the crime-fraud exception does or does not apply to the circumstances of this case. Plaza does not concede that the crime-fraud exception does not apply and reserves the right to make a further prima facie showing at trial (or otherwise) that the crime-fraud exception obviates the privilege.

3

a party from introducing evidence that a court finds admissible with the benefit of knowing the particular evidence and relevant context.")). The Fourth Circuit has reversed a decision of a district court to exclude an entire category of documents without engaging in a "particularized" determination of "what evidence . . . should be admitted." *E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 564 F. App'x 710, 715 (4th Cir. 2014) (reversing because "the *blanket exclusion* of such evidence seriously prejudiced [the defendant's] ability to present its case to the jury." (emphasis in original)).

Defendants bear the burden of proving that the privilege applies to any particular document or other piece of evidence. *N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 501 (4th Cir. 2011). Granting Defendants' Privilege Motion would absolve Defendants of their burden to show that the privilege applies in advance of Plaza asking even its first question at trial. Moreover, the attorney-client privilege must be "strictly construed" because it impedes the truth-seeking function of civil litigation. *See Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189 (1990) (citing *Trammel v. United States*, 445 U.S. 40, 50-51, 100 (1980) ("Testimonial exclusionary rules and privileges contravene the fundamental principle that "the public . . . has a right to every man's evidence.").

Ultimately, the Court must determine what actual questions impermissibly seek privileged information in response. And it is impossible for the Court to make this determination before hearing the question, how it is phrased, the context in which it is asked, and without considering other developments at trial. *See Evans v. Quintiles Transnat'l Corp.*, 2015 WL 9455580, at *8 (D.S.C. Dec. 23, 2015) (refusing to grant a motion in limine precluding any testimony that raised privilege issues and directing that those issues be raised at trial). One of Defendants' cases supports denying the Privilege Motion for this reason. In *In re Zetia (Ezetimibe) Antitrust Litigation*, the court denied a motion in limine "to the extent it seeks to preclude Purchasers from asking <u>any</u>

question that results in an invocation of privilege." 2023 WL 4156858, at *5 (E.D. Va. Apr. 5, 2023) (emphasis in original). The court observed:

> There are simply too many ways that privilege could become a relevant issue at trial -- or that [opposing counsel] could unintentionally ask a question that results in an invocation of privilege -- for the court to deem, in advance, any question resulting in the invocation of privilege improper. This is particularly so given the many privilege assertions surrounding the crucial and highly disputed evidence of [the defendants'] views about [a] pending . . . litigation.

*Id.*

Defendants have made over-broad assertions of privilege throughout this litigation, to the point that using Defendants' expected objection as a metric for admissibility would prevent Plaza from asking many legitimate questions. One example is the following questioning of Mr. Barron:

> Q. The last paragraph of your letter, this is IWA 100, you state, "Tenant appreciates your offer to meet in person with the principals of tenant, but tenant does not have any reason to meet with the landlord with respect to the ground lease and/or the building at this time." Do you see that?
>
> A. Yes.
>
> Q. So you declined the landlord's proposal to meet even in Florida?
>
> A. Yes.
>
> Q. Who made that decision?
>
> MS. KROPF: Objection. Instruct him not to answer.
>
> BY MR. BOSCH:
> Q. Did you independently determine not to have the landlord meet with the tenant?
>
> MS. KROPF: Objection. And I instruct him not to answer.
>
> BY MR. BOSCH:
> Q. Why not meet?
>
> MS. KROPF: Same instructions.
>
> BY MR. BOSCH:

**R.A.174**

Q. You understand that landlord was already concerned about who RSD was and whether it had the financial ability to perform. Why not meet and provide some assurance and build some trust, Mr. Barron?

MS. KROPF: Same instruction.

BY MR. BOSCH:
Q. Wouldn't that be in good faith?

MS. KROPF: Same instruction.

Ex. A, Barron Dep. Tr. 334:1-335:10.

Counsel made these objections even after the Court observed in allowing Mr. Barron's deposition to proceed that not every interaction or conversation involving a lawyer is privileged – especially here, where Mr. Barron was acting as a corporate representative. *See* Ex. B, Feb. 16, 2023, Hr'g Tr. 102:6-11 ("THE COURT: I'm not sure the why is necessarily answered by the fact that a lawyer is in the conversation. It may be if the lawyer gave the advice, but why did you do this and you're asking the principal of the defendant and he's saying – or she, I can't answer because I talked about this to my lawyer? That can't be."); *see also id.* at 99:9-16 ("THE COURT: Well, wait a minute. Suppose Mr. Barr[o]n weren't a lawyer? I mean, was a corporate rep? . . . Even if the client instructed him of all these things, you couldn't block that inquiry, could you? MS. KROPF: We couldn't, Your Honor. THE COURT: By naming a lawyer as you're effectively the mouthpiece or whatever you would call him here, you get to use the privilege?").

The fact that Mr. Barron also acted in a business capacity for RSD means that not every interaction he had with RSD is privileged. *See Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 410 (D. Md. 2005) ("The Fourth Circuit has spoken unequivocally on this point: 'it is the unquestioned rule that the mere relationship of attorney-client does not warrant a presumption of confidentiality.'") (quoting *United States v. (Under Seal)*, 748 F.2d 871, 874-75 (4th Cir. 1984)); *F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 71

(D. Md. 1998) ("While legal advice provided in the context of business negotiations is protected under the attorney client privilege, business information provided in the context of business negotiations does not acquire protection under the privilege merely because it has been provided by an attorney."). Yet Defendants have improperly asserted that all of Mr. Barron's conversations with RSD are privileged:

> Q. All right. So at the time that you were identified as the person to whom questions could be directed, did you have any understanding as to what answers you were authorized to provide?
>
> MS. KROPF: Objection as to form.
>
> THE WITNESS: I understood that I would -- I would stick to the terms of the lease and what I was required under the lease to communicate.
>
> . . .
>
> Q. Mr. Barron, let me finish. On August 30, 2017, as the person to whom questions were to be directed, what did you understand you were authorized to disclose?
>
> MS. KROPF: Let me just -- Mr. Bosch, I'm sorry to be frustrating here, but I need to interpose an objection. Because he's stated repeatedly that **he's the lawyer for the entity who can only be authorized by his clients.** And to the extent any authority comes from your clients, I instruct you not to answer.
>
> THE WITNESS: Okay.
>
> **MS. KROPF: Whoever the client is, that would be privileged. We'd object to it. And I instruct you not to answer.**
>
> THE WITNESS: Okay. Thank you.
>
> BY MR. BOSCH:
> Q. So were you advised by your client as to what information you could disclose?
>
> MS. KROPF: Objection. And I instruct you not to answer.
>
> THE WITNESS: Understood.
>
> BY MR. BOSCH:
> Q. So you can't say what information you were permitted to disclose or were not permitted to disclose without you divulging attorney-client communications?

MS. KROPF: You can – object to form. But you can answer.

THE WITNESS: I don't know how I could –
(Reporter clarifies.)

MS. KROPF: Yes. Object to form. You can answer.

THE WITNESS: I don't know to answer that question without discussing communication with my client.

**MR. BOSCH: And, Ms. Kropf, so it's clear, you're saying that all communications with his client about the information that he could or could not disclose is privileged?**

**MS. KROPF: Yes.**

Ex. A, Barron Dep. Tr. 246:11-249:14 (emphasis added).

In light of Defendants' frequent improper privilege objections, Plaza should not be precluded from asking questions that will elicit a privilege objection from counsel.[2] At minimum, any privilege objection should be resolved by the Court at trial after it has a chance to consider the specific question being asked, and questions that do not improperly seek privileged information should be allowed to proceed.

**B.    The Court Should Not Preemptively Block Plaza from Referencing any Evidence that the Fourth Circuit did not Preclude Plaza from Obtaining or Introducing.**

Likewise, the Court should not preclude Plaza from referring to "any of Defendants' privileged information" in advance of trial. Plaza does not dispute that, following the Fourth Circuit Order, it cannot refer to the three documents excerpted in the August 17, 2023, Memorandum Opinion at trial. No motion in limine was required to prevent Plaza from doing so.

---

[2] Counsel even promised that "If we have Mr. Barr[o]n's deposition, we're just going to be objecting on privilege." Ex. B, Feb. 16, 2023, Hr'g Tr. 106:18-19. There is no reason to expect that trial will be different, but these objections should be ruled on by the Court.

Defendants' Privilege Motion, however, goes much further and seeks to preclude Plaza from referencing the broad, sweeping category of all of Defendants' "privileged information." Beyond a generalized assertion of privilege, Defendants do not articulate what information or evidence Plaza should be precluded from referring to. The Privilege Motion should be denied for this reason. *See E.I. DuPont*, 564 F. App'x at 715; *see also Humbert v. O'Malley*, 2015 WL 1569182, at *4 (D. Md. Apr. 6, 2015) ("[C]oncerning speculative arguments and evidence; the Court is unable to resolve these motions outside of the context of trial."); *In re C.R. Bard, Inc., Pelvic Repair Sys. Products Liab. Litig.*, 2013 WL 3282926, at *2 (S.D.W. Va. Jun. 27, 2013) (denying motions in limine because the court could not rule on them "without knowing the particular piece of evidence" at issue or the argument to be made and the context in which such evidence or argument would arise), *aff'd in relevant part*, 810 F.3d 913 (4th Cir. 2016).

Moreover, as explained above, a broad preclusion from referencing any privileged material at trial without a particularized evaluation of whether the privilege applies would both free Defendants of their burden to establish that privilege applies and run contrary to the nature of the privilege as an evidentiary rule, which must be construed narrowly to aid the pursuit of the truth. The Court therefore should deny the motion and wait until trial to make specific rulings on issues of admissibility related to attorney-client privilege as they arise. *See E.I. DuPont*, 564 F. App'x at 715 ("[A] court is often wise to await the unfolding of evidence before the jury before undertaking to make definitive rulings on the likely probative value of disputed evidence.").

### C. Plaza Can Legitimately Argue that Defendants are "Hiding Behind the Privilege."

Defendants' final request in their Privilege Motion is to preclude Plaza from arguing at trial that Defendants are "hiding behind the privilege." But that is exactly what Defendants are doing, and Plaza should be able to point it out to the Jury if it chooses to do so.

9

**R.A.178**

When IWA notified Plaza that it had assigned the Ground Lease to RSD on August 31, 2017, the only thing IWA said about RSD was that it was a Maryland limited liability company. IWA directed any questions to Mr. Barron at an address in Florida. IWA directed RSD's other principals not to communicate with Plaza for three years, hid the fact that IWA remained the real interested party, and did not record the assignment. And, of course, everyone involved hid IWA's "exit strategy" for RSD to strategically default on the ground lease in three years once the statute of limitations expired, "turning the keys over to the landlord" and leaving Plaza with no recourse.

Following the assignment, despite repeated requests to Mr. Barron for information about the identity or RSD, its plans for the property, and its ability to perform the tenant's obligations under the Ground Lease, Mr. Barron refused to provide any information about RSD to Plaza. And after Plaza filed suit, Defendants have continued to use Mr. Barron's identity as an attorney as an excuse not to answer legitimate questions about RSD and the assignment, as demonstrated above. This is no accident, but rather a deliberate strategy of obfuscation to prevent Plaza from learning more about RSD and IWA's exit strategy by placing a lawyer in front of the entire operation:

> BY MR. BOSCH:
> Q. So when landlord reaches out to you, the sole point of contact, the lawyer for RSD, and asks -- it indicates it's willing to sit down with the principals, meet in Florida, you can't tell me what was discussed in response without divulging privileged communications?
>
> MS. KROPF: Objection. He can't tell you consistent with the rules of professional conduct and the law in every jurisdiction across the United States. So I instruct him not to answer.
>
> MR. BOSCH: That's because RSD has put a lawyer out in front for any communications from the landlord to the tenant?
>
> MS. KROPF: Objection. And I instruct him not to answer.

Ex. A, Barron Dep. Tr. 297:9-298:2.

10

Mr. Barron is not merely RSD's lawyer, but he was identified by IWA as its representative and point of contact for all matters pertaining to the Ground Lease. This choice does not establish a wall against all questions directed to Mr. Barron or RSD merely because Mr. Barron is a lawyer. Because Mr. Barron's role involved more than providing legal advice, and "whether specific communications are privileged will also depend on the purpose and context for which they were made." *Allen v. TV One, LLC*, 2016 WL 7157420, at \*4 (D. Md. Dec. 8, 2016). By making overly broad assertions of privilege, Defendants have further concealed the fraudulent transfer of the Ground Lease. This, in and of itself, is evidence of IWA's fraudulent intent in assigning the Ground Lease to RSD, and Plaza should be able to tell the jury about it. *See* Ex. C, Aug. 12, 2021, Hr'g Tr. at 4:10 (observing that Mr. Barron's refusal to provide basic information about RSD is a "fairly central potentially dispositive issue in this case" as a whole).

## III.    CONCLUSION

For the foregoing reasons, Plaza respectfully requests that this Court deny Defendants' Privilege Motion.

Dated: July 29, 2024

Respectfully submitted,
*/s/William M. Bosch*

William M. Bosch
Deborah B. Baum
Anthony Cavanaugh
Alvin Dunn
Katherine Danial
Nicole Steinberg
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: 202-663-8000
Facsimile: 202-663-8007
william.bosch@pillsburylaw.com

anthony.cavanaugh@pillsburylaw.com
alvin.dunn@pillsburylaw.com

*Counsel for Plaintiff Rock Spring Plaza II,
LLC*

# EXHIBIT A



# Transcript of Robert W. Barron

**Date:** April 14, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2

3    ROCK SPRING PLAZA II, LLC,

            Plaintiff,
4

5    -vs-

6    INVESTORS WARRANTY OF AMERICA, LLC, et al.,

            Defendants.
7    _____/

8

9

10

11

12      VIDEOTAPED DEPOSITION OF ROBERT W. BARRON

13

14              Friday, April 14, 2023
                9:04 a.m. - 5:42 p.m.

15              (Conducted Remotely)

16

17

18

19   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
20   Notary Public, State of Florida
     PLANET DEPOS
21
                       -  -  -
22

Transcript of Robert W. Barron
Conducted on April 14, 2023      426

```
1                         CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF PALM BEACH

4

5

6              I, the undersigned authority, certify

7        that ROBERT W. BARRON personally appeared before

8        me and was duly sworn.

9

10             Dated this 18th day of April, 2023.

11

12

13

14

15       _____
         Pamela J. Pelino, RPR, FPR, CLR
         Notary Public - State of Florida
16       My Commission No.:  HH 275669
         My Commission Expires:  June 13, 2026
17

18

19

20

21

22
```

1              C E R T I F I C A T E

2   STATE OF FLORIDA

3   COUNTY OF PALM BEACH

4

5           I, Pamela J. Pelino, Registered Professional
    Court Reporter and Notary Public in and for the State of
6   Florida at Large, do hereby certify that the
    aforementioned witness was by me first duly sworn to
7   testify the whole truth; that I was authorized to and
    did report said deposition in stenotype; and that the
8   foregoing pages are a true and correct transcription of
    my shorthand notes of said deposition.

9

10          I further certify that said deposition was
    taken at the time and place hereinabove set forth and
    that the taking of said deposition was commenced and
11  completed as hereinabove set out.

12          I further certify that I am not attorney
    or counsel of any of the parties, nor am I a
13  relative or employee of any attorney or counsel of
    party connected with the action, nor am I
14  financially interested in the action.

15          The foregoing certification of this
    transcript does not apply to any reproduction of
16  the same by any means unless under the direct
    control and/or direction of the certifying
17  reporter.

18

19          Dated this 18th day of April, 2023.

20

21          _____
            Pamela J. Pelino, RPR, FPR, CLR
22

Transcript of Robert W. Barron
Conducted on April 14, 2023                          246

| | | |
|---|---|---|
| 1 | understand you were authorized to disclose? | 14:36:08 |
| 2 | A.    Can we -- can I just -- friendly | 14:36:13 |
| 3 | amendment, the letter doesn't say that they'll | 14:36:16 |
| 4 | answer all your questions.  It says that you can | 14:36:18 |
| 5 | ask questions. | 14:36:21 |
| 6 | Q.    Well, we now know that, right?  But so | 14:36:22 |
| 7 | -- okay.  Fair enough, Mr. Barron. | 14:36:24 |
| 8 | Let me go back, then, and start all | 14:36:27 |
| 9 | over. | 14:36:29 |
| 10 | A.    Yes, sir. | 14:36:29 |
| 11 | Q.    All right.  So at the time that you | 14:36:30 |
| 12 | were identified as the person to whom questions | 14:36:32 |
| 13 | could be directed, did you have any understanding | 14:36:35 |
| 14 | as to what answers you were authorized to provide? | 14:36:37 |
| 15 | MS. KROPF:  Objection as to form. | 14:36:41 |
| 16 | THE WITNESS:  I understood that I would | 14:36:42 |
| 17 | -- I would stick to the terms of the lease | 14:36:45 |
| 18 | and what I was required under the lease to | 14:36:47 |
| 19 | communicate. | 14:36:51 |
| 20 | BY MR. BOSCH: | 14:36:52 |
| 21 | Q.    And what did you understand you were | 14:36:53 |
| 22 | required to communicate? | 14:36:55 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                247

| | | |
|---|---|---|
| 1 | MS. KROPF:  Objection as to form. | 14:36:59 |
| 2 | THE WITNESS:  Read the terms of the | 14:36:59 |
| 3 | lease.  I think part of the -- part of the -- | 14:37:02 |
| 4 | part of the challenge is is that I looked you | 14:37:09 |
| 5 | up when you can -- contacted me, and I found | 14:37:13 |
| 6 | out that you were the head of the litigation | 14:37:20 |
| 7 | of your prior firm. | 14:37:22 |
| 8 | BY MR. BOSCH: | 14:37:23 |
| 9 | Q.    Not my question, sir. | 14:37:24 |
| 10 | A.    Yes, it is. | 14:37:25 |
| 11 | Q.    I'm asking what you understood you were | 14:37:26 |
| 12 | authorized to disclose -- | 14:37:28 |
| 13 | A.    To keep -- | 14:37:29 |
| 14 | (Simultaneous speakers.) | 14:37:30 |
| 15 | Q.    Mr. Barron, let me finish. | 14:37:30 |
| 16 | On August 30, 2017, as the person to | 14:37:32 |
| 17 | whom questions were to be directed, what did you | 14:37:35 |
| 18 | understand you were authorized to disclose? | 14:37:38 |
| 19 | MS. KROPF:  Let me just -- Mr. Bosch, | 14:37:41 |
| 20 | I'm sorry to be frustrating here, but I need | 14:37:42 |
| 21 | to interpose an objection.  Because he's | 14:37:45 |
| 22 | stated repeatedly that he's the lawyer for | 14:37:47 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

R.A.188

Transcript of Robert W. Barron
Conducted on April 14, 2023                                    248

| | | |
|---|---|---|
| 1 | the entity who can only be authorized by his | 14:37:48 |
| 2 | clients. | 14:37:52 |
| 3 | And to the extent any authority comes | 14:37:52 |
| 4 | from your clients, I instruct you not to | 14:37:54 |
| 5 | answer. | 14:37:56 |
| 6 | THE WITNESS:  Okay. | 14:37:56 |
| 7 | MS. KROPF:  Whoever the client is, that | 14:37:57 |
| 8 | would be privileged.  We'd object to it. | 14:37:58 |
| 9 | And I instruct you not to answer. | 14:38:01 |
| 10 | THE WITNESS:  Okay.  Thank you. | 14:38:04 |
| 11 | BY MR. BOSCH: | 14:38:05 |
| 12 | Q.    So were you advised by your client as | 14:38:06 |
| 13 | to what information you could disclose? | 14:38:08 |
| 14 | MS. KROPF:  Objection. | 14:38:11 |
| 15 | And I instruct you not to answer. | 14:38:11 |
| 16 | THE WITNESS:  Understood. | 14:38:13 |
| 17 | BY MR. BOSCH: | 14:38:14 |
| 18 | Q.    So you can't say what information you | 14:38:15 |
| 19 | were permitted to disclose or were not permitted | 14:38:16 |
| 20 | to disclose without you divulging attorney-client | 14:38:20 |
| 21 | communications? | 14:38:26 |
| 22 | MS. KROPF:  You can -- object to form. | 14:38:29 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    249

```
 1              But you can answer.                              14:38:34

 2              THE WITNESS:  I don't know how I                 14:38:37

 3        could --                                               14:38:37

 4              (Reporter clarifies.)                            14:38:38

 5              MS. KROPF:  Yes.  Object to form.                14:38:38

 6              You can answer.                                  14:38:38

 7              THE WITNESS:  I don't know to answer             14:38:38

 8        that question without discussing                       14:38:38

 9        communication with my client.                         14:38:39

10              MR. BOSCH:  And, Ms. Kropf, so it's              14:38:44

11        clear, you're saying that all communications          14:38:46

12        with his client about the information that he          14:38:48

13        could or could not disclose is privileged?            14:38:49

14              MS. KROPF:  Yes.                                 14:38:53

15   BY MR. BOSCH:                                               14:38:57

16        Q.    Were you involved in any discussions             14:38:59

17   concerning what information to disclose to                  14:39:01

18   landlord about the assignment at the time of this          14:39:03

19   notice, August 30th, 2017?                                 14:39:09

20              MS. KROPF:  You can answer that to the           14:39:12

21        extent it's not disclosing communications             14:39:13

22        with your client.                                     14:39:15
```

R.A.190

Transcript of Robert W. Barron
Conducted on April 14, 2023                                          297

```
1              MR. BOSCH:  And, Ms. Kropf, you're              15:23:18

2         taking the position that that's a privileged         15:23:20

3         communication?                                        15:23:22

4              MS. KROPF:  Whether or not he discussed          15:23:23

5         that letter with his clients, yes.  I take            15:23:24

6         the position that that is an attorney-client          15:23:26

7         communication.                                        15:23:28

8    BY MR. BOSCH:                                              15:23:32

9         Q.    So when landlord reaches out to you,           15:23:34

10   the sole point of contact, the lawyer for RSD, and       15:23:35

11   asks -- it indicates it's willing to sit down with       15:23:37

12   the principals, meet in Florida, you can't tell me       15:23:39

13   what was discussed in response without divulging         15:23:42

14   privileged communications?                                15:23:48

15             MS. KROPF:  Objection.  He can't tell           15:23:49

16        you consistent with the rules of professional        15:23:51

17        conduct and the law in every jurisdiction            15:23:52

18        across the United States.                             15:23:55

19             So I instruct him not to answer.                 15:23:56

20             MR. BOSCH:  That's because RSD has put           15:23:59

21        a lawyer out in front for any communications          15:24:00

22        from the landlord to the tenant?                      15:24:03
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    298

| | | |
|---|---|---|
| 1 | MS. KROPF:  Objection. | 15:24:07 |
| 2 | And I instruct him not to answer. | 15:24:07 |
| 3 | BY MR. BOSCH: | 15:24:09 |
| 4 | Q.    So is RSD hiding behind a lawyer? | 15:24:09 |
| 5 | MS. KROPF:  Objection. | 15:24:13 |
| 6 | And I instruct him not to answer. | 15:24:14 |
| 7 | BY MR. BOSCH: | 15:24:15 |
| 8 | Q.   Is RSD not responding in good faith, | 15:24:15 |
| 9 | Mr. Barron? | 15:24:20 |
| 10 | MS. KROPF:  You can answer that. | 15:24:27 |
| 11 | THE WITNESS:  Sir, with respect, the | 15:24:29 |
| 12 | landlord sued the tenant after the tenant | 15:24:30 |
| 13 | relied on the covenant of the landlord in the | 15:24:35 |
| 14 | estoppel that said you'd have the absolute | 15:24:39 |
| 15 | right to assign the lease to a third party | 15:24:42 |
| 16 | and be automatically released. | 15:24:45 |
| 17 | So I would say in big, bright letters, | 15:24:48 |
| 18 | the very fact that I am here is evidence of | 15:24:51 |
| 19 | the bad faith of the landlord not to stand | 15:24:54 |
| 20 | behind the covenant they made in order to | 15:24:57 |
| 21 | induce the lender to make the loan. | 15:25:00 |
| 22 | So bad faith, there's a concept of | 15:25:03 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    334

```
 1        Q.    The last paragraph of your letter, this      16:07:35

 2   is IWA 100, you state, "Tenant appreciates your        16:07:43

 3   offer to meet in person with the principals of         16:07:46

 4   tenant, but tenant does not have any reason to          16:07:49

 5   meet with the landlord with respect to the ground      16:07:52

 6   lease and/or the building at this time."               16:07:56

 7             Do you see that?                              16:08:00

 8        A.    Yes.                                         16:08:01

 9        Q.    So you declined the landlord's proposal     16:08:03

10   to meet even in Florida?                                16:08:09

11        A.    Yes.                                         16:08:16

12        Q.    Who made that decision?                      16:08:17

13             MS. KROPF:  Objection.                        16:08:21

14             Instruct him not to answer.                   16:08:21

15   BY MR. BOSCH:                                           16:08:22

16        Q.    Did you independently determine not to      16:08:30

17   have the landlord meet with the tenant?                16:08:31

18             MS. KROPF:  Objection.                        16:08:33

19             And I instruct him not to answer.             16:08:33

20   BY MR. BOSCH:                                           16:08:35

21        Q.    Why not meet?                                16:08:36

22             MS. KROPF:  Same instructions.                16:08:39
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                335

```
 1   BY MR. BOSCH:                                    16:08:43

 2       Q.    You understand that landlord was      16:08:43

 3   already concerned about who RSD was and whether it 16:08:45

 4   had the financial ability to perform.  Why not   16:08:47

 5   meet and provide some assurance and build some   16:08:55

 6   trust, Mr. Barron?                               16:08:57

 7           MS. KROPF:  Same instruction.            16:08:59

 8   BY MR. BOSCH:                                    16:09:00

 9       Q.    Wouldn't that be in good faith?        16:09:01

10           MS. KROPF:  Same instruction.            16:09:03

11   BY MR. BOSCH:                                    16:09:03

12       Q.    So if you thought they were looking for 16:09:04

13   a reason to sue, why not sit down and say, there's 16:09:05

14   no reason to sue?  IWA is standing behind this new 16:09:09

15   entity?                                          16:09:11

16           MS. KROPF:  Same instruction.            16:09:12

17   BY MR. BOSCH:                                    16:09:13

18       Q.    Was that discussed?                    16:09:14

19           MS. KROPF:  Same instructions.           16:09:15

20   BY MR. BOSCH:                                    16:09:16

21       Q.    Was that discussed before the          16:09:16

22   assignment?                                      16:09:17
```

R.A.194

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

```
ROCK SPRING PLAZA II, LLC,          )
                                    )
        Plaintiff,                  )
                                    )DOCKET NO.
            vs.                     )8:20-cv-1502
                                    )
INVESTORS WARRANTY OF AMERICA, LLC, )
ET AL.,                             )
                                    )
        Defendants.                 )
_____)
```

TRANSCRIPT OF PRETRIAL HEARING
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT COURT JUDGE
THURSDAY, AUGUST 8, 2024 AT 11 A.M.

APPEARANCES:

On Behalf of the Plaintiff:

        WILLIAM M. BOSCH, ESQ.
        DEBORAH B. BAUM, ESQ.
        ANTHONY F. CAVANAUGH, ESQ.
        NICOLE STEINBERG, ESQ.
        ALVIN B. DUNN, ESQ.
        PILLSBURY WINTHROP SHAW PITTMAN LLP
        1200 17th St NW
        Washington, DC 20036

On Behalf of the Defendant Investors Warranty of America:

        REBECCA ALLISON DAVIS, ESQ.
        JENNIFER L. SHELFER, ESQ.
        ARNALL GOLDEN GREGORY LLP
        171 17th St NW, Suite 2100
        Atlanta, GA 30363
and
        WILLIAM B. HILL, JR.
        SEYFARTH SHAW LLP
        1075 Peachtree Street, NE, Suite 2500
        Atlanta, GA 30309


    KATHY CORTOPASSI, RDR, CRC, USDC, Greenbelt, Maryland


      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

APPEARANCES (Continued):


On Behalf of the Defendant Rock Springs Drive, LLC:

        SARA KROPF, ESQ.
        REBECCA GUITERMAN, ESQ.
        KROPF MOSELEY PLLC
        1100 H Street NW, Suite 1220
        Washington, DC 20005

1        Defendants' joint motion in limine to exclude
2    information protected by the attorney/client privilege and
3    work product doctrine, this is ECF Number 480.
4        Defendants argue that in light of the Fourth
5    Circuit's rulings on -- particularly the ruling on the second
6    petition for the writ of mandamus -- the Court should
7    preclude Plaza witnesses from referencing or alluding to any
8    of defendant's privileged information, including as
9    referenced or excerpted in the Court's August 17, 2023,
10   memorandum on prime fraud exception, which remains sealed, I
11   believe.  It is still sealed.
12       Also, a request by defendants that the Court
13   preclude plaintiffs from asking questions reasonably expected
14   to elicit an objection from defense counsel on the grounds of
15   privilege or work product.
16       And, further, precluding plaintiff from making
17   improper argument to the jury, including, for example, that
18   defendants are hiding behind the privilege.
19       Defendants, moreover, contend that the Court cannot
20   instruct the jury to draw a negative inference from a proper
21   invocation of the attorney/client privilege and the Court
22   should police Plaza to ensure it does not ask questions that
23   will require witnesses opining on defendant's behalf to
24   invoke the privilege.
25       Plaintiff responds by saying it intends to fully

27

1   comply with the Fourth Circuit's mandamus order and generally
2   the motion is too vague and too broad and too imprecise for
3   the Court to rule on at this time.

4         Plaza, in particular, takes issue with the request
5   that Plaza be precluded from asking questions that are
6   reasonably expected to elicit an objection from defense
7   counsel on the ground of privilege or work product because
8   defense counsel has, throughout the history of this case,
9   made overbroad, improper, and generalized assertions of
10  privilege.

11        Plaza notes that defendants do not specify what
12  evidence or testimony they claim to be privileged.  They do
13  not limit their possible assertion of privilege to the three
14  communications at issue in the Court's crime fraud opinions
15  or the ancillary documents that were before the Fourth
16  Circuit in its mandamus order.

17        The Court denies the motion.  The Court does find
18  that the motion is overly broad and is, frankly, deniable on
19  those grounds alone.

20        The Court does intend to follow the Fourth
21  Circuit's mandamus order, and the plaintiff is warned and
22  understands it may not inquire, directly or indirectly, the
23  three communications at issue in the Fourth Circuit's
24  mandamus order or the ancillary documents covered by the
25  order.

1      But the Court cannot say -- and this is why an in

2 limine motion is sort of tricky -- to say you cannot ask any

3 defense witness any question that they may have to assert

4 privilege or they wish to assert privilege.

5      Defense counsel, again, needs to understand that

6 any overbroad assertions at trial are going to present an

7 issue.

8      Let me take a moment and then speak about that, as

9 well.

10      I don't know whether you're saying that Mr. Barron,

11 for example, can stand on privilege, this same privilege.

12 And he can be your witness and say what he wants to but he

13 can't answer anything that they ask.  You can use it as a

14 sword, but you can't use it as a shield.

15      Are you suggesting that Mr. Barron also can't be --

16 I'm not saying across-the-board, but when Barron was made the

17 personal contact here and he basically stonewalled, you're

18 saying you can't ask him why?

19      MS. KROPF:  Your Honor, first of all, he did not

20 stonewall.

21      THE COURT:  Well, I read his deposition responses.

22      MS. KROPF:  He did not stonewall, Your Honor.  We

23 properly asserted privilege.  The plaintiff never moved to

24 compel on it.  They have never challenged privilege

25 throughout all the months of discovery here.

1    The idea that we're standing here at a pretrial
2  while they are trying to reopen discovery to say that we
3  improperly asserted privilege is the problem.

4    He did not stonewall, Your Honor.  He appropriately
5  answered questions that were not privileged.  We asserted
6  objections that they have never challenged before the Court
7  and don't even challenge in their reply nor did they file
8  their own motion saying, "this is what we want to ask him."

9    He answered questions about the facts that he was
10  able to answer.

11    For example, Your Honor it was not privileged, the
12  communications between Mr. Barron and IWA when they were
13  negotiating the operating agreement.  So, he answered those
14  questions.  What were the communications?  How did the
15  negotiations work?  He answered all of those questions.

16    What he didn't answer, Your Honor, is the heart of
17  privilege.  Mr. Bosch repeatedly asked him about Mr. Barron's
18  communications with Mr. Taylor and Mr. Rubin.  Of course he
19  didn't answer those questions, and I instructed him not to.
20  They have not challenged them in the last year and a half.

21    And yet we're here at the pretrial expecting to
22  have Mr. Barron -- they are calling Mr. Barron, Your Honor.
23  They are calling him.  So, talking about sword and a shield.
24  We haven't decided whether to call him.  He's on our list.

25    THE COURT:  We'll come to that issue.  I think

30

1    you've taken a position that you're not going to make him
2    available until -- just for your case.  I'll address that
3    momentarily.
4          MS. KROPF:  Understood, Your Honor.  But he did --
5    the characterization that he stonewalled is concerning that
6    the Court says that because I'm sure the Court does not think
7    that asserting the attorney/client privilege is stonewalling.
8          We received a 100-page privilege log from the
9    plaintiff.  That's not them stonewalling.
10         If I had asked Mr. Camalier about his
11   communications with Mr. Bosch, they would have asserted
12   privilege.  That's not stonewalling, Your Honor.  That is an
13   appropriate objection.  That's why the privilege exists.
14         THE COURT:  All right.
15         MS. KROPF:  What they want do is put Mr. Barron on
16   the stand, ask him questions, and have us have to stand up
17   and object on privilege so that they can make their improper
18   argument that we are hiding behind the privilege.
19         We are not hiding behind it, Your Honor.  It is
20   there.  They have asserted it and we have asserted it.  That
21   is an improper argument they shouldn't be permitted to make
22   it in front of the jury at any time.
23         And appropriately asserting privilege, that has
24   never been challenged the last year and a half is
25   inappropriate in a pretrial.

31

1          So, we do ask for Your Honor's guidance on this

2     because --

3              THE COURT:  That's why we're talking about it now.

4              MS. KROPF:  -- we do think it's inappropriate

5     because I think what they're going to try to do, Your Honor,

6     is create the impression in front of the jury that we are

7     trying to hide something.

8          Your Honor, we are protecting the privilege.  If I

9     didn't do that, that would be malpractice.  I will do it.

10    And if I need to do it during trial, of course I will.  But

11    it's going to slow down the trial.  And you know how juries

12    think, Your Honor.  They don't like it when the lawyers get

13    up and object.  They don't like thinking that things are

14    being kept from them.

15         Their theory of the case is that we were being

16    secretive.  They have said it a million times over and Your

17    Honor has agreed with them.  If you make us do this at trial,

18    it will at least, even if they don't explicitly argue it,

19    which I think alone would be improper, it will create that

20    impression.

21         And it is unfair for them to use a proper

22    invocation of client privilege to make their case in front of

23    the jury indirectly.

24         The Fourth Circuit could not have been clearer.

25    The privilege may not be --

1           THE COURT:  The Fourth Circuit did not talk about

2     Mr. Barron.

3           MS. KROPF:  Your Honor, because it has never been

4     challenged and they have never asserted crime fraud as to

5     him.

6           So, yes, you're correct, Your Honor.  But the fact

7     that they have never challenged it, it has never gone up to

8     the Fourth Circuit.  If it needs to, we will, Your Honor.  We

9     don't think it needs to.

10          THE COURT:  All right.  Well, let's hear the

11    response.   Who is going to respond?

12          MR. BOSCH:  Ms. Baum will handle this.

13          THE COURT:  This is Ms. Baum?

14          MS. BAUM:  Yes.  Debby Baum, Your Honor.

15          I heard a couple of things there that I think are

16    important to address in framing this issue because as Your

17    Honor points out, there are a myriad of these issues that

18    could arise out of this privilege objection.

19          And the first is:  Thematically, the concept that

20    Plaza hasn't challenged these things in the last year and a

21    half.

22          There were scores and scores of privilege

23    objections, and there's no rule obviously that says we have

24    to come and move to compel on something in order to ask the

25    question at trial.

33

1        What really jumps out at me is in a couple

2   places -- and it's not just crime fraud because that wasn't

3   taken to the Fourth Circuit relative to Mr. Barron for

4   sure -- but it's just fundamentally are these things

5   privileged at all?

6        For example, we highlighted on Page 7 of our

7   opposition brief an exchange with Mr. Barron wherein -- in

8   which Mr. Bosch asked questions getting to:  What was your

9   instruction as to what you can disclose and what you couldn't

10  disclose?  Object.  Instruct him not to answer.

11       An instruction to the purported representative of

12  the client as to what they can disclose and what they can't

13  disclose is not a privileged communication as I've ever

14  understood the privilege.

15       And so they're not talking about privileged

16  communications even to begin with totally apart from the

17  notion that this individual, they said in their papers, well,

18  he really wasn't ever a corporate officer.  He didn't

19  share -- he wasn't corporate secretary and General counsel.

20  He was just their lawyer.

21       Well, he was just their lawyer until they said,

22  "Here's the person you ask.  Here is our spokesperson."  And

23  then he had a different role.  And you've got this selective

24  disclosure of information, including in his March 30, 2018,

25  letter, which they want to use, which says to Plaza:  Tenant

1   has told me this.  Tenant has told me this.  Tenant has

2   informed us since obtaining the assignment, it has paid

3   monthly.

4           THE COURT:  Sorry.  You're saying this is what

5   Barron says?

6           MS. BAUM:  Yes, Your Honor.  What Mr. Barron says

7   in a March 30, 2018, letter:  Tenant advises me this.  I

8   understand this.  I understand this.

9           So, he's doling out snippets of information, and

10  their position is:  That's it.  You can't inquire as to

11  anything else.  It's as Your Honor said, your Honor hit it

12  right on the nail on the head:  It's the sword and the

13  shield.

14          You can't, to begin with, starting in 2018 say,

15  "Here's our spokesperson and he's going to tell you tenant

16  has informed us that" blah, blah, blah.  Or, "We understand

17  that tenant is doing this."  We can't hear anything else that

18  they told us.

19          And, more fundamentally, you can't inquire as to

20  what the parameters were and who gave those parameters of

21  what you could disclose and what you couldn't.  That's a

22  really important issue.

23          And, frankly, I'm not sure how much it matters what

24  the answer is, but -- and Plaza may have made a decision it

25  wasn't worth it to tee it up because you don't need to know

1  in advance of trial the answer to that question as a

2  discovery matter.  Try to conserve some judicial resources.

3  But it's fundamentally not privileged.

4          And the fact that it wasn't challenged in a motion

5  to compel to burden this court with more motions in this case

6  doesn't mean that somehow Plaza doesn't get to ask Mr. Barron

7  on the stand, "What were your instructions as to what you

8  could and couldn't?"

9          Now, maybe there is some tangential issues that get

10 into advice of counsel.  But instructions from the client and

11 conveying information that could and could not be shared when

12 your designated representative for communicating

13 information -- could have been a lawyer, could have been

14 anybody -- it doesn't make it privileged.  That's not an

15 attorney/client communication fundamentally.

16          THE COURT:  Ms. Kropf.

17          MS. KROPF:  Mr. Barron testified, Your Honor, that

18 the information in the letters came from his clients, from

19 Mr. Rubin and Mr. Taylor.  He testified about the source of

20 them.

21          Then what Your Honor had said in advance of

22 Mr. Barron's deposition is:  Your concern was that we, Rock

23 Springs Drive was going to have Mr. Barron say:  I can't tell

24 you who made the decision and that our principals were going

25 to say the same.

36

1          But that's not at all what happened.

2          Your Honor said during -- and I forget which

3   hearing it was -- so long as someone on our side was going to

4   explain where the decision came from about what to disclose

5   with respect to IWA's involvement in Rock Springs Drive, that

6   it wouldn't -- you weren't going to pierce the privilege.

7   And so Mr. Taylor testified about that.

8          So Mr. Barron absolutely -- it's a misstatement to

9   say that he didn't.  He said the information in the

10  letters -- and I think that letter in particular came from

11  Mr. Rubin.  Mr. Rubin is the day-to-day person who handles a

12  lot of the property.  Mr. Barron absolutely said that and I

13  didn't stop him from saying it.

14         Again, what they're trying to do, Your Honor, is

15  get deeper than that.  They want Mr. Barron's legal advice to

16  his clients about what did and didn't have to be disclosed

17  legally.

18         THE COURT:  I don't hear them saying they want his

19  legal advice.  He just wants to know what -- tell it -- you

20  talked to this man.  Tell us what we want to know.

21         MS. KROPF:  And he is -- can do that, your Honor.

22  But what he doesn't need to do -- and I don't understand why.

23  He is the lawyer for the entity.  That is it.  And I

24  understand that they want to characterize it in a different

25  way, Your Honor.

37

```
1         Mr. Barron was hired -- and he testified during his
2    deposition the only role he had was as a lawyer to Rock
3    Springs Drive, okay.  So to allow them to characterize his
4    representation is contrary to the facts, and they aren't
5    allowed to recharacterize it in that way.
6         In the same way, Your Honor, if Mr. Barron
7    testifies, you know -- and you're going to say he has to talk
8    about what he said to his clients, then I guess we get to ask
9    Mr. Camalier what he talked about with Mr. Bosch, who was
10   their person communicating with Rock Springs Drive.  What was
11   behind their letters?  What were the communications there?
12   It goes both ways.
13        And they have been unwilling -- of course, we were
14   not allowed to depose Mr. Bosch.  I was appropriate.  I did
15   not ask questions of Mr. Camalier.
16        THE COURT:  Let me make just a comment on that.  A
17   lot of your discovery motions came at the last minute after
18   extended discovery when the Court was trying to close it down
19   and move this case forward.  So, to act as if you have
20   somehow been prejudiced in your pursuits, they came late in
21   the day.  And the Court certainly has discretion to say:  Too
22   late to go forward.  Keep that principle in mind when you say
23   we were precluded from ABC.
24        MS. KROPF:  Understood, Your Honor.  And I think
25   now it is too late for them to do the same.  If you were
```

1  unhappy about us filing in I think September of 2023 -- both
2  sides filed at the same time.  We submitted it.  We submitted
3  them.  We understood your point.  But, Your Honor, if it was
4  too late then, it's hard to understand now, three weeks
5  before trial, that it's time to evaluate this.

6          THE COURT:  All right.

7          MS. KROPF:  And that's what troubles us here, Your
8  Honor, when we're sitting here and we're watching the Court
9  deny things for us --

10         THE COURT:  Now, look, now look, I need to sort of
11 corral myself.  There's been a lot of accusations of bias on
12 my part.  I've been a judge 40 years.  Making my best calls
13 in a difficult case which has been contentious.  So, when I
14 hear you say "you're making calls in their favor and against
15 us" and then you argue that somehow that demonstrates bias,
16 it really doesn't have any place.  So, move on from that.
17 I'm making the rulings on the best way that I can do.  You
18 keep that in mind when you argue.

19         MS. KROPF:  Understood, Your Honor.  But I just ask
20 that if you're going to consider the time frame of our motion
21 in August of 2023 or September of 2023, you consider the fact
22 that what they're doing now is making a motion for more
23 discovery.  They're saying:  We didn't bother doing it during
24 discovery.  We want to ask him on the stand knowing that we
25 are going to -- we will assert privilege.  I will go ahead

39

1   and let you know.  We will assert it.  If they plan to ask
2   those questions, --
3           THE COURT:  All right.  Well, let's leave it at
4   that.  I've heard your argument.  Let me respond for a
5   moment.  You take a seat.
6           MS. KROPF:  Yes, Your Honor.
7           THE COURT:  The problem that I think defendants
8   have in this case, whether you like it or not, is you were
9   told -- that plaintiffs were told "talk to this guy."  When
10  he would ask, "tell us what's going on."  And then when they
11  go to talk to him, apparently he shuts down.
12          Now, there may be areas where he isn't obliged.
13  But when he shuts down, they want to basically say "these
14  folks declined to give us answers to our questions."
15          Now, I know apart from that, it's defendants' view
16  that "we had no obligation to do it."  Well, we'll see
17  whether the jury agrees with that or not.
18          But apart from that, when you tell the plaintiff
19  "go ahead and talk to this gent" and he makes certain other
20  statements, you're into a serious waiver of privilege
21  situation.  And that's a ruling that the Court would make.
22  And although I don't need to make it right now, I'm inclined
23  to make it when it comes up, that he has waived any privilege
24  when he is told by your clients "he's the man to talk to."
25  Now that's the problem.

1            You can't have it both ways.  You can't say talk to

2   him and then say well he can't talk to you.  That's not the

3   way it is.  Now, you may not have intended it, but that's the

4   problem that you've got.

5            Now, the issue is going to be -- and you need both

6   sides give thought.  What do we do when you do say privilege?

7   And I say well, Counsel, we'll do this at the bench.  My

8   ruling is that you waived the privilege based on what went on

9   here.

10           What do you think?  You say now well you can't tell

11  the jury it can make any kind of inference from that, I

12  wonder?

13           MS. KROPF:  We'd like to have the opportunity to

14  take it up to the Fourth Circuit a third time.

15           THE COURT:  In the middle of the trial, no.

16           MS. KROPF:  No.  That's why this is too late, Your

17  Honor.  If they wanted to do this, they should have done it

18  during discovery.  Your Honor, they are effectively

19  precluding us --

20           THE COURT:  The trial is going forward, Ms. Kropf.

21  We are not going up to the Fourth Circuit again.

22           MS. KROPF:  I understand, Your Honor.

23           THE COURT:  You can preserve your objection.

24           MS. KROPF:  I would like to preserve it.

25           THE COURT:  Well, sure.

41

1         MS. KROPF:  I am interrupted.  I would like to
2    preserve it.

3         If Your Honor is going to rule during trial that
4    the same objections that I made during that deposition that
5    there has been a waiver of privilege, then we would like the
6    opportunity to take it up to the Fourth Circuit.  We can do
7    it on an emergency basis, Your Honor.  But we can do it and
8    they can look at it a third time to decide whether or not
9    there was a waiver.

10        I will note, Your Honor, that for the plaintiffs,
11   Mr. Bosch was their spokesperson, as well.

12        THE COURT:  I don't want to hear about Mr. Bosch.
13   You were not told to talk to Mr. Bosch about my view.

14        MS. KROPF:  Yes, Your Honor, we absolutely were.

15        THE COURT:  Ms. Kropf, have a seat.  Please make a
16   seat.  You made your point with some insistence.  I'm going
17   to hear plaintiff's response to what I said about the
18   potential waiver issue.

19        MS. BAUM:  Your Honor, as I mentioned earlier, we
20   agree that has been a waiver.  I think there are two issues
21   here.

22        THE COURT:  I'm sorry.  Say that again.

23        MS. BAUM:  Your Honor, I agree, as I stated
24   earlier, there has been waiver through designation, through
25   the letter that selectively provided information.

1    And then, more pointedly, there's a more
2  fundamental issue with the existence of the privilege to
3  begin with regardless of the role that Mr. Barron took,
4  although I guess it's related, wherein, I want to read the
5  question specifically by Mr. Bosch.  "You were advised by
6  your client as to what information you could disclose?"

7         "Objection.  I instruct you not to answer."

8         It goes to an instruction.  An instruction from a
9  client "you are to do this and not this" is not a privileged
10 communication to begin with.  So, and certainly in this
11 context where he's the spokesperson.

12        So, I really don't understand the notion that we
13 are too late.  This is the defendant's motion.  And we didn't
14 have to do any discovery on this at all.  We could call
15 Mr. Barron and ask the questions for the first time at trial.

16        We're not -- the argument that we are asking for
17 discovery too late?  We're not asking for discovery.  We want
18 to ask questions eliciting nonprivileged information at
19 trial.  That's all.

20        THE COURT:  Let me ask you, though, let me go back
21 to my question.  Assuming that, as Ms. Kropf says, she will
22 raise the privilege issue and she would be overruled on that,
23 what is the jury to be told about the fact that he says "I
24 decline to answer" and then the Court says well, A, either he
25 must answer or he may say "I decline to."  Is there then an

43

1  inference that the jury is entitled to draw from it?

2          MS. BAUM:  I think that if there is a ruling by the

3  Court that it were privileged, that the information were

4  privileged and he didn't answer, you can't draw an inference.

5          If he sits there and declines to answer in the face

6  of Your Honor's ruling, I think there could be an inference.

7          THE COURT:  Well, what is the inference?  You may

8  infer whatever you care to from the fact that he has declined

9  to answer?  Does the Court say you must answer?  Does the

10 Court say to the jury he has declined to answer and you may

11 draw from that declination any inference that you care to?

12         MS. BAUM:  I think it would be an adverse inference

13 instruction similar to --

14         THE COURT:  What's adverse?  Because there's a

15 content to it.  Adverse meaning that -- it's not a positive

16 or negative.  The question is what were you told?

17         MS. BAUM:  What were you instructed?

18         THE COURT:  Let me go back to visit in a more

19 generic way.  It seems to be the part the plaintiff is trying

20 to show in this case is that there was a refusal to give

21 answers.

22         MS. BAUM:  Correct.

23         THE COURT:  Is that really disputed?  There was a

24 refusal to give answers?

25         MS. KROPF:  They have the letters, Your Honor.

44

1  They can argue what they want.

2          THE COURT:  But it was not complete, that's their

3  argument.

4          MS. KROPF:  Well, they are welcome to argue that.

5  They don't need to invade the privilege to do that.

6          THE COURT:  Let me pose it that way.  Clearly, it's

7  a fair argument on the record of this case that their

8  disclosure was at best incomplete.  That's a fair argument.

9  That's a fair argument.

10         Now, what about that?

11         And let me say something else in conjunction with

12 that.  I don't know that either party raised this in the

13 context of the briefing, but I thought plaintiff had to come

14 to court to get the court order to order them to disclose

15 certain information.  Does that factor into the case?  That

16 plaintiff came to the Court and was required -- or at least

17 their view was they didn't have enough information and were

18 compelled to come to Court to get an order to get

19 information?

20         I'm trying to factor out how you propose to work

21 with that procedural history.

22         MS. BAUM:  I think it does, Your Honor.  And I

23 think being able to explain to, if there's a jury here, to

24 explain to the jury that we tried to get information here.

25         And I think it is relevant whether the client

45

1  instructed the lawyer not to share certain information.  I

2  think that's relevant.  I think the jury is entitled to hear

3  it.

4          And so going back to Your Honor's question about an

5  adverse inference --

6          THE COURT:  Wait a minute, though.  Let's go back

7  and look at the record.  Either -- have a seat, Ms. Kropf.

8          You called Mr. Barron as a witness.  And his answer

9  is the same.  You ask him what did your client tell you to

10  disclose?  And he says, "I'm not going to answer that."  Or

11  he may answer it in some ways.  That's been their position in

12  the case.  They don't have any obligation to tell you these

13  things.

14          And that's where we sort of get into the crunch

15  here because the answer may be:  Well, they do have a duty to

16  disclose.  Maybe fair dealing and good faith require it.

17  Maybe Rule 317 in the restatement second requires it.

18          They are suggesting that, no, we didn't provide the

19  information.  We're not going to provide the information.

20          I looked at it slightly differently that there

21  might be a waiver on the whole issue.  Not that's going to

22  tell you on the stand -- and I am hearing Ms. Kropf with her

23  argument that maybe she's saying she's going to instruct him

24  not say anything on the stand.  And then what?  And then she

25  wants to go the Fourth Circuit for the third time in the

1  middle of the trial.

2         You know, that's -- what about that?  What do you

3  think about going to the Fourth Circuit in the middle of the

4  trial?  This case will never get tried with all these

5  interlocutory appeals.

6         MS. BAUM:  We would like the case to just get

7  tried, Your Honor.

8         THE COURT:  The case will get tried.  Whether she

9  can get somehow get a stay from the Fourth Circuit to answer

10  each issue that I think you may find troublesome, I've got to

11  run the train here.  I can't just keep stopping to allow

12  independent Fourth Circuit advice.  That's not the way it

13  gets done.

14         MS. BAUM:  Cases that go up on issues that happen

15  at trial post trial all the time, including privilege.

16         THE COURT:  Well, I agree.  I agree with that.

17  It's just a ruling the Court has made.

18         MS. BAUM:  But I agree.  I want to be clear.  We

19  agree with Your Honor about privilege.  They identified

20  Mr. Barron as their spokesperson.  And to the extent that

21  they said he's our lawyer, he's our spokesperson, that's a

22  dual role.  And it was completely appropriate for Mr. Bosch

23  to be asking the questions on behalf of the plaintiff.

24         And the question is:  So, there's sort of two

25  levels of nondisclosure.  There's the nondisclosure of

47

1    substantive information and then there would be the

2    nonresponse on the stand if, in fact, he's instructed not to

3    answer when it's not privileged.

4         And I would argue that I think -- I'm just trying

5    to think through Your Honor's question about inference and

6    what does that do?  I think there's a waiver to begin with.

7    There's sort of two levels of issues substantively on the

8    privilege.  There's a waiver.  And instructions to a lawyer

9    to do something or not do something are not in and of

10   themselves privileged in that context.

11        And then, moreover, if it's not privileged and Your

12   Honor says it's not privileged, it's tantamount to

13   spoliation.  It's preventing the Court from having

14   information that is -- that was there.  So, I think it would

15   be similar to a spoliation instruction, Your Honor, would be

16   appropriate.

17        THE COURT:  Well, maybe I need to be a little

18   clearer with it.  My inclination is to find waiver here with

19   regard -- my turn, Ms. Kropf.

20        MS. KROPF:  Yes, Your Honor.

21        THE COURT:  My inclination is to find waiver here.

22   If you think it's appealable, you can certainly try it, but

23   I'm not going to stop the trial to let you try and do that.

24   This is a case that it doesn't seem to me to be only

25   extraordinary in the sense that the jury is going to hear the

48

1   man, when the Court overrules your objection, and he will

2   say, "well, I still refuse to answer," then the question is:

3   What is the jury going to be told the consequence of that?

4              MS. KROPF:  And, Your Honor --

5              THE COURT:  And that's plaintiff's view of the case

6   and they'll roll the dice on it, I guess.  And they win or

7   lose.  And then you -- who knows what the Fourth Circuit

8   would do for sure, but they can look at it after the fact.

9              Ms. Kropf?

10             MS. KROPF:  Your Honor, the Fourth Circuit has

11  plainly ruled a negative inference should not be drawn from a

12  proper invocation.

13             THE COURT:  And the proper invocation.  But it's

14  not proper.

15             MS. KROPF:  Your Honor, you haven't heard the

16  question or the answer.  So, I think prejudging whether or

17  not it's proper at this point is incorrect.

18             You asked them what they think the result would be

19  if it weren't answered.  The jury absolutely cannot be

20  instructed --

21             THE COURT:  They won't be instructed at that point

22  necessarily.

23             But here's the thing.

24             MS. KROPF:  Sure.

25             THE COURT:  This is why I need to hear questions

49

1   and answers.

2           MS. KROPF:  Right.

3           THE COURT:  I need to hear them.  So I can't rule

4   in a vacuum right now.

5           MS. KROPF:  Right.

6           THE COURT:  I agree that the fact that whatever

7   they asked him on deposition, they could use that, I suppose.

8   But they're going to be able to call him, as well, which is

9   an issue we'll come to again.

10          But that's where we are.  I need to hear specific

11  questions and specific answers.  It is clear there may be a

12  repository of questions that might be put to Barron that

13  really do invade the attorney/client privilege.  I haven't

14  heard them yet, but there may be.  I have to hear them as

15  they come.

16          Right now, when he's -- again, I'm giving you my

17  view -- that when he is told to be the guy to contact and he

18  basically says, "I'm instructed not to tell you anything",

19  then what?  What are they supposed to do?

20          MS. KROPF:  Your Honor, I don't want to re-argue

21  it, but there are long letters from Mr. Barron where he did

22  give information.  They can argue that wasn't enough and it

23  wasn't what they asked.

24          THE COURT:  But, but the letters that he gave and

25  the information would pose part of the waiver.  You can't be

50

1   selective.

2           MS. KROPF:  No.  They are letters to a third party.

3   There is absolutely no waiver in a lawyer writing a letter to

4   a third-party.

5           THE COURT:  Okay.  I simply need to see the

6   questions and answers.  Right now I think I'm inclined to be

7   where I am.  And I know where you are.  And you better

8   prepare for it.

9           MS. KROPF:  Understood, Your Honor.

10          And we just ask, then, since Your Honor hasn't

11  decided any questions or answers, that whoever is opening for

12  plaintiff not open with the argument that we are, quote,

13  "hiding behind the privilege."

14          THE COURT:  Are you intending to say that?  I think

15  the issue is:  Did you not disclose information?  Not you're

16  hiding behind privilege.  I don't think you need to argue

17  that.

18          MR. BOSCH:  Your Honor, until they invoke the

19  privilege, we are not going to be able to argue it.  We may

20  close with it they invoked the privilege improperly.  But we

21  have no intention in the opening to say it.

22          THE COURT:  I just have to see how it goes.  I

23  mean, again, asking me to make all these calls in advance, a

24  little hard.  But right now that's where I'm inclined.  Be

25  prepared for it, but I need to hear the specific questions

51

1  and answers.

2          Now, as long as we're talking about Mr. Barron,

3  let's take a moment and talk about what I understood to be

4  defendant's position, which is:  We're not making him

5  available to you.  We're going to call him.  But you'll have

6  to just base your call on -- your inquiry on

7  cross-examination.  Is that still your position?

8          MS. KROPF:  Your Honor, I'm going to phrase it a

9  little differently.  We plan to follow the Rules of Civil

10  Procedure.  They have the ability to subpoena Mr. Barron if

11  he lives here.  He does not.  He lives in Florida.  So, all

12  we are taking is the position that they are allowed to do

13  exactly what the rules permit him.

14          THE COURT:  Do you have authority for what you're

15  proposing?  I don't remember ever seeing that.  It's

16  particularly uncooperative, I might say.  Let me tell you how

17  it usually works in these cases.  Where you have a witness

18  that both sides are interested in, we try and accommodate the

19  witness to come only once so that they don't have to come at

20  the beginning of plaintiff's case and then two weeks later

21  come back from wherever they are in defendant's case.

22          So that, for example, here, it could be that Barron

23  gets called at the end of plaintiff's case and the beginning

24  of defendant's case.  And that way he's here physically for

25  both.

52

```
 1         But that's really the situation that it really
 2    seems unfair.  And he is, basically, if you will, a
 3    corporate, not "the" corporate representative, but someone
 4    involved in the litigation rather intimately that you want to
 5    call.
 6         So I don't -- I've never really run into the
 7    experience where you're saying "we're not going to make him
 8    available but we're going to call him in our case."
 9         I suppose the Court could subpoena him under the
10    circumstances, anyway.  I'm not absolutely iron bound by the
11    100-mile rule, I think you know that.
12         MS. KROPF:  And of course we would follow Your
13    Honor's ruling.
14         But in their brief, Your Honor, to be clear, they
15    said that what they plan to do at trial is to put Mr. Barron
16    on the stand and try to prove up crime fraud during the
17    trial.
18         As you can imagine, --
19         THE COURT:  I'm sorry.  I missed that.  Crime
20    fraud?
21         MS. KROPF:  Yes, they plan to put him up -- let me
22    find the footnote.  This is footnote 1 of their brief.
23    "Although the Fourth Circuit vacated this Court's production
24    order and made no determination of the crime fraud exception
25    does or does not apply to the circumstances of this case,
```

53

 1  Plaza does not concede that the crime fraud exception does
 2  not apply and reserves the right to make a further prima
 3  facie showing at trial, or otherwise, that the crime fraud
 4  exception obviates the privilege."
 5          And they do that in terms of Mr. Barron.
 6          As you can imagine, there's a little consternation.
 7          THE COURT:  Maybe I missed that.  Is that something
 8  you're pursuing?
 9          Who is going to argue that?  Ms. Baum, Mr. Bosch?
10  Maybe I missed that.
11          MR. BOSCH:  Your Honor, the notion that the Fourth
12  Circuit resolved that the crime fraud exception doesn't apply
13  is not accurate.  We do not intend to invoke the crime fraud
14  exception, but we reserve the right to prove through the
15  witnesses that the crime fraud exception applies.  So, when
16  this goes up to the Fourth Circuit --
17          THE COURT:  The crime fraud section applies.  The
18  rule, rather.  You're alleging criminal activity here?
19          MR. BOSCH:  No.  Fraud, Your Honor.
20          THE COURT:  And you're saying -- tell me again what
21  you're saying when you say "it applies."  What applies?
22          MR. BOSCH:  Well, so, again, it depends on the
23  proper scope of the privilege as defendants will invoke.
24          Let me give a hypothetical, Your Honor.
25          A question is directed to Mr. Feltman.

R.A.224

54

1  Mr. Feltman, recall, is IWA's representative, the other
2  witness they refuse to bring for our case-in-chief.  The
3  question is directed to Mr. Feltman:  At any time did
4  IWA consider defaulting after the expiration of the statute
5  of limitations?  If he testifies no, all right, then we want
6  to make a proffer to the Court that Mr. Feltman is lying
7  under oath.
8          THE COURT:  But you would make that at the bench.
9          MR. BOSCH:  We would make it at the bench.  We will
10 not argue crime frauds to the jury.  This is for the Court to
11 preserve that issue for appeal.
12         THE COURT:  I understand.
13         MR. BOSCH:  Thank you.
14         That was something I think in one of our telephone
15 call conferences I raised that issue.  What do you do if
16 somebody gets up and says something that is directly contrary
17 to an earlier statement?  Go ahead.
18         MS. KROPF:  Well, I think the Fourth Circuit spoke
19 pretty clearly about that.
20         THE COURT:  They want to make a record.  They're
21 not saying it should go to the jury.
22         MS. KROPF:  Understood, Your Honor.
23         THE COURT:  They want to make a record and
24 essentially ask the Fourth Circuit to re-visit it.  I don't
25 know that I can preclude them from making the record.

55

1          MS. KROPF:  Absolutely not.

2          I think we're talking about Mr. Barron and whether

3   or not he will be here.

4          Our plan was to call him in our case.  Of course,

5   Your Honor --

6          THE COURT:  Could you hold one second?

7          (Pause.)

8          Go ahead.

9          MS. KROPF:  Sure.

10         Our plan is to call him in our case, but we don't

11  know exactly how our case will pan out.  We are the

12  defendant.  We're going to see what case the plaintiff puts

13  on as we are entitled to do.

14         So right now he is on our list.  Our intention is

15  to call him.  And that's where we are.

16         They had the chance to depose him.  That is the

17  point, as we all know, when we take the deposition of an out

18  of state witness who may or may not be available at trial.

19  For subpoena power or for any other reason, you take the

20  deposition so you can present it at trial.  And they took

21  that opportunity.  They deposed him for hours and hours.  And

22  they can obviously use that deposition.

23         We have their deposition designations.  They've

24  designated substantial portions.  They have a video.  They

25  can absolutely put on what they need to put on in front of

56

1   the jury in their case.

2          So they're not being precluded from putting on

3   Mr. Barron's testimony.  They can put on what they obtained

4   during the deposition.

5          And that's the way this works.

6          We are looking at the Rules of Civil Procedure,

7   which give the 100-mile rule.  And they cannot subpoena him

8   to be here for trial.

9          Right now, we do hope to put him on, but we're not

10  sure because it obviously depends on the scope of their case.

11         And it's playing into our decisionmaking, Your

12  Honor, whether or not you're going to instruct him to answer

13  questions that we believe are privileged.  It's something I

14  discussed with him, obviously their firm's general counsel

15  and all that.  But we'll get the transcript and we'll

16  obviously discuss it with him.

17         But that will play into our decision of whether or

18  not it's necessary to bring him here.  Obviously, we can't

19  force him to come here, either.  If we wanted to subpoena

20  him, he is also outside.

21         THE COURT:  Why is he coming here voluntarily for

22  you?

23         MS. KROPF:  He would be coming voluntarily if he

24  believes it's appropriate and is not concerned about what

25  could happen on the stand and the accusations that they're

57

1  going to try to invoke crime fraud or that Your Honor will be

2  instructing him to answer questions that he believes are

3  privileged creates some uncertainty there that we'll need to

4  discuss with him.

5          THE COURT:  Well, as I say usually the case.  I

6  don't remember when it hasn't happened.  Parties cooperate

7  and he's called at one time and basically he's given an

8  opportunity to put on your case-in-chief while he's here even

9  though he's also here for their case-in-chief.  That's the

10 way it's worked to try and accommodate a witness who is

11 coming in from out of town.

12         Let me just check the rule on the 100-mile rule.

13 Do you have that?

14         (Pause.)

15         THE COURT:  Is Mr.-- am I correct that Mr.-- is he

16 an officer, as well?

17         MS. KROPF:  No, Your Honor.

18         THE COURT:  He's just the attorney?

19         MS. KROPF:  Just the attorney.

20         THE COURT:  Well, I thought you represented earlier

21 he had other positions.

22         MS. BAUM:  No, no.  I said that the defendants were

23 trying to analogize to a position and saying he's not both an

24 officer and an attorney.

25         My point, Your Honor, was slightly different, which

58

1   is that by making him their representative for purposes of
2   the very communication stream that is at issue in this case,
3   it's at the core of this case, they made him their
4   representative.  He was effectively the spokesperson for the
5   party.
6           THE COURT:  I don't have the case cites with me
7   now, but I had this issue come up in another case not long
8   ago where the person was 102 miles from -- and he was ordered
9   to appear notwithstanding.
10          And I think there is -- what do you have?  It is
11  slightly different.
12          Well, I don't know how -- I gather it is definitely
13  plaintiff's decision to call Barron -- you wish to call him
14  in person?
15          MR. BOSCH:  Your Honor, I have a proposal here.
16          So, what they want -- and you can see the
17  gamesmanship here.  They want the opportunity to call him
18  live, but they want to compel plaintiffs to present him
19  through video deposition.
20          THE COURT:  Right, I understand.
21          MR. BOSCH:  Which will be confusing and wasteful to
22  the jury.
23          If they have the ability to voluntarily bring
24  Mr. Barron, he should come once live for both parties.  If
25  they won't produce him live in our case then they, too,



# Transcript of Troy Taylor

**Date:** April 6, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3                CIVIL ACTION FILE

4              NO: 8:20-CV-01502-PJM

5    ---------------------------------------x
     ROCK SPRING PLAZA II, LLC,
6                        Plaintiff,

7

8    INVESTORS WARRANTY OF AMERICA, LLC,

9    et al.

10                       Defendants.
     ---------------------------------------x
11

12

13        VIDEOTAPED DEPOSITION OF TROY TAYLOR

14                 Miami, Florida

15            Thursday, April, 6, 2023

16

17   REPORTED BY:
                 BOBBIE ZELTMAN
18               Professional Realtime Court Reporter
                 and Notary for New York and Florida
19

20

21

22   Job Number    484448

1               C E R T I F I C A T E

2    STATE OF FLORIDA    )
                                    : ss.
3    COUNTY OF BROWARD   )

4             I, BARBARA R. ZELTMAN, a Professional
          Realtime Court Reporter and Notary Public,
5         within and for the State of Florida, do
          hereby certify:
6             That TROY TAYLOR, the witness whose

7    deposition is hereinbefore set forth, was

8    duly sworn by me remotely and that such

9    transcript is a true record of the

10   testimony given by the witness.

11            I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I

14   am in no way interested in the outcome of

15   this matter.

16            IN WITNESS WHEREOF, I have hereunto

17   set my hand this 12th day of April, 2023.

18

19                    *Barbara Zeltman*

20                    BARBARA R. ZELTMAN
                      Professional Realtime Reporter
21                    and Notary Public
                      COMM NO. HH 133639
22                    EXP:  August 9, 2025

Transcript of Troy Taylor
April 6, 2023                                  344

```
1         Q    So was a decision made that only a        03:12:24

2    lawyer for the entity would answer questions       03:12:26

3    about RSD?                                          03:12:30

4         MS. KROPF:  Objection as to               03:12:32

5      form.                                            03:12:32

6         A    The management committee basically       03:12:32

7    felt that Mr. Barron should be the point of        03:12:34

8    contact and basically we should have as            03:12:36

9    little contact with them as possible and           03:12:39

10   Mr. Barron would be the mouthpiece, at least       03:12:41

11   for the near term.                                 03:12:44

12 BY MR. BOSCH:                                        03:12:44

13        Q    You mean Mr. Barron in his capacity      03:12:45

14   as a lawyer would be the representative of         03:12:47

15   RSD?                                               03:12:52

16        MS. KROPF:  Objection as to               03:12:53

17     form.                                            03:12:53

18        A    I don't understand your nuance           03:12:54

19   between representative and legal -- your           03:12:57

20   parsing here is above my ability to                03:13:00

21   understand.                                        03:13:02

22 BY MR. BOSCH:                                        03:13:02
```